1  MCNUTT LAW FIRM, P.C.
   Daniel R. McNutt, Esq., Bar No. 7815
2  Matthew C. Wolf, Esq., Bar No. 10801
   Mark D. Hesiak, Esq., Bar No. 12397
3  11441 Allerton Park Drive, Suite # 100
   Las Vegas, Nevada 89135
4  Tel.: (702) 384-1170 / Fax.: (702) 384-5529
   drm@mcnuttlawfirm.com
5  mcw@mcnuttlawfirm.com
   mdh@mcnuttlawfirm.com
6  *Counsel for Defendant Detective John Squeo*

7              UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

8   JEANNE LLERA, and JORGE L. GOMEZ,        Case No.: 2:20-cv-01589-RFB-DJA
    as the appointed co-special administrators of
9   the estate of JORGE A. GOMEZ; JEANNE
    LLERA; and JORGE L. GOMEZ,
10                                            **Defendant Detective John Squeo's Motion
11      Plaintiffs,                           for Renewed Judgment as a Matter of Law
                                              or Alternatively for a New Trial and
12  v.                                        Remittitur**

13  LAS VEGAS METROPOLITAN POLICE
    DEPARTMENT; RYAN FRYMAN; DAN
14  EMERTON; VERNON FERGUSON;
    ANDREW LOCHER; JOHN SQUEO; and
15  DOES 2-10, inclusive,

16      Defendants.

17

18      Defendant Detective John Squeo respectfully moves under Fed. R. Civ. P. 50(b) and 59 for

19  renewed judgment as a matter of law (JMOL) or for a new trial and remittitur.  Squeo also incorpo-

20  rates all arguments raised by Defendant Sergeant Ryan Fryman in his post-judgment motions and

21  all arguments in Squeo's Rule 50(a) motion for JMOL filed on October 27, 2025.  (Dkt. 231.)

22

23

24

25

26

27

28

1

1

2

TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................................ii

I.    INTRODUCTION. ............................................................................................................2

II.   BACKGROUND...............................................................................................................6

III.  STANDARD OF REVIEW ...............................................................................................15

IV.   LEGAL ARGUMENTS....................................................................................................16

    A.   Squeo is Entitled to Qualified Immunity. .........................................................16

        1.   *Squeo's Actions Did Not Violate Clearly Established Law.*.............................19

        2.   *Clearly Established Law Does Not Protect Jorge Antonio's Conduct.*...........24

    B.   JMOL or a New Trial is Warranted Because No Evidence Supports the Verdict. ..............26

        1.   *Mt. Healthy Necessitates Entering JMOL on this Record.* .............................27

        2.   *No Evidence Supports the First Amendment Claim's First Prong.*................28

        3.   *No Evidence Supports the First Amendment Claim's Third Prong.*...............29

    C.   This Court's Answers to the Jury's Questions Necessitate a New Trial. ...........31

    D.   The Verdict's Inconsistency Necessitates a New Trial. ....................................36

    E.   This Court's Rulings on the Dispersal Order Necessitate a New Trial............36

    F.   The Grossly Excessive Verdict Necessitates Remittitur or a New Trial. ..........44

    G.   The Rejection of Squeo's Proposed Special Verdict Form and Special Interrogatories Was a Prejudicial Abuse of Discretion Requiring a New Trial.................................46

    H.   The Prejudicial Exclusion of Admissible Evidence Requires a New Trial.......47

V.    CONCLUSION................................................................................................................50

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

**Cases**

3

*Acosta v. City of Costa Mesa*,
  718 F.3d 800, 826 n.14 (9th Cir. 2013) ........................................................... 17, 43, 44

4

5

*Allen v. Iranon*,
  283 F.3d 1070, 1074–75 (9th Cir. 2002) ..................................................................... 27

6

7

*Alves v. Cnty. of Riverside*,
  135 F.4th 1161, 1168 (9th Cir. 2025) ......................................................................... 36

8

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ....................................................................................... 28

9

10

*Anderson v. Franklin Cnty., Mo.*,
  192 F.3d 1125, 1132 (8th Cir. 1999) ........................................................................... 22

11

12

*Arpin v. Santa Clara Valley Transp. Agency*,
  261 F.3d 912 (9th Cir. 2001) ....................................................................................... 33

13

14

*Ashcroft v. al-Kidd*,
  563 U.S. 731, 741 (2011) ................................................................................. 19, 24, 44

15

16

*Bailey v. Ramos*,
  125 F.4th 667, 685–86 (5th Cir. 2025) ......................................................................... 30

17

*Ballentine v. Tucker*,
  28 F.4th 54, 61 (9th Cir. 2022) .................................................................................... 16

18

19

*Bandary v. Delta Air Lines, Inc.*,
  623 F. Supp. 3d 1071, 1077 (C.D. Cal. 2022) .............................................................. 45

20

*Barnes v. Felix*,
  605 U.S. 73, 80 (2025) ........................................................................................... 19, 49

21

22

*Baskerville v. Mulvaney*,
  411 F.3d 45, 50 (2d Cir. 2005) .................................................................................... 24

23

24

*Batson v. State*,
  113 Nev. 669, 676, 941 P.2d 478, 483 (1997) ............................................................. 33

25

26

*Batyukova v. Doege*,
  994 F.3d 717, 722 (5th Cir. 2021) ..................................................................... 22, 23, 24

27

*Bauer v. Sampson*,
  261 F.3d 775, 783 (9th Cir. 2001) ............................................................................... 29

28

*Bell v. Williams*,
  108 F.4th 809 (9th Cir. 2024) .................................................. 5, 15, 44, 45

*Bello-Reyes v. Gaynor*,
  985 F.3d 696, 702 (9th Cir. 2021) ..................................................... 27

*Bidwell v. Cnty. of San Diego*,
  607 F. Supp. 3d 1084, 1096 (S.D. Cal. 2022) .................................... 21

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
  20 F.4th 1231, 1245 (9th Cir. 2021) .................................................. 39

*Blind-Doan v. Sanders*,
  291 F.3d 1079, 1082 (9th Cir. 2002) ................................................. 47

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
  963 F.3d 859, 869 (9th Cir. 2020) .................................................... 31

*Bollenbach v. United States*,
  326 U.S. 607, 612–613 (1946) .......................................................... 32

*Boquist v. Courtney*,
  32 F.4th 764, 777 (9th Cir. 2022) ..................................................... 30

*Boyd v. City & Cnty. of San Francisco*,
  576 F.3d 938 (9th Cir. 2009) ............................................................ 49

*Buck v. City of Albuquerque*,
  549 F.3d 1269, 1292 (10th Cir. 2008) ............................................... 40

*Burton v. City of Zion*,
  901 F.3d 772 (7th Cir. 2018) ............................................................ 49

*Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*,
  356 U.S. 525, 531 (1958) .................................................................. 44

*C.B. v. City of Sonora*,
  769 F.3d 1005, 1032–33 (9th Cir. 2014) ...................................... 18, 19

*Caballero v. City of Concord*,
  956 F.2d 204, 207 (9th Cir. 1992) .................................................... 32

*Capp v. Cnty. of San Diego*,
  940 F.3d 1046, 1053 (9th Cir. 2019) ................................................. 30

*Cervantes v. San Diego Police Chief Shelley Zimmerman*,
  2020 WL 5759752, at *7 (S.D. Cal. Sept. 28, 2020) .......................... 34

*Chaudhry v. Aragon,*
    68 F. 4th 1161, 1171 (9th Cir. 2023) ........................................................................30

*Cheairs v. City of Seattle,*
    145 F.4th 1233, 1235 (9th Cir. 2025) ..................................................................31, 34

*City of Houston v. Hill,*
    482 U.S. 451, 453–54 (1987) ............................................................................21, 33

*City of Tahlequah, Oklahoma v. Bond,*
    595 U.S. 9, 12 (2021) ........................................................................................17

*Claiborne v. Blauser,*
    934 F.3d 885, 893 (9th Cir. 2019) ........................................................................27

*Clem v. Lomeli,*
    566 F.3d 1177, 1182 (9th Cir. 2009) ....................................................................32

*Cnty. of Los Angeles, Calif. v. Mendez,*
    581 U.S. 420, 427–28 (2017) ..........................................................................19, 49

*Collins v. Jordan,*
    110 F.3d 1363 (9th Cir. 1996) ........................................................................40, 41

*Colony Cove Props., LLC v. City of Carson,*
    888 F.3d 445 (9th Cir. 2018) ..............................................................................15

*Colten v. Kentucky,*
    407 U.S. 104, 109 (1972) ..................................................................................34

*Corales v. Bennett,*
    567 F.3d 554, 562 (9th Cir. 2009) ........................................................................18

*Counterman v. Colorado,*
    600 U.S. 66, 69 (2023) ......................................................................................29

*Crawford v. City of Bakersfield,*
    944 F.3d 1070, 1079 (9th Cir. 2019) ....................................................................47

*D.C. v. Wesby,*
    583 U.S. 48, 63 (2018) ......................................................................................26

*D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60,*
    647 F.3d 754, 762 (8th Cir. 2011) ........................................................................29

*Dang v. Cross,*
    422 F.3d 800, 811 (9th Cir. 2005) ........................................................................32

*Daniels v. Keane*,
  1998 WL 213196, at *2 (S.D.N.Y. Apr. 30, 1998) ................................................. 34

*Dees v. Cnty. of San Diego*,
  960 F.3d 1145, 1153–54 (9th Cir. 2020) ............................................................... 16

*Deorle v. Rutherford*,
  272 F.3d 1272, 1280–81 (9th Cir. 2001) ............................................................... 20

*Doornbos v. City of Chicago*,
  868 F.3d 572 (7th Cir. 2017) ................................................................................. 49

*Dupree v. Younger*,
  598 U.S. 729, 731 (2023) ....................................................................................... 15

*Duran v. City of Douglas*, Ariz.,
  904 F.2d 1372, 1377 n.4 (9th Cir. 1990) ............................................................... 41

*Eng v. Cnty. of Los Angeles*,
  737 F. Supp. 2d 1078, 1094 (C.D. Cal. 2010) ....................................................... 27

*Est. of Aguirre v. Cnty. of Riverside*,
  131 F.4th 702, 706 (9th Cir. 2025) .................................................................... 16, 17

*Frank Briscoe Co. v. Clark Cnty.*,
  857 F.2d 606, 614 (9th Cir. 1988) .......................................................................... 46

*Gates v. Khokhar*,
  884 F.3d 1290, 1302 (11th Cir. 2018) .................................................................... 44

*Glenn v. Washington County*,
  673 F.3d 864, 871-80 (9th Cir. 2011) .................................................................... 20

*Gonzales v. Police Dep't, City of San Jose, Cal.*,
  901 F.2d 758, 762 (9th Cir. 1990) .......................................................................... 37

*Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark, N. J.*,
  366 F.2d 740, 742 (9th Cir. 1966) .......................................................................... 37

*Grady v. Cratsenburg*,
  769 F. Supp. 3d 609 (E.D. Mich. 2025) ....................................................... 34, 40, 41

*Graham v. Connor*,
  490 U.S. 386 (1989) .......................................................................... 19, 21, 22, 23, 24

*Hakopian v. Mukasey*,
  551 F.3d 843, 846 (9th Cir. 2008) .......................................................................... 28

v

*Harper v. City of Los Angeles*,
    533 F.3d 1010, 1021 (9th Cir. 2008) ................................................................15

*Harris v. Roderick*,
    933 F. Supp. 977, 983–84 (D. Idaho 1996), *aff'd*, 126 F.3d 1189 (9th Cir. 1997) ...................23

*Hartman v. Moore*,
    547 U.S. 250, 260 (2006) ..............................................................................30

*Hartzell v. Marana Unified Sch. Dist.*,
    130 F.4th 722, 744 (9th Cir. 2025) ..........................................................18, 22

*Hill v. City of Fountain Valley*,
    70 F.4th 507, 519 (9th Cir. 2023) ..........................................31, 33, 34, 43

*Hinton v. Pearson*,
    2021 WL 4521994, at *4 (D. Conn. Oct. 4, 2021) ....................................26

*Hung Lam v. City of San Jose*,
    869 F.3d 1077, 1086 (9th Cir. 2017) ..............................................................46

*In re Bard IVC Filters Prod. Liab. Litig.*,
    969 F.3d 1067, 1072 (9th Cir. 2020) ..............................................................15

*In re EPD Inv. Co., LLC*,
    114 F.4th 1148, 1161 (9th Cir. 2024) ............................................................27

*Index Newspapers LLC v. United States Marshals Serv.*,
    977 F.3d 817, 827 (9th Cir. 2020) ..................................................................18

*Jazzabi v. Allstate Ins. Co.*,
    278 F.3d 979, 981–82 (9th Cir. 2002) ......................................................33, 37

*Jenkins v. Town of Vardaman, Miss.*,
    899 F. Supp. 2d 526, 534 (N.D. Miss. 2012) ..............................................23

*Jerden v. Amstutz*,
    430 F.3d 1231, 1241 (9th Cir. 2005) ..............................................................37

*Josephs v. Pac. Bell*,
    443 F.3d 1050, 1062 (9th Cir. 2006) ..............................................................27

*K.J.P. v. Cnty. of San Diego*,
    621 F. Supp. 3d 1097, 1156–57 (S.D. Cal. 2022) ......................................44

*Kendall v. Brazil*,
    2025 WL 2521185, at *16 (E.D. Cal. Sept. 2, 2025) ..................................34

*Kirk v. Bostock,*
 2011 WL 52733, at *3 (E.D. Mich. Jan. 7, 2011) ................................................. 23

*Kisela v. Hughes,*
 584 U.S. 100, 104–5 (2018) ................................................................................... 19

*Knight through Kerr v. Miami-Dade Cnty.,*
 856 F.3d 795 (11th Cir. 2017) ............................................................................... 49

*Krechman v. County of Riverside,*
 723 F.3d 1104, 1109 (9th Cir. 2013) ..................................................................... 26

*Lane v. Franks,*
 573 U.S. 228, 243–47 (2014) ................................................................................. 18

*LaVine v. Blaine Sch. Dist.,*
 257 F.3d 981, 983 (9th Cir. 2001) ......................................................................... 24

*Llera v. Las Vegas Metro. Police Dep't,*
 2023 WL 6393092, at *15 (D. Nev. Sept. 30, 2023) ...................................... 19, 20

*Mackinney v. Nielsen,*
 69 F.3d 1002, 1007 (9th Cir. 1995) ....................................................................... 25

*Malley v. Briggs,*
 475 U.S. 335, 341 (1986) ....................................................................................... 17

*Mazzeo v. Gibbons,*
 649 F. Supp. 2d 1182, 1194 (D. Nev. 2009) .......................................................... 30

*Medvedeva v. City of Kirkland, Washington,*
 720 F. App'x 384, 386 (9th Cir. 2018) ................................................................... 34

*Menotti v. City of Seattle,*
 409 F.3d 1113, 1118, 1148–50 (9th Cir. 2005) ................................................ 40, 41

*Mitchell v. Kirchmeier,*
 28 F.4th 888, 896 (8th Cir. 2022) .......................................................................... 43

*Moist Cold Refrigerator Co. v. Lou Johnson Co.,*
 249 F.2d 246, 256 (9th Cir. 1957) ......................................................................... 27

*Molina v. City of St. Louis, Missouri,*
 59 F.4th 334, 338 (8th Cir. 2023) ....................................................... 18, 26, 30, 43

*Molski v. M.J. Cable, Inc.,*
 481 F.3d 724, 729 (9th Cir. 2007) ......................................................................... 27

*Montoya v. City of Albuquerque,*
   2004 WL 3426436, at *10 (D.N.M. May 10, 2004) ................................................23

*Moore v. Garnand,*
   83 F.4th 743, 750 (9th Cir. 2023) ....................................................................16

*Morales v. Fry,*
   873 F.3d 817, 821 (9th Cir. 2017) ........................................................15, 16, 17

*Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.,*
   104 F.4th 1128, 1139 (9th Cir. 2024) ........................................................26, 27

*Mt. Healthy City Sch. District Board of Education v. Doyle,*
   429 U.S. 274 (1977)................................................................................27, 28

*Mullenix v. Luna,*
   577 U.S. 7, 11 (2015) ....................................................................................17

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886, 933 (1982) ........................................................................25, 29

*Napouk v. Las Vegas Metro. Police Dep't,*
   123 F.4th 906, 922 (9th Cir. 2024) ................................................................17

*Nieves v. Bartlett,*
   587 U.S. 391, 402 (2019) ........................................................................18, 23

*Nitco Holding Corp. v. Boujikian,*
   491 F.3d 1086, 1089 (9th Cir. 2007) ............................................................15

*Ortiz v. Jordan,*
   562 U.S. 180, 184 (2011) ..............................................................................16

*Palin v. New York Times Co.,*
   113 F.4th 245, 277–78 (2d Cir. 2024) ..........................................................33

*Pavon v. Swift Transp. Co.,*
   192 F.3d 902, 906 (9th Cir. 1999) ................................................................15

*Peralta v. Dillard,*
   744 F.3d 1076, 1082 (9th Cir. 2014) ............................................................32

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists,*
   290 F.3d 1058, 1072 (9th Cir. 2002) ............................................................29

*Ponce v. Socorro Indep. Sch. Dist.,*
   508 F.3d 765, 766 (5th Cir. 2007) ................................................................29

*Poppell v. City of San Diego*,
    149 F.3d 951, 970 (9th Cir. 1998)............................................................27

*Price v. Elder*,
    175 F. Supp. 3d 676, 678 (N.D. Miss. 2016) .........................................23

*Price v. Sery*,
    513 F.3d 962, 967 (9th Cir. 2008) ..........................................................19

*Puente v. City of Phoenix*,
    123 F.4th 1035, 1061 (9th Cir. 2024)......................................19, 30, 41

*Quraishi v. St. Charles Cnty., Missouri*,
    986 F.3d 831, 838 (8th Cir. 2021) ..........................................................40

*R.A.V. v. City of St. Paul*,
    505 U.S. 377, 388 (1992)........................................................................29

*Reed v. Lieurance*,
    863 F.3d 1196, 1208 (9th Cir. 2017) ...............................................37, 40

*Reichle v. Howards*,
    566 U.S. 658, 664 (2012)........................................................................18

*Rice v. Morehouse*,
    989 F.3d 1112, 1120 (9th Cir. 2021) ......................................................17

*Robinson v. City of San Diego*,
    954 F. Supp. 2d 1010, 1023 (S.D. Cal. 2013) .........................................2

*S.B. v. Cnty. of San Diego*,
    864 F.3d 1010, 1013 (9th Cir. 2017) ......................................................20

*Sabbe v. Washington Cnty. Bd. of Commissioners*,
    84 F.4th 807, 825 (9th Cir. 2023)...........................................................17

*Sanchez v. City of Chicago*,
    700 F.3d 919, 927 n.3 (7th Cir. 2012).....................................................19

*Saucier v. Katz*,
    533 U.S. 194, 202 (2001)........................................................................17

*Shad v. Dean Witter Reynolds, Inc.*,
    799 F.2d 525, 526 (9th Cir. 1986)....................................................47, 48

*Shafer v. Cnty. of Santa Barbara*,
    868 F.3d 1110, 1118 (9th Cir. 2017).......................................................17

*Sidibe v. Sutter Health,*
    103 F.4th 675, 706 (9th Cir. 2024)....................................................................37, 47

*Smith v. Agdeppa,*
    81 F.4th 994, 1001 (9th Cir. 2023)....................................................................17, 20

*Snyder v. Freight, Const., Gen. Drivers, Warehousemen & Helpers, Loc. No. 287,*
    175 F.3d 680, 689 (9th Cir. 1999)..........................................................................44

*Spence v. State of Wash.,*
    418 U.S. 405, 411 (1974).......................................................................................18

*Stevens v. Duquette,*
    2022 WL 2292975, at *6 (N.D.N.Y. Apr. 19, 2022)...............................................26

*Tabares v. City of Huntington Beach,*
    988 F.3d 1119, 1125 n.6 (9th Cir. 2021)................................................................49

*Texas v. Johnson,*
    491 U.S. 397, 404 (1989).......................................................................................18

*Thunder Studios, Inc. v. Kazal,*
    13 F.4th 736, 746 (9th Cir. 2021)...........................................................................29

*United States v. 4.0 Acres of Land,*
    175 F.3d 1133, 1139 (9th Cir. 1999)......................................................................16

*United States v. Bagdasarian,*
    652 F.3d 1113, 1116 (9th Cir. 2011)......................................................................29

*United States v. Castillo-Mendez,*
    868 F.3d 830, 835 (9th Cir. 2017)..........................................................................32

*United States v. Frederick,*
    78 F.3d 1370, 1381 (9th Cir. 1996)........................................................................37

*United States v. Frega,*
    179 F.3d 793, 810 (9th Cir. 1999)..........................................................................32

*United States v. Gaudin,*
    515 U.S. 506, 508 (1995).......................................................................................39

*United States v. Poocha,*
    259 F.3d 1077, 1083 (9th Cir. 2001)......................................................................34

*United States v. Rundo,*
    990 F.3d 709, 717 (9th Cir. 2021)..........................................................................29

*United States v. Sutcliffe*,
    505 F.3d 944, 961 (9th Cir. 2007) ............................................................29

*Velazquez v. City of Long Beach*,
    793 F.3d 1010, 1018 (9th Cir. 2015) ........................................................15

*Virginia v. Black*,
    538 U.S. 343, 359–60 (2003) ....................................................................29

*Ward v. City of San Jose*,
    967 F.2d 280, 286 (9th Cir. 1991) ............................................................36

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227, 1238 (9th Cir. 2017) ........................................................37

*Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*,
    106 F.3d 894, 902 (9th Cir. 1997) ......................................................19, 29

*White v. Lee*,
    227 F.3d 1214, 1228 (9th Cir. 2000) ........................................................29

*White v. Pauly*,
    580 U.S. 73, 78–79 (2017) ........................................................................17

*Wilkerson v. Wheeler*,
    772 F.3d 834, 838 (9th Cir. 2014) ................................................31, 32, 47

*Wise v. City of Portland*,
    483 F. Supp. 3d 956, 967 (D. Or. 2020) ..................................................34

*Wood v. Moss*,
    572 U.S. 744, 758 (2014) ..........................................................................17

*Young v. Cnty. of Los Angeles*,
    655 F.3d 1156, 1170 (9th Cir. 2011) ........................................................34

**Statutes**

Nev. Rev. Stat. § 200.471 ..............................................................................28
Nev. Rev. Stat. § 203.020 ..................................................................7, 40, 41

**Rules**

Fed. R. Evid. 401 ...........................................................................................49
Fed. R. Evid. 403 ...........................................................................................49
Fed. R. Civ. Proc. 50 ..............................................................................passim
Fed. R. Civ. Proc. 59 ...............................................................................16, 27

xi

1

**I. INTRODUCTION.**

2      On the night of June 1, 2020, during George Floyd protests in downtown Las Vegas, Detec-

3  tive Squeo guarded the Lloyd D. George U.S. Courthouse to maintain order.  The Las Vegas Met-

4  ropolitan Police Department (Metro) issued a dispersal order after violent protesters injured offic-

5  ers.  Officers worked to clear the protesters, but some defied the dispersal order and moved south

6  toward the courthouse.  Hidden in the shadow of a tree near the courthouse Jorge Antonio Gomez

7  stood in a bulletproof vest, armed with a rifle.

8      After Jorge Antonio ignored repeated orders to leave, Detective Colin Snyder approached

9  to arrest him.  At that moment, Jorge Antonio reached for what appeared to be a baseball bat—but,

10  in truth, was his rifle—and raised it to strike Snyder.  Facing an escalating threat to Snyder, Squeo

11  fired beanbags, successfully halting the assault.  Jorge Antonio then fled northbound, brandishing

12  his rifle toward the Shooting Officers,[1] compelling them to use lethal force in self-defense.  Two of

13  those officers, each of whom prevailed at trial on every claim against them, fired rifles in self-

14  defense; the others fired handguns.  Jorge Antonio died from an unsurvivable gunshot wound to the

15  head from a rifle.  By returning a defense verdict for the two Shooting Officers who fired the rifles,

16  the jury declared Jorge Antonio's death lawful, necessary for self-defense, and justified.

17      Plaintiffs pursued three claims at trial against Squeo: (1) a First Amendment retaliatory force

18  claim; (2) a Fourth Amendment excessive force claim; and (3) a state law battery claim.  The First

19  Amendment claim was limited to the beanbags.  The sole questions for that claim were (1) whether

20  Jorge Antonio was engaged in constitutionally protected activity when Squeo fired the beanbags;

21  and (2) whether retaliation was the substantial motivation for the beanbags.  This Court correctly

22  prohibited the Estate from relying on an arrest to support the First Amendment claim because the

23  amended complaint did not allege that Squeo attempted to arrest Jorge Antonio without probable

24  cause.[2]  The sole question for the Fourth Amendment and battery claims (collectively, the Force

25

26  [1]   The Shooting Officers are Andrew Locher, Daniel Emerton, Ryan Fryman, and Vernon Fergu-
       son.

27  [2]   Even if this Court had allowed the Estate to pursue an unpled First Amendment retaliatory
       arrest claim, the jury's conclusion that Jorge Antonio threatened to assault Snyder would defeat the
28     claim. *See, e.g., Robinson v. City of San Diego*, 954 F. Supp. 2d 1010, 1023 (S.D. Cal. 2013)

1    Claims) was whether firing the beanbags was objectively reasonable.

2        The jury found in Squeo's favor on the Force Claims. That outcome was possible only if

3    the jury concluded that, under the totality of the circumstances, firing the beanbags was objectively

4    reasonable to stop Jorge Antonio from assaulting Snyder. But the jury found in favor of Jorge

5    Antonio's Estate on the First Amendment claim and awarded $1.5 million. This Court should enter

6    JMOL or grant Squeo a new trial or remittitur.

7        Squeo is entitled to qualified immunity because his actions violated neither a constitutional

8    right nor clearly established law. By ruling for Squeo on the Force Claims, the jury necessarily

9    found that Squeo's beanbags were objectively reasonable to avert an assault on Snyder. Squeo

10   violated no constitutional right because the First Amendment does not protect assaultive conduct.

11   And no clearly established law has ever held that objectively reasonable force used to avert an

12   imminent assault can violate the First Amendment.

13       No substantial evidence supports the verdict, and the clear weight of the evidence contra-

14   dicts it. The first prong of a First Amendment retaliation claim requires proof the plaintiff engaged

15   in protected activity. No evidence on this record supports that prong because by finding for Squeo

16   on the Force Claims, the jury determined that Jorge Antonio threatened to assault Snyder. Threat-

17   ening to assault someone is not a constitutionally protected activity.

18       The third prong for the First Amendment claim requires proof that retaliating against con-

19   stitutionally protected activity was the substantial motivation for the beanbags. Again, the jury's

20   verdict for Squeo on the Force Claims establishes that the beanbags were motivated not by retalia-

21   tory animus but by the lawful objective of protecting a fellow officer from imminent harm. The

22   verdict for Squeo also establishes that the but-for cause of the beanbags was Jorge Antonio's as-

23   saultive conduct instead of any constitutionally protected activity.

24       Respectfully, a new trial is warranted because this Court erroneously prevented the jury

25   from hearing the testimony of Metro Lieutenant Steven Riback, ruled as a matter of law that no

26   facts existed allowing Metro to enforce the dispersal order around the courthouse, and prohibited

27

28
───────────────
    ("Even if the arrest was unlawful, that would not justify or excuse an assault upon the officer.").

Squeo from relying on the dispersal order in his defense.  Riback's testimony was central to Squeo's defense, for it showed that (1) facts existed allowing Metro to enforce the dispersal order around the courthouse, and (2) Jorge Antonio violated the dispersal order.  Those facts would have convinced the jury that Jorge Antonio was neither protesting nor engaged in any other constitutionally protected activity.

Additionally, this Court usurped the jury's fact-finding role by deciding, based on its own review of videos, that no facts justified enforcing the dispersal order around the courthouse.  Besides improperly making factual findings that should have been made by the jury, that ruling reached the wrong conclusion, is not supported by substantial evidence, and is contrary to the clear weight of evidence on this record, necessitating a new trial.  The ruling was also erroneous because the First Amended Complaint (FAC) admits that the dispersal order applied to the courthouse by alleging that Jorge Antonio was complying with the order and returning to his vehicle.[3]  Nowhere does the FAC allege that the dispersal order did not apply to the courthouse.  Respectfully, this Court ruled in the Estate's favor on an issue not in dispute in the operative pleading.

Respectfully, this Court erred in holding that Metro could not enforce the dispersal order around the courthouse.  The police have the authority to order violent or lawless assemblies to disperse and to arrest those who defy such orders.  A large, violent crowd assembled, and fireworks were fired at officers originating from in front of the courthouse.  By denying Squeo the opportunity to rely on the dispersal order and by inserting related language into the jury instructions, this Court prejudiced the jury's assessment of the First Amendment claim.  This Court also erred by prohibiting Squeo from defending his actions based on his understanding of his duty to enforce the dispersal order.  Actions motivated by one's understanding of official duties lack retaliatory animus.

Respectfully, this Court's answers to the jury's questions warrant a new trial because they were unresponsive, legally incorrect, and failed to dispel confusion.  After a mere two hours of deliberation, the jury inquired whether noncompliance with an officer's command could constitute

---

[3]    FAC ¶ 29, Dkt. 21, Feb. 17, 2021 ("In compliance with the order to disperse from law enforcement, DECEDENT left the BLM protest and began to walk towards his parked vehicle so he could leave the area.").

4

expressive conduct.  Over Squeo's objection, this Court instructed the jury that noncompliance could be expressive conduct if it satisfied the definition of constitutionally protected activity in the jury instructions.  That response failed to clear the jury's confusion and was legally incorrect, necessitating a new trial on de novo review.

The next day, on the day of the verdict, the jury asked whether ignoring an officer's command three times was unlawful or ***arrestable***, revealing the jury's misunderstanding that the First Amendment claim involved only beanbags and not an arrest.  This Court declined Squeo's request to correct that misunderstanding, providing instead an answer that failed to resolve the jury's confusion.  These prejudicial errors, subject to de novo review, necessitate a new trial.

The jury's $1.5 million award—grossly excessive, unsupported by the record, contrary to the evidence's clear weight, and based on speculation—requires remittitur or a new trial.  In the § 1983 case *Bell v. Williams*, 108 F.4th 809 (9th Cir. 2024), the Ninth Circuit found a $504,000 award grossly excessive, remanding for the plaintiff to choose between remittitur capped at $150,000 or a new trial.  The *Bell* plaintiff had severe pain during the ordeal and suffered emotional distress, but the ordeal lasted less than two minutes and resulted in only minor injuries.

Here, the jury's $1.5 million award to the Estate for the First Amendment claim is even more excessive and unsupported by the record than the award in *Bell*.  Although several beanbags struck Jorge Antonio in the legs and lower abdomen, potentially causing some bruises and pain, the Estate cannot recover any damages for those alleged injuries because firing the beanbags was objectively reasonable and justified, as the jury concluded.  Furthermore, only twelve seconds passed between the beanbags and the lawful, justified shooting of Jorge Antonio.  Thus, any violation of his First Amendment rights and any pain or trauma from the beanbags lasted no more than twelve seconds.  *Bell* found a $504,000 award excessive for an ordeal lasting less than two minutes and causing pain lasting for several days.  The $1.5 million award here is even less justifiable, given the jury's findings that the beanbags were justified and that a lawful rifle shot killed Jorge Antonio twelve seconds later.  Therefore, the court should reduce the verdict to $150,000, consistent with *Bell*, or grant a new trial on the First Amendment claim.

This Court's exclusion of relevant and admissible evidence related to Jorge Antonio's

conduct, possession of prohibited weapons, and statements advocating violence toward the police was prejudicial and necessitates a new trial.  Respectfully, this Court departed from established circuit precedent and failed to consider the relevance of the evidence to claims beyond the Fourth Amendment claim, *i.e.*, to the First Amendment claim.  It overlooked the option of instructing the jury to weigh the evidence for that specific claim only.  Even more, Plaintiffs' own statements to the jury mischaracterized the legality of Jorge Antonio's firearm possession and his demeanor, opening the door to the excluded evidence.  The excluded evidence would have proven that Jorge Antonio was not engaged in constitutionally protected activity but in a calculated confrontation with the police, changing the jury's assessment of the First Amendment claim and allowing Squeo to prevail.

Squeo is entitled to JMOL or a new trial for these reasons and others.

## II.  BACKGROUND.

The following facts derive from the trial transcripts in the record listed below:

| Trial Date | Day of Trial | Dkt. No. | Abbreviation |
|---|---|---|---|
| 10/20/2025 | 01 | 262 | Day-1-Tr. |
| 10/21/2025 | 02 | 227 | Day-2-Tr.-(Squeo) |
| 10/21/2025 | 02 | 263 | Day-2-Tr. |
| 10/22/2025 | 03 | 264 | Day-3-Tr. |
| 10/23/2025 | 04 | 265 | Day-4-Tr. |
| 10/24/2025 | 05 | 272 | Day-5-Tr. |
| 10/27/2025 | 06 | 267 | Day-6-Tr. |
| 10/28/2025 | 07 | 268 | Day-7-Tr. |
| 10/29/2025 | 08 | 270 | Day-8-Tr. |
| 10/30/2025 | 09 | 273 | Day-9-Tr. |
| 11/03/2025 | 10 | 274 | Day-10-Tr. |

The events occurred on the night of June 1, 2020, the third night of George Floyd protests in downtown Las Vegas.[4]  Squeo was a commercial robbery detective for Metro.[5]  He had received training from Metro on the First Amendment and had no personal objection to citizens protesting.[6]

---

4    Day-2-Tr.-(Squeo) 7:23–24.
5    Day-2-Tr.-(Squeo) 81:4–12; *Id.* 91:4–6.
6    Day-2-Tr.-(Squeo) 87:11–88:24.

He also had no personal opinions about the George Floyd protests or protesters.[7]  That night, Metro assigned Squeo to guard the Lloyd D. George U.S. Courthouse, along with other Metro commercial robbery detectives and U.S. Marshals.[8]  Metro tasked them with defending a rock quarry near the courthouse stairs and a command center in the courthouse parking lot.[9]

Squeo stood atop the courthouse's stairs on the north side of the staircase.[10]  He carried a shotgun with an orange stock loaded with beanbags.[11]  Metro trained Squeo that he could fire bean-bags only in response to assaultive behavior.[12]  Squeo elected not to wear a gas mask so that he could issue verbal commands, if necessary.[13]  He was the only officer at the scene without one.[14]

The interaction between Squeo and Jorge Antonio occurred about 45–60 minutes after Metro ordered protesters to disperse from downtown Las Vegas.  Under Nev. Rev. Stat. § 203.020, "If two or more persons assemble for the purpose of disturbing the public peace, or committing any unlawful act," the police can order them to disperse, and if they "do not disperse, on being desired or commanded so to do by" the police, they "are guilty of a misdemeanor."  Squeo received training from Metro regarding dispersal orders.[15]  Metro trained him that all officers who hear on their radio that Metro has given a dispersal order must immediately enforce the order.[16]

About 45–60 minutes before encountering Jorge Antonio, Squeo heard on his radio and learned from other officers that Metro had given a dispersal order a few blocks north at Las Vegas Blvd. and Fremont St.[17]  The radio broadcast did not inform Squeo of the order's language; only that Metro had given the order.[18]  Squeo played no role in issuing the dispersal order.  Those duties

---

[7]    Day-2-Tr.-(Squeo) 93:8–11.
[8]    Day-2-Tr.-(Squeo) 6:16–21; *Id.* 92:4–10.
[9]    Day-2-Tr.-(Squeo) 91:9–22.
[10]   Day-2-Tr.-(Squeo) 14:12–23; Ex. A (Trial Ex. 20–33, LVMPD 001410, Staircase Photo).
[11]   Day-2-Tr.-(Squeo) 5:12–15; Day-2-Tr. 12:13–13:10 (admitting Trial Ex. 20-112); Ex. B (Trial Ex. 20-112, LVMPD 002575) (photo of Squeo that night).
[12]   Day-2-Tr.-(Squeo) 51:4–6.
[13]   Day-3-Tr.-(Snyder) 54:2–7; Day-6-Tr.-(Dennett) 138:2–10.
[14]   Day-3-Tr.-(Snyder) 54:2–7.
[15]   Day-2-Tr.-(Squeo) 88:18–24.
[16]   Day-2-Tr.-(Squeo) 89:3–90:25.
[17]   Day-2-Tr.-(Squeo) 9:7–15.
[18]   Day-2-Tr.-(Squeo) 93:22–94:19.

1    fell upon Riback, who oversaw Metro's downtown area command that night.[19]

2        Riback and his team gave the dispersal order.[20]    At that time, there were "thousands and

3    thousands of people that extended out to the south" from Las Vegas Blvd. and Fremont St., poten-

4    tially "towards Bridger."[21]   The courthouse lies south of Las Vegas Blvd. and Bridger Avenue.[22]

5    Riback observed "wall-to-wall people."[23]   Some protesters started rioting by throwing batteries,

6    frozen water bottles, and rocks and firing fireworks, creating a "very volatile, very dangerous, very

7    violent" environment.[24]   Officers could not distinguish fireworks from gunshots.[25]   Describing the

8    chaos, Riback said, "[T]here w[ere] chunks of concrete.  People were destroying private property.

9    They were chipping off pieces of buildings and then using those to throw at -- at us who were

10   there."[26]   Riback saw officers injured from the rioters.[27]

11       Metro issued the dispersal order and commanded protesters "to go east on Fremont" around

12   10:50 p.m.[28]   The order was given over loudspeakers, and officers in the downtown area heard it

13   announced on their radio channel.[29]   The order told protesters that "they are to go east, immediately

14   to go east" away from Las Vegas Blvd. and Fremont St.[30]   Most of the protesters moved south in

15   violation of the order, causing Metro to follow the crowd and continue giving the order in "slightly

16   different location[s],"[31] including "at Bridger and Las Vegas Boulevard."[32]

17       Protesters were congregated "en masse"[33] at Bridger and Las Vegas Blvd., according to

18

19   [19]   Day-7-Tr.-(Riback) 170:2–18.
20   [20]   Day-7-Tr.-(Riback) 170:19–171:6.
     [21]   Day-7-Tr.-(Riback) 174:15–25; *Id.* 180:21–22 ("I would say almost for sure to Bridger ....").
21   [22]   Day-2-Tr.-(Squeo) 133:3–5.
     [23]   Day-7-Tr.-(Riback) 176:5.
22   [24]   Day-7-Tr.-(Riback) 171:12–172:23.
     [25]   Day-7-Tr.-(Riback) 172:24–173:4.
23   [26]   Day-7-Tr.-(Riback) 178:12–15.
     [27]   Day-7-Tr.-(Riback) 174:7–14.
24   [28]   Day-7-Tr.-(Riback) 177:15–17; *Id.* 194:17–195:2.
25   [29]   Day-7-Tr.-(Riback) 177:24–179:8.
     [30]   Day-7-Tr.-(Riback) 179:18.
26   [31]   Day-7-Tr.-(Riback) 186:7.
27   [32]   Day-7-Tr.-(Riback) 180:14–183:3; *Id.* 188:10–12 ("[A]s we would get … the crowd to disperse,
     we would then incrementally move in that south direction.").
28   [33]   Day-7-Tr.-(Riback) 183:21–184:2.

1   Riback.  He saw protesters throwing objects in front of or near the courthouse.[34]  While stationed

2   at that intersection, officers were targeted by skipping fireworks— "firebombs, essentially, coming

3   at us" —fired from around the front of the courthouse.[35]  The dispersal order ended "when the

4   crowd dispersed and [Metro was] able to maintain law and order again," which was around 3 a.m.

5   or 4 a.m.—four or five hours after Jorge Antonio was fatally shot at 11:22 p.m.[36]

6        The dispersal order applied to the entire downtown area covered by Squeo's radio channel.[37]

7   Similar to Riback's testimony, Squeo testified that officers pushed the crowd of protesters away

8   from Las Vegas Blvd. and Fremont St. and moved with the crowd until it broke into smaller

9   groups.[38]  As smaller groups passed by the courthouse, Squeo instructed them to continue moving

10  and leave the area in compliance with the dispersal order.[39]

11       As he stood atop the courthouse stairs, Squeo heard someone say "Who's that?" and spotted

12  Jorge Antonio hiding in the dark shadow of a tree next to a concrete wall near the courthouse

13  stairs.[40]  Squeo had not previously seen Jorge Antonio and knew nothing about him.[41]  Nor had

14  Squeo previously seen any other protesters in that spot along the wall.[42]

15       Nonparty Detective Boe Dennett was guarding the courthouse with Squeo that night.[43]  Like

16

17

18  [34]  Day-7-Tr.-(Riback) 197:19–24 ("THE COURT: You're saying you were present in front of or
        near the Federal Courthouse -- THE WITNESS: *Yes*. THE COURT: -- and you had things
19      thrown at you at that point. THE WITNESS: *Yes*.") (emphasis added); *Id.* 200:13–23 (Riback
        saw a large gathering in front of the courthouse after 11 p.m. on June 1, 2020).

20  [35]  Day-7-Tr.-(Riback) 198:1–19 ("… So if I am at the corner of Las Vegas Boulevard and Bridger,
        then ***they are 100 percent*** at some point ***in front of the*** property of -- of the ***courthouse***, as you
21      asked. THE COURT: You're saying you witnessed that or you're assuming that? THE WIT-
        NESS: That's -- no, I'm -- ***I witnessed that***.") (emphasis added).

22  [36]  Day-7-Tr.-(Riback) 191:21–192:1; Day-3-Tr.-(Ferguson) 62:16–18 (the fatal shooting occurred
        at 11:22 p.m.).
23
    [37]  Day-2-Tr.-(Squeo) 10:18–24.
24  [38]  Day-2-Tr.-(Squeo) 11:15–21.

    [39]  Day-2-Tr.-(Squeo) 11:22–12:2.
25
    [40]  Day-2-Tr.-(Squeo) 15:4–21; *Id.* 95:4–96:2; Day-3-Tr. 138:10–15 (admitting Trial Ex. 594-
26      1862); Ex. C (Trial Ex. 594-1862, LVMPD 003048) (providing an overhead view of the stairs
        and showing the tree closest to the stairs under which Jorge Antonio hid).

27  [41]  Day-2-Tr.-(Squeo) 14:24–15:3.

    [42]  Day-2-Tr.-(Squeo) 96:3–6.
28  [43]  Day-6-Tr.-(Dennett) 132:5–7; *Id.* 132:23–133:5; *Id.* 133:17–134:2; *Id.* 136:1–4.

                                            9

Squeo, he had not seen any other protesters along that wall.[44]  Snyder noticed that Jorge Antonio was "facing" the wall.[45]  Snyder "felt [Jorge Antonio's] actions were out of the ordinary for individuals we had dealt with that night, so it definitely had my senses heightened."[46]

Dennett shone his flashlight on Jorge Antonio as Jorge Antonio hid underneath the tree and observed that Jorge Antonio "was crouched down near what I thought was a bag.  And he was doing some sort of motion, I think I described it as him, like, taking off his belt."[47]  A video admitted as Trial Ex. 698 shows Jorge Antonio's stationary shadow underneath the tree and Dennett's flashlight beam.[48]  It "struck [Dennett] immediately as very odd that somebody would be there, in the shadows, crouched down.  He was not behaving like a normal -- what I would say a normal protester had behaved like the rest of the evening."[49]  Dennett said to Squeo, "John, hey.  I don't know what this guy is doing.  It -- something is off about this guy. We need to watch him."[50]

Besides Jorge Antonio's behavior and location, another unusual feature about him was his bulletproof vest.[51]  Squeo "had not seen [other] protesters that evening wearing" bulletproof vests.[52]  The bulletproof vest was so unusual that it made Squeo wonder whether Jorge Antonio was a U.S. Marshal.[53]  Squeo said to Jorge Antonio, "Who are you?",[54] and after realizing Jorge Antonio was a civilian, he commanded him to stay outside the pylons surrounding the courthouse stairs, to which Jorge Antonio or someone else responded, "What f[*****]g barriers?"[55]  Squeo was unsure if that

---

44   Day-6-Tr.-(Dennett) 140:7–12.
45   Day-3-Tr.-(Snyder) 34:2.
46   Day-3-Tr.-(Snyder) 55:12–14.
47   Day-6-Tr.-(Dennett) 140:13–24.
48   Day-6-Tr.-(Dennett) 142:12–144:20; Ex. D (Trial Ex. 698, LVMPD 005711) at 00:00–00:28 (showing Jorge Antonio's shadow underneath the tree).
49   Day-6-Tr.-(Dennett) 141:9–14.
50   Day-6-Tr.-(Dennett) 141:17–18.
51   Day-2-Tr.-(Squeo) 58:7; *Id.* 96:17–25; Day-6-Tr. (Jorge Luis) 64:18–65:10 (admitting Trial Ex. 594-1738); Ex. E (Trial Ex. 594-1738, LVMPD 002924) (photograph of Jorge Antonio's vest); Day-5-Tr. (Rayos) 62:13–24 (admitting Trial Ex. 26b); Ex. F (Trial Ex. 26b) (showing Jorge Antonio approaching the courthouse carrying a rifle and wearing a bulletproof vest).
52   Day-2-Tr.-(Squeo) 97:5.
53   Day-2-Tr.-(Squeo) 98:14–99:4.
54   Day-2-Tr.-(Squeo) 99:1–4; *Id.* 103:3–5.
55   Day-2-Tr.-(Squeo) 15:22–16:2.

1    comment came from Jorge Antonio or from someone else nearby.[56]

2        Squeo told Jorge Antonio that Metro had issued a dispersal order and that he was required

3    to leave the area.[57]  Jorge Antonio walked toward Las Vegas Blvd., then stopped and stood still,

4    forcing Squeo to re-issue the command.[58]  Squeo did not instruct Jorge Antonio to stop walking and

5    had no idea why he did so.[59]  Although he had not yet spotted a weapon in Jorge Antonio's posses-

6    sion, Squeo found it odd that Jorge Antonio's right arm stayed rigid along his right side while his

7    left arm swung with his stride.[60]  The right arm's rigidity also alarmed Dennett.[61]  Dennett thought

8    that Jorge Antonio was "acting not as everyone else had acted that night."[62]

9        Squeo loudly told Jorge Antonio, "'Police.  Keep walking south.  You've been given a dis-

10   persal order. Walk south.  Keep moving,' things of those nature."[63]  Following Squeo's commands,

11   Jorge Antonio began taking half steps but stopped walking yet again for several seconds.[64]

12       After Jorge Antonio stopped walking for a second time, Squeo announced, "Metro Police.

13   You're under arrest.  Put your hands up."[65]  Although the arrest is immaterial to the First Amend-

14   ment claim because the claim is limited to the beanbags, Squeo made the judgment-decision to

15   arrest Jorge Antonio for violating the dispersal order "[b]ecause [Jorge Antonio] had been given

16   three opportunities and commands to leave the area and he kept refusing to do so."[66]  By then,

17

18   _____
     [56] Day-2-Tr.-(Squeo) 99:11–14.

19   [57] Day-2-Tr.-(Squeo) 16:24–17:8; *Id.* 17:23–18:1; Day-6-Tr.-(Dennett) 141:25–142:5.

20   [58] Day-2-Tr.-(Squeo) 18:25–19:19; *Id.* 73:11–16 (admitting Trial Ex. 41a); Ex. G (Trial Ex. 41a,
         2Up Cameras Synced Video) at 00:00–00:28 (showing Jorge Antonio stop walking); Day-4-Tr.
         (Sylvia) 279:5–15 (admitting Trial Ex. 615); Ex. H (Trial Ex. 615, LVMPD 005628) at 0:00:00–

21       0:04:07 (showing aerial footage of Jorge Antonio); SD2 46:8–21 (admitting Trial Ex. 726); Ex.
         I (Trial Ex. 726) (showing zoomed-in aerial footage of Jorge Antonio).

22   [59] Day-2-Tr.-(Squeo) 105:8–11.

23   [60] Day-2-Tr.-(Squeo) 28:5–7; *Id.* 104:12–21.

     [61] Day-6-Tr.-(Dennett) 146:14–147:11.
24
     [62] Day-6-Tr.-(Dennett) 149:19–20.
25
     [63] Day-2-Tr.-(Squeo) 105:15–16; Day-3-Tr.-(Snyder) 19:7 (Snyder heard Squeo say "keep mov-
         ing" after Jorge Antonio came to a stop).
26   [64] Day-2-Tr.-(Squeo) 19:17–19; *Id.* 20:19–23; *Id.* 47:12–14; Ex. G (Trial Ex. 41a, 2Up Cameras
         Synced Video) at 00:28–01:05.
27   [65] Day-2-Tr.-(Squeo) 24:21–22; *Id.* 27:2–10 (Squeo commanded Jorge Antonio to raise his hands
         more than once); Day-6-Tr.-(Dennett) 151:10–13.
28   [66] Day-2-Tr.-(Squeo) 24:25–25:10; *Id.* 109:2–10.

1    Squeo "could tell that [Jorge Antonio] wasn't going to" comply with additional commands.[67]

2         At that moment, Squeo's arrest team, Snyder and Dennett, began descending the stairs to

3    arrest Jorge Antonio.[68]   Snyder was a "hands-on officer" designated to detain and arrest individuals,

4    if necessary.[69]   Dennett gave Snyder the arrest signal, and Snyder began descending the stairs to

5    arrest Jorge Antonio.[70]   Snyder was wearing a gas mask, and as he descended the stairs, a nearby

6    construction light created "a pretty bad glare on my gas mask."[71]   The light "[q]uite detrimental[ly]"

7    impacted Snyder's ability to see.[72]   Additionally, as he descended the stairs, Snyder had to glance

8    down to avoid tripping on the "unusual size[d]" steps.[73]

9         Snyder testified that in a perfect scenario, "Mr. Antonio would put his hands up.  He would

10   turn around.  He would be taken into custody and escorted into the Federal Courthouse booking

11   station."[74]  But that is not what happened.  Instead, as Snyder descended the stairs, Squeo saw Jorge

12   Antonio reach for, grab, and raise an item on his right side that Squeo believed was a baseball bat.[75]

13        Dennett likewise saw Jorge Antonio "holding something that I thought was a cylindrical

14   object, either a pipe or a bat."[76]   Dennett tried to yell something "like, 'Hey, he's got a bat or a pipe

15   or whatever.  He's got something'" because "[o]bviously, I didn't want my partner [Snyder] to be

16   hit with whatever this, you know, object was."[77]   Unbeknownst to the officers, the item was neither

17   a bat nor a pipe but a rifle that was "much thicker in girth compared to" other rifles.[78]   At that same

18   time, nonparty Officer Michael Lee saw Jorge Antonio's "right hand grab[] the pistol grip of the

19

20

21   [67]   Day-2-Tr.-(Squeo) 109:7–8.
     [68]   Day-2-Tr.-(Squeo) 26:3–7.
22   [69]   Day-3-Tr.-(Snyder) 35:13–21; *Id.* 41:17–42:10.
     [70]   Day-3-Tr.-(Snyder) 19:22–20:11; *Id.* 21:20.
23   [71]   Day-3-Tr.-(Snyder) 38:8–11.
     [72]   Day-3-Tr.-(Snyder) 39:22–40:3; *Id.* 46:5.
24   [73]   Day-3-Tr.-(Snyder) 45:24–47:7.
     [74]   Day-3-Tr.-(Snyder) 43:17–19; *Id.* 44:5–7.
25   [75]   Day-2-Tr.-(Squeo) 26:18–19; *Id.* 27:25–28:15; *Id.* 33:24–34:5; *Id.* 109:19–110:20.
26   [76]   D62 152:22–25.
     [77]   Day-6-Tr.-(Dennett) 153:5–11.
27   [78]   Day-2-Tr.-(Squeo) 116:20–117:20 (testifying regarding Trial Ex. 594-1019); Ex. J (Trial Ex.
28         594-1019) (Rifle Photo, LVMPD 002205); Day-2-Tr.-(Squeo) 117:14.

1    rifle," prompting Lee to yell, "Take your hand off the rifle."[79]

2    　　　　Upon seeing Jorge Antonio raise a perceived baseball bat and threaten to strike Snyder,

3    Squeo yelled out, "Bat.  He has something.  Beanbag,"[80] and discharged a beanbag within a "split

4    second."[81]  Squeo deployed beanbags because he "believed [Jorge Antonio] was raising that bat to

5    resist arrest and batter Detective Snyder."[82]  He believes he stopped Jorge Antonio from striking

6    Snyder.[83]  He aimed for Jorge Antonio's lower abdomen.[84]

7    　　　　Squeo had no reasonable force option available other than deploying beanbags because he

8    did not have a taser, Jorge Antonio was too far away for pepper spray, and Squeo "believed there

9    had to be immediate action."[85]  Squeo had no time to warn Jorge Antonio before firing beanbags

10   because Snyder "was running down the staircase.  The distance is closing.  The item is coming up.

11   There's no time to wait for compliance.  It was now make compliance."[86]

12   　　　　Squeo did not announce the beanbags on the radio because traffic was dedicated to rescuing

13   an officer who had been critically shot at Circus Circus, and Squeo did not have "time to get on the

14   radio to make an announcement of low lethal."[87]  These facts are not subject to dispute or debate:

15   the jury agreed with Squeo on all them by finding in his favor on the Force Claims.

16   　　　　After Squeo discharged beanbags, Jorge Antonio turned and ran northbound.[88]  While doing

17   so, he fell to the ground, rose, and continued running northbound, at which time Squeo realized the

18   perceived baseball bat was instead a rifle.[89]  Squeo testified, "In that moment when I heard the rifle

19   hit the ground, the polymer makes a very distinct sound when dropped.  And then as he begins to

20   _____

21   [79]  Day-7-Tr.-(Lee) 118:12–18; 119:4–126:15.
       [80]  Day-2-Tr.-(Squeo) 31:9–15.

22   [81]  Day-2-Tr.-(Squeo) 29:22.
       [82]  Day-2-Tr.-(Squeo) 110:17–20; *Id.* 111:15–19; 114:18–20.

23   [83]  Day-2-Tr.-(Squeo) 32:10:11.

24   [84]  Day-2-Tr.-(Squeo) 113:20–21.
       [85]  Day-2-Tr.-(Squeo) 112:14–113:16.

25   [86]  Day-2-Tr.-(Squeo) 31:22–25.

26   [87]  Day-2-Tr.-(Squeo) 17:8–11; *Id.* 55:4–5; *Id.* 56:10–11; Day-3-Tr.-(Ferguson) 66:13–23; Day-4-
             Tr.-(Locher) 16:12–13.

27   [88]  Day-2-Tr.-(Squeo) 33:24–34:5.

28   [89]  Day-2-Tr.-(Squeo) 49:23–25; Ex. G (Trial Ex. 41a) at 01:09–01:13 (showing Jorge Antonio fall,
             rise, and continue running northbound).

13

1    get back up, I can see it silhouetted and see the exact shape of a rifle."[90]  "[D]uring that turn and as

2    he started to run, that's when" Dennett realized, "That's a gun."[91]  No one—not even Jorge Anto-

3    nio's Estate—disputes that Jorge Antonio had a rifle throughout the incident.

4          Squeo "fired four to five"[92] beanbags because he believed Snyder "was still continuing to

5    make the arrest as Jorge [Antonio] was running away.  And I still delivered beanbag rounds in hopes

6    that he would comply and get to the ground or drop the baseball bat."[93]  It is unknown how many

7    beanbags struck Jorge Antonio.[94]

8          Snyder discontinued his foot pursuit as Jorge Antonio fell,[95] and Squeo "began yelling 'he

9    has a rifle or has a gun.'"[96]  Crowds were scattered around the general vicinity.[97]

10         As he ran northbound, Jorge Antonio put the rifle underneath his armpit and ran in a zigzag

11   fashion.[98]  He pointed the rifle "[s]traight out forward."[99]  The rifle was "[i]n his right hand tucked

12   underneath his right arm."[100]  Jorge Antonio was sprinting northbound when Squeo lost sight of

13   him, just seconds before the Shooting Officers fired lethal rounds.[101]  Squeo last saw the rifle's

14   muzzle pointed at a crowd around Las Vegas Blvd. and Bridger Avenue.[102]

15         As agreed to by the medical experts for both sides, Jorge Antonio died from an unsurvivable

16   rifle shot to the head fired by either Emerton or Locher—the only Shooting Officers who fired

17

18

---

19   [90]  Day-2-Tr.-(Squeo) 120:16–19.

20   [91]  Day-6-Tr.-(Dennett) 153:17–154:12.

     [92]  Day-2-Tr.-(Squeo) 53:16.

21   [93]  Day-2-Tr.-(Squeo) 50:8–17.

     [94]  Day-5-Tr.-(Omalu) 212:22–213:5.

22   [95]  Day-3-Tr.-(Snyder) 23:13–15; *Id.* 53:17–23.

23   [96]  Day-2-Tr.-(Squeo) 55:11–13.

     [97]  Day-2-Tr.-(Squeo) 22:14–16.

24   [98]  Day-2-Tr.-(Squeo) 122:20–124:2.

25   [99]  Day-2-Tr.-(Squeo) 123:22.

     [100]  Day-2-Tr.-(Squeo) 132:14; Day-6-Tr.-(Dennett) 157:2–7 (Dennett saw Jorge Antonio "grab[]
26        what I believe was the pistol grip immediately, stood up, and was running with the gun sticking
          straight out, away from his body, almost like a -- like a firing grip, right, is the best way I can
27        describe it.").

     [101]  Day-2-Tr.-(Squeo) 127:6–10; *Id.* 129:1–13.

28   [102]  Day-2-Tr.-(Squeo) 133:9–12.

1    rifles.[103]  The jury found in favor of Emerton and Locher on all claims.[104]  By doing so, the jury

2    found Jorge Antonio's death legal, necessary for self-defense, and justified.

3                                    **III.  STANDARD OF REVIEW.**

4            In civil jury trials, a party must file a pre-verdict motion under Rule 50(a), followed by a

5    post-verdict motion under Rule 50(b), to preserve challenges to the sufficiency of the evidence on

6    appeal.[105]  Those requirements apply only to evidentiary challenges; purely legal questions need

7    not be re-raised under Rule 50 to be preserved.[106]  One such legal issue is the second prong of

8    qualified immunity, "a question of law that only a judge can decide."[107]

9            JMOL is appropriate if no reasonable jury could find for the opposing party, with all rea-

10   sonable inferences drawn in the nonmovant's favor and without weighing evidence or judging cred-

11   ibility.[108]  The Ninth Circuit "review[s] de novo a denial of a Rule 50(b)" motion and will "uphold

12   the jury's verdict if it is supported by substantial evidence, which is evidence adequate to support

13   the jury's conclusion, even if it is also possible to draw a contrary conclusion."[109]

14           The Ninth Circuit reviews a ruling on a motion for a new trial for abuse of discretion and

15   will reverse the "grant of a new trial only if the jury's verdict is supported by the clear weight of

16   the evidence and 'must uphold the district court if any of its grounds for granting a new trial are

17

---

18   103  Day-5-Tr.-(Omalu) 173:17–22 (Plaintiffs' medical expert, Dr. Bennet Omalu, said a rifle caused
        the head wound); 171:4–5 (same); *Id.* 172:8 (Dr. Omalu said the head wound "was a fatal
19      wound"); *Id.* 188:10–12 (same); *Id.* 234:13–14 (same); *Id.* 244:18–21 (Dr. Omalu opined that
        Jorge Antonio could have survived but for the head wound) ("***If not for the wound of the head***,
20      if he had been transported to those hospitals, they may have stopped him from dying from the
        wounds of the trunk.") (emphasis added); Day-6-Tr.-(Vilke) 97:16–19 (Defendants' medical
21      expert, Dr. Gary Vilke, said the head wound was a fatal wound); Day-3-Tr.-(Locher) 211:12
        (Locher fired a rifle); Day-4-Tr.-(Emerton) 104:18–105:2 (Emerton fired a rifle); Day-3-Tr.-
22      (Ferguson) 62:23 (Ferguson fired a pistol); Day-4-Tr.-(Fryman) 171:24 (Fryman fired a pistol).
     104  Verdict Form, Dkt. 261, Nov. 3, 2025.
23
     105  *See, e.g., Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007).
24   106  *Dupree v. Younger*, 598 U.S. 729, 731 (2023); *see also In re Bard IVC Filters Prod. Liab. Litig.*,
        969 F.3d 1067, 1072 (9th Cir. 2020); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 906 (9th Cir.
25      1999).
26   107  *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).
     108  *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015); *see also Colony Cove
27      Props., LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018) (reversing the denial of JMOL).
28   109  *Bell v. Williams*, 108 F.4th 809, 818 (9th Cir. 2024) (quoting *Harper v. City of Los Angeles*, 533
        F.3d 1010, 1021 (9th Cir. 2008)).

1  reasonable.'"[110]  The substantial-evidence standard under Rule 50(b) and the clear-weight-of-the-

2  evidence standard under Rule 59 are distinct standards.  A court may grant a new trial under Rule

3  59 even if substantial evidence supports the verdict, making JMOL under Rule 50 inappropriate.

4  In *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1153–54 (9th Cir. 2020), the Ninth Circuit

5  reversed the district court's entry of JMOL on a Fourth Amendment seizure claim because "sub-

6  stantial evidence supports the jury's verdict" yet affirmed the grant of a new trial under Rule 59

7  "because the clear weight of the evidence does not support the jury's verdict ...."[111]  The lower

8  burden for obtaining a new trial under Rule 59 makes sense because if a Rule 50 motion is granted,

9  judgment is entered for the movant, whereas granting a Rule 59 motion is not case-dispositive.

10  ### IV.  LEGAL ARGUMENTS.

11  **A.    Squeo is Entitled to Qualified Immunity**.

12  "To overcome qualified immunity," the Estate "must show that" Squeo "(1) violated a fed-

13  eral statutory or constitutional right and (2) the unlawfulness of [Squeo's] conduct was clearly es-

14  tablished" as of June 1, 2020.[112]  "After trial, if defendants continue to urge qualified immunity, the

15  decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally

16  sufficient to overcome the defense."[113]

17  As explained below, there is insufficient evidence on this record to establish a constitutional

18  right violation, entitling Squeo to qualified immunity on the first prong.  The jury concluded that

19  Jorge Antonio threatened to assault Snyder.  The First Amendment does not protect violence.

20  Squeo is also entitled to qualified immunity on the second prong—a question of law for the

---

[110]  *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020) (quoting *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999)).

[111]  *See also Dees*, 960 F.3d at 1156 ("While substantial evidence supports the jury's verdict, the clear weight of the evidence does not compel it.").

[112]  *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quoting *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022)) (internal quotes and edits omitted) (granting qualified immunity on First Amendment claims.

[113]  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011); *see also Morales*, 873 F.3d at 824 (if denied pretrial, qualified immunity can be re-raised post-trial under Rule 50); *Est. of Aguirre v. Cnty. of Riverside*, 131 F.4th 702, 706 (9th Cir. 2025) (same).

16

court.[114]  It affords qualified immunity to officials unless their actions violate clearly established legal rights that any reasonable person would recognize under existing precedent.[115]  "Assessing qualified immunity after a jury verdict turns on the second, 'clearly established' prong, which requires deference to the jury's view of the facts."[116]  Even if an officer's conduct violated a constitutional right under the first prong, the officer is still entitled to qualified immunity under the second prong if the constitutional right was not clearly established.[117]

"The dispositive inquiry" for the second prong "is whether it would have been clear to a reasonable officer in" Squeo's "position that [his] conduct was unlawful in the situation [he] confronted."[118]  "This is a high standard[.]"[119]  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[120]

Qualified immunity protects even reasonable mistakes.  In *Acosta v. City of Costa Mesa*, 718 F.3d 800, 826 n.14 (9th Cir. 2013), the Ninth Circuit said that even "if we were to find that no probable cause existed, the officers would still be entitled to qualified immunity.  An officer is entitled to immunity where a reasonable officer would believe that probable cause existed, even if that determination was a mistake."  Qualified immunity rulings are reviewed de novo.[121]

This Court should grant qualified immunity to Squeo and enter JMOL.  Reversing the denial of JMOL in *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), the Ninth Circuit granted qualified immunity to a deputy because the plaintiff "fail[ed] to identify sufficiently specific

---

[114] *Morales*, 873 F.3d at 821. Because it is a question of law, the second prong for qualified immunity need not be re-raised under Rule 50(b) to be preserved for appeal. *See, e.g., Aguirre*, 131 F.4th at 706.

[115] *See, e.g.*, *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 825 (9th Cir. 2023) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017); *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

[116] *Aguirre*, 131 F.4th at 707.

[117] *See, e.g., Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 922 (9th Cir. 2024) ("The officers' conduct did not violate the Fourth Amendment, but even if it did, they would still be entitled to qualified immunity because they did not violate clearly established law.").

[118] *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)) (internal quotes and edits omitted) (granting qualified immunity on a First Amendment claim).

[119] *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023).

[120] *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021).

[121] *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021).

1    constitutional precedents to alert [the deputy] that his particular conduct was unlawful ...."  Like-

2    wise, in *C.B. v. City of Sonora*, 769 F.3d 1005, 1032–33 (9th Cir. 2014), the en banc Ninth Circuit

3    reversed the denial of JMOL for defendants McIntosh and Prock, finding they were entitled to

4    "qualified immunity on C.B.'s Fourth Amendment unlawful seizure claim ...."

5        The Estate brought a First Amendment claim alleging that Squeo fired the beanbags to re-

6    taliate against constitutionally protected activity.[122]  This Court correctly prohibited the Estate from

7    pursuing a First Amendment retaliatory arrest claim and limited the claim to the beanbags because

8    the claim does not allege that Squeo tried to arrest Jorge Antonio without probable cause.[123]  A

9    "retaliatory arrest claim must ***plead*** and prove the absence of probable cause for the arrest."[124]

10       To prevail on its First Amendment claim, the Estate must "show that" [1] Jorge Antonio was

11   "engaged in a constitutionally protected activity," [2] Squeo's "actions would chill a person of or-

12   dinary firmness from continuing to engage in the protected activity, and [3] the protected activity

13   was a substantial or motivating factor in [Squeo's] conduct."[125]  The pertinent analysis for the first

14   prong is "whether '[a]n intent to convey a particularized message was present, and [whether] *the*

15   *likelihood was great* that the message would be understood by those who viewed it.'"[126]

16       To overcome qualified immunity, the Estate must show that the First Amendment protected

17   Jorge Antonio's conduct and that Squeo's actions violated the First Amendment under clearly es-

18   tablished law.[127]  "Because no precedent squarely governs the specific facts at issue and because

19

20   _____

[122] First Am. Compl. ¶¶ 44–46, Dkt. 21, Feb. 17, 2021 (alleging Jorge Antonio was shot "several
times with both nonlethal and lethal rounds" for engaging in constitutionally protected activity).

[123] Day-7-Tr. at 257:1–3; *see also id.* 258:18–24; Day-10-Tr. 9:12–15; *Hartzell v. Marana Unified
Sch. Dist.*, 130 F.4th 722, 744 (9th Cir. 2025) (prohibiting an unpled First Amendment theory).

[124] *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (emphasis added).

[125] *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

[126] *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. State of Wash.*, 418 U.S. 405,
411 (1974)) (emphasis added); *see also Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).

[127] *See, e.g.*, *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 338 (8th Cir. 2023) (quoting *Reichle
v. Howards*, 566 U.S. 658, 664 (2012)) ("Getting past qualified immunity requires the plaintiffs
to show that it would have been 'sufficiently clear [to] every reasonable official ... that what
[they were] doing violate[d]' the First Amendment.") (granting qualified immunity on a First
Amendment claim); *see also Lane v. Franks*, 573 U.S. 228, 243–47 (2014) (granting qualified
immunity because although the First Amendment protected the plaintiff's speech, it was not
clearly established that a college president could not fire the plaintiff for the speech).

1    this is not an obvious case,"[128] Squeo is entitled to qualified immunity, as explained below.

2           **1.    *Squeo's Actions Did Not Violate Clearly Established Law*.**

3           Squeo is entitled to qualified immunity because no clearly established law placed the "consti-

4    tutional question beyond debate"[129] regarding whether the First Amendment outlawed Squeo's ac-

5    tions or protected Jorge Antonio's conduct.  Although this Court declined Squeo's request for a

6    special verdict,[130] it is possible nonetheless to "logically determine what facts a rational juror must

7    have found in order to reach"[131] its verdict for Squeo on the Force Claims.  Those factual findings

8    by the jury mandate granting Squeo qualified immunity.

9           To rule for Squeo on the Force Claims, the jury had to find that, under the totality of the

10   circumstances, Squeo had objectively reasonable grounds to fire beanbags to protect Snyder.

11   "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is

12   whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

13   confronting them, without regard to their underlying intent or motivation."[132]  "[T]he subjective

14   purpose for which an officer employed force against the plaintiff" cannot justify the force and is

15   immaterial.[133]  Furthermore, any "inquiry into the reasonableness of police force requires analyzing

16   the 'totality of the circumstances.'"[134]  These standards also govern the battery claim because that

17   claim has the same legal analysis as the Fourth Amendment claim.[135]

18

19

20   [128]  *Puente v. City of Phoenix*, 123 F.4th 1035, 1061 (9th Cir. 2024) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104–5 (2018)) (internal quotes omitted).

21   [129]  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

     [130]  Squeo's Special Verdict Form, Dkt. 239, Oct. 28, 2025; Day-8-Tr. 21:1–5.

22   [131]  *Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*, 106 F.3d 894, 902 (9th Cir. 1997).

23   [132]  *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also C.B. v. City of Sonora*, 769 F.3d 1005,

24   1037 n4 (9th Cir. 2014) ("subjective beliefs are not relevant" to the Fourth Amendment); *Price v. Sery*, 513 F.3d 962, 967 (9th Cir. 2008) ("[T]he reasonableness inquiry turn[s] upon the cir-

25   cumstances confronting the officer, rather than the officer's subjective beliefs or intentions ....").

     [133]  *Sanchez v. City of Chicago*, 700 F.3d 919, 927 n.3 (7th Cir. 2012).

26   [134]  *Barnes v. Felix*, 605 U.S. 73, 80 (2025) (quoting *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427–28 (2017)).

27   [135]  *Llera v. Las Vegas Metro. Police Dep't*, 2023 WL 6393092, at *15 (D. Nev. Sept. 30, 2023)

28   ("[W]hether deadly force constitutes a battery in Nevada is analyzed under the same standard as the Fourth Amendment excessive force claim.").

The law allowed Squeo to fire the beanbags only to halt an imminent threat of bodily harm to Snyder.  "The 'most important' factor for" the jury's consideration was whether Jorge Antonio "posed an immediate threat to the safety of the officers or others."[136]  Noting that firing beanbags "is permissible only when a strong governmental interest compels the employment of such force," the Ninth Circuit said in *Deorle v. Rutherford*, 272 F.3d 1272, 1280–81 (9th Cir. 2001) that "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  When it denied Squeo's summary-judgment motion, this Court noted that in *Glenn v. Washington County*, 673 F.3d 864, 871-80 (9th Cir. 2011), the "use of less-lethal beanbags against plaintiff was unreasonable even though the plaintiff had a weapon, because plaintiff made no threatening gestures and did not pose imminent threat of harm to any-one[.]"[137]  It also stated that "LVMPD policy states that projectile weapons should only be used against persons who are an imminent threat of harm to officers or others."[138]

Under the above legal standards, which were explained to the jury through the jury instruc-tion, the jury could rule in Squeo's favor on the Force Claims only if objective factors from all the circumstances justified Squeo's decision to fire the beanbags to protect Snyder from imminent as-sault.  This Court denied qualified immunity at the Rule 50(a) stage based on a question of fact regarding whether Squeo fired the beanbags in response to a threat, stating, "[I]t would be clearly established that you couldn't use that type of force against someone who didn't pose a threat."[139]  The jury has now spoken and concluded that Jorge Antonio posed a threat.

No clearly established law existing as of June 1, 2020, warned Squeo that objectively rea-sonable force used to stop an assault could violate the First Amendment rights of the *attacker*, Jorge Antonio.  "[F]or the purpose of deciding whether officers are entitled to qualified immunity, all that is required is a lack of clearly established law that would put them on notice that certain conduct

---

[136] *Smith*, 81 F.4th at 1004 (quoting *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017)).
[137] *Llera*, 2023 WL 6393092, at *10.
[138] *Llera*, 2023 WL 6393092, at *11; *see also* Day-2-Tr.-(Squeo) 51:4–6 (Metro trained Squeo that he could use beanbags only in response to assaultive behavior).
[139] Day-7-Tr. 208:18–19.

1    violates constitutional rights."[140]  No clearly established law put Squeo on notice that the beanbags

2    could be objectively reasonable under the Fourth Amendment to stop the imminent assault of

3    Snyder yet still somehow constitute a supposed First Amendment violation.

4         The notion that threatening to harm another person is a First-Amendment-protected activity

5    is so fundamentally at odds with clearly established precedent.  Analyzing whether an assailant

6    could be engaged in a First-Amendment-protected activity has never been recognized as a factor

7    under *Graham v. Connor*, 490 U.S. 386 (1989).  Recognizing a viable First Amendment retaliatory

8    force claim based on objectively reasonable force would radically transform *Graham*.

9         No case has ever held that objectively reasonable force used to stop an imminent assault

10   violates the First Amendment—unsurprisingly, given the absurdity of that proposition.  It would be

11   absurd if officers had to refrain from using objectively reasonable force out of concern that the force

12   could violate the *assailant's* First Amendment rights.  It would be equally absurd if, in the heat of a

13   dynamic situation, officers confronting an imminent attack had to contemplate whether using ob-

14   jectively reasonable force could violate the *attacker's* First Amendment rights.  Even the notion that

15   an attacker can exercise protected and actionable First Amendment rights while committing an as-

16   sault is absurd.  Imagine a case where an assailant runs at an officer while pointing a rifle and

17   yelling "Why don't you pick on somebody your own size?",[141] and then brings a First Amendment

18   retaliatory force claim after being justifiably shot by the officer.  Upholding the verdict in this action

19   will set dangerous precedent allowing those types of future First Amendment claims.

20        Plaintiffs cannot identify a single case finding that an officer violated the First Amendment

21   by firing objectively reasonable beanbags to stop an imminent assault.  This Court said that "the

22   First Amendment claim is actually one of the more complicated claims" in this case.[142]  It is not

23   just complicated; it is unprecedented.  "[N]either a case of controlling authority nor a consensus of

---

[140]  *Bidwell v. Cnty. of San Diego*, 607 F. Supp. 3d 1084, 1096 (S.D. Cal. 2022), *aff'd*, 2023 WL 7381462 (9th Cir. Nov. 8, 2023) (granting qualified immunity on a First Amendment claim).

[141]  *City of Houston v. Hill*, 482 U.S. 451, 453–54 (1987).

[142]  Day-7-Tr. 215:23–25.

1   cases of persuasive authority"[143] clearly establishes that Squeo violated the First Amendment.

2   　　　On the contrary, clearly established law entitles Squeo to qualified immunity. For starters,

3   the Estate's First Amendment retaliatory force claim is not viable as a matter of law, especially

4   when, as here, the jury has found the force objectively reasonable. As the Fifth Circuit has noted,

5   in *Graham*, 490 U.S. at 395, "the Supreme Court rejected the argument that excessive force could

6   be asserted 'under a "substantive due process" approach'" and "explicitly held 'that ***all claims*** that

7   law enforcement officers have used excessive force — deadly or not — in the course of an arrest,

8   investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amend-

9   ment and its "reasonableness" standard.'"[144] Holding an officer liable under the First Amendment

10  for using objectively reasonable force contradicts *Graham*.

11  　　　In *Batyukova v. Doege*, 994 F.3d 717, 722 (5th Cir. 2021), a deputy shot the plaintiff during

12  a traffic stop after the plaintiff "would not follow the deputy's commands," and the deputy "per-

13  ceived she might be reaching for a weapon ...." The Fifth Circuit affirmed the entry of summary

14  judgment on the Fourth Amendment claim. *Id.* at 725–729. "[L]eav[ing] the question for another

15  day" regarding "whether [*Graham*] precludes a First Amendment retaliation claim based on an of-

16  ficer's use of excessive force during a seizure," the Fifth Circuit affirmed the entry of summary

17  judgment on the First Amendment claim because no evidence showed that "the protected activity

18  … was a but-for cause of" the shooting. *Id.* at 730–731.

19  　　　As *Batyukova* notes, the law is unclear on whether a First Amendment retaliatory force

20  claim based on the same force challenged in a Fourth Amendment claim is viable. Various courts

21  have concluded that *Graham*'s "all claims" statement bars such claims. For example, *Anderson v.*

22  *Franklin Cnty., Mo.*, 192 F.3d 1125, 1132 (8th Cir. 1999) affirmed the dismissal of a First Amend-

23  ment claim because "the conduct at issue plainly implicates the protections of the Fourth Amend-

24  ment and … no cognizable § 1983 First Amendment claim has been asserted."

25

---

26  [143] *Hartzell*, 130 F.4th at 743 (granting qualified immunity on a First Amendment claim because a
27  　　singular district court decision was "neither a case of controlling authority nor a consensus of
    　　cases of persuasive authority").

28  [144] *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021) (internal citations omitted) (emphasis
    　　added).

1    *Price v. Elder*, 175 F. Supp. 3d 676, 678 (N.D. Miss. 2016) held that a First Amendment

2    claim cannot proceed if the "First Amendment theory is based on the same event [the plaintiff]

3    alleges as a basis for recovery under the Fourth Amendment."[145]  *Montoya v. City of Albuquerque*,

4    2004 WL 3426436, at *10 (D.N.M. May 10, 2004) concluded that "to the extent that the Plaintiffs

5    are alleging that the Defendants' use of force or decision to arrest constituted retaliation in violation

6    of the First Amendment, the Court finds that it must analyze these claims under the Fourth Amend-

7    ment."  Finding *Montoya* persuasive, *Kirk v. Bostock*, 2011 WL 52733, at *3 (E.D. Mich. Jan. 7,

8    2011) dismissed a First Amendment retaliatory force claim that "fails as a matter of law."

9    At bottom, the unsettled state of the law on this issue, as discussed in *Batyukova* and re-

10   flected by the cases noted above, entitles Squeo to qualified immunity.  Addressing a Fifth Amend-

11   ment claim alleging "abusive, irrational, or malicious" excessive force, *Harris v. Roderick*, 933 F.

12   Supp. 977, 983–84 (D. Idaho 1996), *aff'd*, 126 F.3d 1189 (9th Cir. 1997) noted uncertainty about

13   whether "the Fourth Amendment is the exclusive remedy for excessive force cases" and concluded

14   that "[e]ven if some uncertainty remains about the applicability of the Fifth Amendment to exces-

15   sive force cases, the Defendants are entitled to qualified immunity for this claim."  So too here

16   regarding the lack of clear law regarding First Amendment retaliatory force claims.

17   If presented with this question, and if it were to allow a First Amendment retaliatory force

18   claim to proceed independently from the Fourth Amendment (it would not, in light of *Graham*), the

19   Supreme Court would hold that a plaintiff pursuing a First Amendment retaliatory force claim must

20   plead and prove that the force was not objectively reasonable.  In *Nieves v. Bartlett*, 587 U.S. 391,

21   402 (2019), the Supreme Court held that a "plaintiff pressing a [First Amendment] retaliatory arrest

22   claim must plead and prove the absence of probable cause for the arrest."  The Supreme Court

23   would extend that same reasoning to a First Amendment retaliatory force claim.

24   Beyond the foregoing considerations, no clearly established law holds that objectively rea-

25   sonable force used to avert an imminent assault violates the First Amendment.  *LaVine v. Blaine*

---

[145]  *See also Jenkins v. Town of Vardaman, Miss.*, 899 F. Supp. 2d 526, 534 (N.D. Miss. 2012) ("An allegation that excessive force was used in the course of making an arrest is clearly a Fourth Amendment, not a First Amendment, matter.").

1   *Sch. Dist.*, 257 F.3d 981, 983 (9th Cir. 2001) concluded that actions taken "to avert perceived po-

2   tential harm" did not infringe the First Amendment.  *Baskerville v. Mulvaney*, 411 F.3d 45, 50 (2d

3   Cir. 2005) held that "[i]f the jury found, as it did, that the officers' use of force did not violate the

4   Eighth Amendment, they necessarily found that it was justified and applied in good faith, and given

5   this, there was no evidence that could have logically and consistently supported a finding for [the

6   plaintiff] on either his racial discrimination or religious retaliation claim."

7        In summation, as the Fifth Circuit noted in *Batyukova*, a case postdating Squeo's actions,

8   the viability of the Estate's First Amendment retaliatory force claim is uncertain based on the pro-

9   nouncement in *Graham*, 490 U.S. at 395 that "all claims that law enforcement officers have used

10  excessive force" must "be analyzed under the Fourth Amendment and its 'reasonableness' standard

11  ...." And even if it were to recognize the Estate's First Amendment retaliatory force claim as viable

12  (it would not, amid that quote from *Graham*), the Supreme Court would nevertheless require the

13  Estate to plead and prove that the force was not objectively reasonable.

14       On top of these considerations, no clearly established law recognizes that objectively rea-

15  sonable force used to stop an imminent assault can violate the *attacker's* First Amendment rights.

16  For these reasons, Squeo is entitled to qualified immunity on the Estate's First Amendment claim.

17       **2.    *Clearly Established Law Does Not Protect Jorge Antonio's Conduct*.**

18       Qualified immunity also applies here because no clearly established law placed the "consti-

19  tutional question beyond debate"[146] regarding whether the First Amendment protected Jorge Anto-

20  nio's conduct.  When it heard Squeo's Rule 50(a) motion, this Court contemplated entering JMOL

21  on the First Amendment claim because no evidence shows a great likelihood that Squeo perceived

22  Jorge Antonio's abnormal walking and behavior as conveying a particular message protected by the

23  First Amendment.[147]  This Court's initial intuition was correct.  No clearly established law put

24

25  [146] *Ashcroft*, 563 U.S. at 741.

26  [147] Day-7-Tr. 227:2–10 ("[A]ll of the witnesses identified what they viewed as not normal walking
    or behavior by Jorge Antonio when he's in front of the courthouse. But I don't know that it's
    clear that they perceived a particular message. ***So help me to understand why I wouldn't po-***

27  ***tentially rule as a matter of law on the First Amendment claim because you can't establish***
    ***what the particularized message was that would be perceived symbolically as expressive by***

28  ***those who viewed the conduct.***") (emphasis added).

24

1    Squeo on notice that the First Amendment supposedly protects Jorge Antonio's conduct.

2        Even more, Jorge Antonio was not engaged in constitutionally protected activity, and it was

3    not clearly established that his activities were constitutionally protected, because he violated the

4    dispersal order by heading south toward the courthouse. Riback testified that Jorge Antonio vio-

5    lated the dispersal order.[148] Like Squeo, Riback also believed that Metro officers could arrest pro-

6    testers like Jorge Antonio who failed to disperse and remained stationary.[149] That belief, even if

7    mistaken (it was not), entitles Squeo to qualified immunity.

8        Furthermore, the jury could have found for Squeo on the Force Claims only by concluding

9    that Jorge Antonio threatened to assault Snyder, as explained above. It is clearly established that

10   "violent conduct is beyond the pale of constitutional protection."[150] Although citizens have a "right

11   *verbally* to challenge the police,"[151] they have no right to *violently* confront an arresting officer.

12       By ruling for Squeo on the Force Claims, the jury concluded that Squeo fired the beanbags

13   not in response to a supposed constitutionally-protected verbal challenge but because Jorge Antonio

14   violently threatened Snyder, as Squeo testified below:

15       Q.    At this point did you use the beanbag because Mr. Antonio was refusing to disperse?

16       A.    No.

17       Q.    Did you use the beanbag because of any statements he had made?

18       A.    No.

     Q.    Was he carrying a sign or anything?

19       A.    A sign?

20       Q.    Like a sign.

21       A.    No, sir.

     Q.    You don't know -- do you know anything about his social or political views?

22       A.    No, sir.

23

---

24   [148] Day-7-Tr.-(Riback) 201:17–23 ("Q. If … someone is walking to their car in front of the Federal
25   Courthouse, did the dispersal order as you understood it prohibit that? A. I mean, it depends
     when they were walking in that direction. Q. Let's say 11:20 at night after the -- a half hour
26   after the dispersal order had been given at Fremont and Vegas. A. They would have been in
     violation of it.").
27   [149] Day-7-Tr.-(Riback) 184:15–185:10.
     [150] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982).
28   [151] *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) (emphasis added).

25

Q.      Why did you use the beanbag?

A.      Because I believed he was going to strike Detective Snyder with a deadly weapon.[152]

Not only did the First Amendment not protect Jorge Antonio's violent conduct, but it also did not protect his statements. He made no statements to Squeo immediately before the beanbags. He said nothing to Squeo that night apart from potentially asking "What f[*****]g barriers?" when Squeo commanded him to move along while staying outside the pylons.[153] Squeo did not know at the scene if Jorge Antonio or someone else nearby made that statement.[154]

The Estate cannot pursue its First Amendment claim based on that statement without evidence that Jorge Antonio made it. No such evidence exists on this record. And besides the absence of proof that Jorge Antonio made the "What f[*****]g barriers?" statement, the statement has "no obvious pro-protest message. Or, at the very least, any pro-protest message is not 'beyond debate,' which"[155] entitles Squeo to qualified immunity. The statement was "in the nature of a confrontation or argument"[156] that was not protected by the First Amendment.

In summation, on this record, Squeo would have had no clear indication from clearly established law that he allegedly violated the First Amendment, entitling him to qualified immunity.

**B.      JMOL or a New Trial is Warranted Because No Evidence Supports the Verdict.**

JMOL is appropriate "if there is no legally sufficient basis for a reasonable jury to find for" the nonmovant.[157] "[A] general jury verdict will be upheld only if there is substantial evidence to

---

[152] Day-2-Tr., Dkt. 227, Oct. 26, 2025, 114:5–20.

[153] Day-2-Tr. 15:22–16:2 ("Q. Did you hear him say anything at that point? A. I'm not sure if he said it. I made an announcement, 'Stay on the other side of the pylons or the barriers.' And someone, whether it be him or neighboring, that yelled, 'What f[*****]g barriers?' To that I said, 'The pylons.' And then I started issuing commands."); *id.* 99:6–9 ("As I said before, I did hear someone say, 'What f[*****]g barriers?' And then I repeated, 'Pylons. Down stay on the other side of the pylons. ***But from there on out, he never spoke to me.***") (emphasis added).

[154] Day-2-Tr.-(Squeo) 99:11–14.

[155] *Molina*, 59 F.4th at 342 (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018)).

[156] *Stevens v. Duquette*, 2022 WL 2292975, at *6 (N.D.N.Y. Apr. 19, 2022), *report and recommendation adopted*, 2022 WL 2292047 (N.D.N.Y. June 24, 2022), *aff'd*, 2024 WL 705954 (2d Cir. Feb. 21, 2024) (quoting *Hinton v. Pearson*, 2021 WL 4521994, at *4 (D. Conn. Oct. 4, 2021)).

[157] *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1139 (9th Cir. 2024) (quoting *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013)) (internal quotes omitted).

26

1    support each and every theory of liability submitted to the jury."[158]

2        Rule 59, on the other hand, enables a trial judge to "set aside a jury's verdict if, weighing

3    the evidence as he saw it, he concludes that the verdict, even though supported by substantial evi-

4    dence is contrary to the clear weight of the evidence, or is based upon evidence which is false, or

5    that a new trial is necessary to prevent, in the sound discretion of the trial judge, a miscarriage of

6    justice. … [T]he trial court may weigh the evidence and assess the credibility of witnesses and is

7    not required to view the evidence in the light most favorable to the verdict."[159]   The denial of a

8    motion for a new trial is reviewed for abuse of discretion.[160]

9        Neither substantial evidence nor the clear weight of the evidence supports the verdict.  This

10   Court should enter JMOL for Squeo because "the 'evidence permits only one reasonable conclu-

11   sion, and that conclusion is contrary to the jury's verdict.'"[161]   Alternatively, it should grant a new

12   trial for Squeo on the First Amendment claim because the verdict is contrary to the clear weight of

13   the evidence, and a new trial is necessary to prevent a miscarriage of justice.

14       **1.**    ***Mt. Healthy* Necessitates Entering JMOL on this Record**.

15       This Court correctly instructed the jury that even if the Estate established all the elements

16   for its First Amendment claim (it did not), the jury still "must find for" Squeo if he "would have

17   taken the action in question even in the absence of any motive to retaliate against Jorge Antonio."[162]

18   That instruction incorporates the burden-shifting standard from *Mt. Healthy City Sch. District*

19   *Board of Education v. Doyle*, 429 U.S. 274 (1977).[163]

20       When it found for Squeo on the Force Claims, the jury concluded that Jorge Antonio

21

22   [158]  *Poppell v. City of San Diego*, 149 F.3d 951, 970 (9th Cir. 1998).

23   [159]  *Morris*, 104 F.4th at 1151–52 (internal quotes and cites omitted) (cleaned up) (quoting *Moist
        Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957)); *see also Molski
        v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

24   [160]  *Claiborne v. Blauser*, 934 F.3d 885, 893 (9th Cir. 2019) (ordering a new trial based on plain
        error).

25   [161]  *In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1161 (9th Cir. 2024) (quoting *Josephs v. Pac. Bell*,
26       443 F.3d 1050, 1062 (9th Cir. 2006)).

27   [162]  Day-8-Tr. 37:11–18.

     [163]  *See, e.g., Allen v. Iranon*, 283 F.3d 1070, 1074–75 (9th Cir. 2002); *see also Bello-Reyes v. Gay-
28       nor*, 985 F.3d 696, 702 (9th Cir. 2021); *Eng v. Cnty. of Los Angeles*, 737 F. Supp. 2d 1078, 1094
        (C.D. Cal. 2010).

1    threatened to assault Snyder and that Squeo fired the beanbags to stop that assault.  Regardless of

2    whether Jorge Antonio was engaged in a constitutionally protected activity (he was not), Squeo

3    would have still fired the beanbags to stop the assault, entitling him to JMOL under *Mt. Healthy*.

4              **2.    *No Evidence Supports the First Amendment Claim's First Prong*.**

5              There is no evidence on this record that Jorge Antonio was engaged in constitutionally pro-

6    tected speech or conduct.  No evidence suggests he made any constitutionally protected statements.

7    The only statement he may have made was to ask, "What f[*****]g barrier?" when commanded to

8    stay outside the pylons.  The First Amendment does not protect that statement.

9              Even more, the FAC alleges that Jorge Antonio approached the courthouse not to protest or

10   engaged in another form of constitutionally protected activity but to go to his vehicle "so he could

11   leave the area."[164]  That allegation is a binding judicial admission.[165]  Taking the allegedly quickest

12   route to one's vehicle is not a constitutionally protected activity.  Based on the FAC's face, it is

13   uncontroverted that Mr. Antonio was engaged in no constitutionally protected activity, warranting

14   entering JMOL for Squeo on the face of the FAC.

15             Besides not protecting Jorge Antonio's possible "What f[*****]g barrier?" statement or his

16   walking to his vehicle, the First Amendment also does not protect Jorge Antonio's assaultive con-

17   duct that caused Squeo to fire the beanbags.  When it ruled for Squeo on the Force Claims, the jury

18   concluded that Squeo had an objectively reasonable basis, based on the totality of the circum-

19   stances, to fire the beanbags to stop Jorge Antonio from assaulting Snyder.  The jury could not have

20   found in Squeo's favor without reaching that conclusion.  By threatening to assault Snyder with a

21   deadly weapon, Jorge Antonio committed a felony under Nev. Rev. Stat. § 200.471(2).  The First

22   Amendment does not protect a felony assault or other forms of violence.

23             The First Amendment does not protect a "true threat," i.e., "a serious expression of an intent

24

25

26

---

27   [164] FAC ¶¶ 29–30, Dkt. 21, Feb. 17, 2021.

28   [165] *See, e.g., Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988)) ("Allegations in a complaint are considered judicial admissions.").

to commit an act of unlawful violence ...."[166]  "[V]iolent conduct is beyond the pale of constitutional protection."[167]  Neither conduct nor "speech that 'incites' or 'instigates' a riot" is protected.[168]  Excluding threatening conduct from First Amendment protection allows the government to outlaw and prosecute such heinous conduct as (1) burning crosses, *Virginia v. Black*, 538 U.S. 343, 363 (2003); (2) threats of harm to abortion providers, *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1072 (9th Cir. 2002), and (3) threats of mass school shootings, *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 766 (5th Cir. 2007); *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 762 (8th Cir. 2011).

Following a civil jury verdict, this Court can "determine[] the facts necessarily found by the jury in reaching [its] verdict[]" and "appl[y] the correct law to those implicit factual findings."[169] The jury could not have found in Squeo's favor on the Force Claims without concluding that Squeo's perception of an imminent assault was objectively reasonable, based on the totality of the circumstances.  This Court should set aside the verdict based on the jury's conclusion that Jorge Antonio threatened to assault Snyder—conduct not protected by the First Amendment.

### 3.    *No Evidence Supports the First Amendment Claim's Third Prong*.

This Court should enter JMOL for Squeo because not a scintilla of evidence suggests that Squeo fired the beanbags to retaliate against constitutionally protected activity or that Jorge Antonio's supposed constitutionally protected activity was the but-for cause of the beanbags.  This Court noted on the record, "On the First Amendment claim, it's going to I think turn on whether or not jurors believe that a bat was seen or that Jorge Antonio was going to attack the arresting officers or

---

[166] *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021) (quoting *Virginia v. Black*, 538 U.S. 343, 359–60 (2003)); *see also United States v. Sutcliffe*, 505 F.3d 944, 961 (9th Cir. 2007); *Bauer v. Sampson*, 261 F.3d 775, 783 (9th Cir. 2001).

[167] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982); *see also Counterman v. Colorado*, 600 U.S. 66, 69 (2023) ("True threats of violence are" not protected); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992); *United States v. Bagdasarian*, 652 F.3d 1113, 1116 (9th Cir. 2011); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000).

[168] *United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021).

[169] *Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*, 106 F.3d 894, 896 (9th Cir. 1997).

not, right."[170]   The jury has now spoken and concluded that Jorge Antonio threatened to attack Snyder.  Because Squeo fired the beanbags to halt that attack, the beanbags were not "subjectively motivated by antipathy to [Jorge Antonio's alleged] political speech."[171]

Based on the verdict for Squeo on the Force Claims, no constitutionally protected activity was the but-for cause of the beanbags as a matter of law, warranting JMOL for Squeo on the First Amendment claim.  All § 1983 claims require proof of actual and proximate cause.[172]  "A defendant's conduct is an actual cause, or cause-in-fact, of a plaintiff's injury only if the injury would not have occurred but for that conduct."[173]

"[T]he third prong of the prima facie case for First Amendment retaliation … requires the plaintiff to show a causal relationship between the protected conduct and the material adverse action ...."[174]  To meet that burden, the Estate must show a causal relationship between a constitutionally protected activity and the beanbags.  "[A] plaintiff must show that the defendant's retaliatory animus was a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."[175]  "If something else" besides a constitutionally protected activity "was the motivation" for the beanbags, the constitutionally protected activity "was not a 'but-for cause' of [Jorge Antonio's alleged] injuries."[176]

---

[170] Day-4-Tr. 6:14–17.

[171] *Puente*, 123 F.4th at 1063.

[172] *See, e.g., Chaudhry v. Aragon*, 68 F. 4th 1161, 1171 (9th Cir. 2023).

[173] *Chaudhry*, 68 F. 4th at 1170 n.11 (quoting *White v. Roper*, 901 F.2d 1501, 1505–06 (9th Cir. 1990)) (internal quotes and edits omitted).

[174] *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022); *see also Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182, 1194 (D. Nev. 2009) (requiring the plaintiff to prove "the defendant would not have taken the action but for the defendant's desire to chill plaintiff's speech"); *Bailey v. Ramos*, 125 F.4th 667, 685–86 (5th Cir. 2025) (concluding that an officer was "entitled to judgment as a matter of law on [a] First Amendment retaliatory arrest claim" because the plaintiff identified no "evidence that would show that [the officer] had a subjective retaliatory motive, much less that any such motive was the but-for cause of [the] decision to arrest him").

[175] *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)); *see also Hartman*, 547 U.S. at 260 ("[A]ction colored by some degree of bad motive does not amount to a constitutional tort *if that action would have been taken anyway*.") (emphasis added); *Nieves*, 587 U.S. at 399 (the plaintiff must prove "that the adverse action against the plaintiff would not have been taken absent the retaliatory motive"); *Id.* at 416 (Gorsuch, J., concurrence in part) (the "plaintiff must prove the officer would not have arrested him but for his protected speech").

[176] *Molina*, 59 F.4th at 341.

1    Amid the jury's conclusion that Squeo fired the beanbags to protect Snyder, no constitution-

2    ally protected activity was the but-for cause of the beanbags.  Even if Jorge Antonio had not engaged

3    in the alleged constitutionally protected activity, Squeo would still have fired the beanbags to halt

4    Jorge Antonio's assaultive behavior, defeating but-for causation and entitling him to JMOL.

5    In *Cheairs v. City of Seattle*, 145 F.4th 1233, 1235 (9th Cir. 2025), the plaintiff sued an

6    officer who injured him with a blast grenade at a protest, bringing First and Fourth Amendment

7    claims.  The Ninth Circuit affirmed the entry of summary judgment on the Fourth Amendment

8    claim because the force was objectively reasonable.  *Id.* at 1244.  It also affirmed the entry of sum-

9    mary judgment on the First Amendment claim because no evidence existed of a "causal relationship

10   between [the] protected activity and [the] subsequent injury."[177]  *Id.* at 1247.

11   Likewise, in *Hill v. City of Fountain Valley*, 70 F.4th 507, 519 (9th Cir. 2023), the Ninth

12   Circuit affirmed the entry of summary judgment on a First Amendment retaliation claim because

13   "no evidence suggests that [the officers] would not have arrested [the plaintiff] absent [the plain-

14   tiff's] statements.  The record suggests the officers arrested [the plaintiff] because they believed,

15   though mistakenly, that he was hiding a suspect in a potential kidnapping case."

16   In summation, the jury found a legitimate justification for the beanbags by returning a ver-

17   dict for Squeo on the Force Claims.  That legitimate justification was to protect Snyder from an

18   imminent assault.  That legitimate justification prevents the Estate from satisfying the third prong

19   of its First Amendment claim.  Hence, this Court should enter JMOL in favor of Squeo.

20   **C.    This Court's Answers to the Jury's Questions Necessitate a New Trial**.

21   The Ninth Circuit "review[s] a district court's formulation of civil jury instructions for an

22   abuse of discretion, but we consider de novo whether the challenged instruction correctly states the

23   law."[178]  "Jury instructions must be supported by the evidence, fairly and adequately cover the

24

25

---

[177] The *Cheairs* plaintiff was not involved in conduct threatening violence, unlike Jorge Antonio.
26   If he had been, *Cheairs* would have disposed of the retaliatory force First Amendment claim
     under the first prong because threatening violence is not constitutionally protected activity.

27   [178] *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014); *see also Blumenthal Distrib., Inc. v.
     Herman Miller, Inc.*, 963 F.3d 859, 869 (9th Cir. 2020) (ordering a new trial because a jury
28   instruction misstated the law).

1  issues presented, correctly state the law, and not be misleading."[179]  A new trial is warranted if a

2  jury instruction prejudicially misstates the law, and prejudice presumably occurs unless "it is more

3  probable than not that the jury would have reached the same verdict had it been properly in-

4  structed."[180]  "Prejudice is ... generally more likely than not if nothing about the jury's verdict in-

5  dicates that the result would have been the same without the error."[181]

6      The Ninth Circuit found that an erroneous instruction warranted a new trial in the § 1983

7  case *Wilkerson v. Wheeler*, 772 F.3d 834 (9th Cir. 2014).  The instruction "was misleading" and "in

8  tension with [the plaintiff's] trial testimony in a way that likely confused the jury" because it told

9  the jury that the plaintiff resisted correctional officers without clarifying that the resistance was

10  verbal.  *Id.* at 841–42.  "In light of the instruction, the jurors may well have understood that they

11  were to disbelieve [the plaintiff's] testimony in whole or in part."  *Id.* at 841.

12      "The Supreme Court has clearly stated that it is reversible error for a trial judge to give an

13  answer to a jury's question that is misleading, unresponsive, or legally incorrect."[182]  "When a jury

14  makes explicit its difficulties a trial judge should clear them away with concrete accuracy."[183]  The

15  Ninth Circuit "review[s] de novo whether the district court's response to a jury question correctly

16  states the law.  When a jury demonstrates confusion about a controlling legal principle, we also

17  review whether the district court eliminated that confusion."[184]

18      The Ninth Circuit will "reverse and remand for a new trial where a district court's supple-

19  mental instruction failed to clear away jury confusion with its answer or when the answer was

20  legally incorrect, and when such error or confusion was prejudicial to the defendant."[185]  *Jazzabi v.*

21

---

22  [179]  *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014).

  [180]  *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Dang v. Cross*, 422 F.3d 800, 811
23      (9th Cir. 2005)) (reversing a defense verdict in a § 1983 case because the jury instructions mis-
      stated the law, and the error in the instructions was prejudicial).

24  [181]  *Clem*, 566 F.3d at 1183 (quoting *Caballero v. City of Concord*, 956 F.2d 204, 207 (9th Cir.
      1992)) (cleaned up).

25  [182]  *United States v. Frega*, 179 F.3d 793, 810 (9th Cir. 1999) (quoting *Bollenbach v. United States*,
26      326 U.S. 607, 612–613 (1946)).

  [183]  *Bollenbach*, 326 U.S. at 612–13.

27  [184]  *United States v. Castillo-Mendez*, 868 F.3d 830, 835 (9th Cir. 2017) (internal cites and quotes
      omitted) (ordering a new trial based on "a misleading supplemental instruction").

28  [185]  *Castillo-Mendez*, 868 F.3d at 839.

1    *Allstate Ins. Co.*, 278 F.3d 979, 981–82 (9th Cir. 2002) reversed a verdict because after receiving a

2    note, the district court gave two supplemental instructions, the second being erroneous.[186]

3          A mere two hours into deliberations, and shortly before 5:00 p.m. on the eighth day of trial,

4    the jury sent a note asking, "Is the act of not complying with [an] officer's commands a form of

5    engaging in expressive conduct?"[187]  Because the jury would be discharged at 5:00 p.m., Squeo

6    asked to research the issue that evening and discuss it with this Court in the morning, but this Court

7    said, "No, we have to decide it now ...."[188]  Squeo then requested that the answer be "no," citing

8    *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001).[189]

9          Under *Arpin*, "The absence of probable cause does not grant an individual the right to offer

10    resistance."[190]  When Squeo told Jorge Antonio he was under arrest and commanded him to raise

11    his hands, Jorge Antonio had to comply, regarding of whether probable cause supported the arrest

12    (it did).[191]  But this Court instructed the jury, "The act of not complying with an officer's commands

13    can be a form of expressive conduct if it satisfies the definition set forth in the instructions."[192]

14          Respectfully, this Court's instruction was incorrect, did not clear away the jury's confusion,

15    and prejudiced and harmed Squeo, requiring a new trial.  This Court relied on *City of Houston, Tex.*

16    *v. Hill*, 482 U.S. 451 (1987).[193]  But *Hill* addresses verbal criticism rather than the disobedience of

17    lawful orders—"nonaggressive" and "nonviolent" criticism.  *Id.* at 454 n.1.  Raymond Hill shouted

18    to nearby police, "Why don't you pick on somebody your own size?"[194]  In no way does *Hill* grant

19    First Amendment protection to the disobedience of lawful orders.

20

21    [186]  *See also Palin v. New York Times Co.*, 113 F.4th 245, 277–78 (2d Cir. 2024) (ordering a new
      trial because a response to the jury's question misstated the law and was prejudicial).

22    [187]  Day-8-Tr. 163:3–5; *Id.* 159:13 (deliberations began at 2:41 p.m.); *Id.* 161:24 (the jury returned
23    to the courtroom at 4:44 p.m. for this Court to answer its question).

      [188]  Day-8-Tr. 164:7–19.

24    [189]  Day-8-Tr. 165:22–171:19.

25    [190]  *Arpin*, 261 F.3d at 921; *see also Batson v. State*, 113 Nev. 669, 676, 941 P.2d 478, 483 (1997)
      (under Nevada law, one may use force against a police officer only to protect against unlawful
26    and excessive force threatening imminent serious bodily harm).

      [191]  Day-8-Tr. 166:4–16.

27    [192]  Day-8-Tr. 172:21–23.

      [193]  Day-8-Tr. 169:5–13.

28    [194]  *Hill*, 482 U.S. at 453–54.

In *Colten v. Kentucky*, 407 U.S. 104, 109 (1972), the Supreme Court said, "[W]e have little doubt that Colten's conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment." In *United States v. Poocha*, 259 F.3d 1077, 1083 (9th Cir. 2001), *Hill* protected the defendant's verbal statements, yet the Ninth Circuit upheld the defendant's "conviction for failing to obey a lawful order under 36 C.F.R. § 2.32(a)(2)."

In *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011), the plaintiff's "failure to reenter his truck" as commanded "was not an act of expression protected by the First Amendment, but rather a simple failure to obey a police officer's lawful instructions." In *Medvedeva v. City of Kirkland, Washington*, 720 F. App'x 384, 386 (9th Cir. 2018), the plaintiff's "failure to open the front door," as the police commanded, "was not expressive conduct protected by the First Amendment, but rather a simple failure to obey lawful instructions."

*Cheairs v. City of Seattle*, 2024 WL 1765663, at *14 (W.D. Wash. Apr. 24, 2024), *aff'd*, 145 F.4th 1233 (9th Cir. 2025) found no "genuine issue for trial regarding whether [the plaintiff] was engaged in protected conduct at the time of the adverse action" when he violated a dispersal order. In *Cervantes v. San Diego Police Chief Shelley Zimmerman*, 2020 WL 5759752, at *7 (S.D. Cal. Sept. 28, 2020), *aff'd sub nom. Ramirez v. Zimmerman*, 2021 WL 5104371 (9th Cir. Nov. 3, 2021), "[t]he Cervantes Plaintiffs had no First Amendment right to remain in the area of a protest or riot after police issued an order to disperse and were violating the law by doing so." *Id.* at *7. Those plaintiffs also cited no authority "to support the proposition that they could lawfully remain in the area of an unlawful assembly despite the order to disperse." *Id.*, 2020 WL 5759752, at *8.

*Kendall v. Brazil*, 2025 WL 2521185, at *16 (E.D. Cal. Sept. 2, 2025) said, "While plaintiff is entitled to pursue First Amendment activities, he is also required to follow lawful orders by correctional officers, even if plaintiff disagrees with them." *Wise v. City of Portland*, 483 F. Supp. 3d 956, 967 (D. Or. 2020) found that the protest-medics plaintiffs "simply have no unique status under the First Amendment that allows them to disregard lawful orders."

*Grady v. Cratsenburg*, 769 F. Supp. 3d 609, 650 (E.D. Mich. 2025) said that "an order is not rendered unlawful by the First Amendment if the order can be fairly justified in reference to conduct rather than speech." *Daniels v. Keane*, 1998 WL 213196, at *2 (S.D.N.Y. Apr. 30, 1998)

34

1    said that "[a]s to the First Amendment claim, nothing has been presented to indicate that plaintiff's

2    'protesting' was anything more than simple disobedience to lawful orders.  Such circumstances do

3    not implicate the First Amendment."   Respectfully, these authorities not only conflict with this

4    Court's instruction to the jury but also entitle Squeo to qualified immunity because it was not clearly

5    established that the First Amendment protected Jorge Antonio's noncompliance with commands.

6         On the tenth day of trial, the jury sent another note asking, "Is not listening to a police

7    officer's command three times against the law or ***arrestable***?"[195]  The word "arrestable" reflected

8    confusion, signaling the jury did not grasp that the First Amendment claim was limited to the bean-

9    bags without including an arrest.  Nor did the Fourth Amendment or battery claims include an arrest.

10        To remedy that confusion, Squeo asked this Court to "answer it by telling the jury that the

11   arrest is not part of the First Amendment claim."[196]  This Court acknowledged that the jury should

12   not be considering an arrest in connection with the claim and contemplated telling the jury,

13   "[Y]ou're instructed that whether the arrest was lawful or unlawful, right, is not to be considered

14   by you and cannot form the basis of a decision on the First Amendment claim."[197]

15        But this Court later declined to give that instruction because it was unsure whether the ques-

16   tion related to the First or Fourth Amendment claim[198]—even though the jury should not have been

17   considering an arrest for either claim, and Squeo's proposed instruction would have remedied the

18   confusion regardless of which claim the jury had in mind.  Ultimately, this Court answered the

19   question by telling the jury, "The Court cannot tell you as jurors as a matter of law that any failure

20   to follow commands in this case was necessarily unlawful or arrestable."[199]

21        Respectfully, that answer did not clear up the jury's confusion and prejudiced and harmed

22   Squeo, requiring a new trial.  The jury misunderstood that the First Amendment claim did not in-

23   clude an arrest and was limited solely to the beanbags, as reflected by the question's explicit refer-

24   ence to an arrest.  Respectfully, to remedy the confusion, this Court should have granted Squeo's

---

[195]  Day-10-Tr. 4:23–24 (emphasis added); *see also id.* 4:14–15:5.

[196]  Day-10-Tr. 5:9–11.

[197]  Day-10-Tr. 5:21–25; *see also id.* 8:13–19.

[198]  Day-10-Tr. 7:1–3; *see also id.* 7:8–10.

[199]  Day-10-Tr. 15:1–3.

1    request to instruct "the jury that the arrest is not part of the First Amendment claim."[200]

2         Respectfully, the failure to give Squeo's requested instruction prejudiced and harmed Squeo

3    by allowing the jury to return a verdict against Squeo based on an arrest that should not have been

4    considered for **any** claim.  The jury would not have returned a verdict against Squeo had this Court

5    given Squeo's requested instruction and the jury understood that the arrest was not part of any claim

6    in the case.  Thus, this Court should grant Squeo a new trial.

7    **D.    The Verdict's Inconsistency Necessitates a New Trial**.

8         When a motion for new trial is "based on an alleged inconsistency in the jury verdict, the

9    question is whether the verdict can be reconciled on any reasonable theory consistent with the evi-

10   dence."[201]  In *Ward v. City of San Jose*, the jury concluded that the officers used excessive force

11   and found against them on a Fourth Amendment claim but returned a defense verdict on a wrongful

12   death claim.  *Id.* at 282.  The Ninth Circuit ordered a new trial on the wrongful death claim because

13   the verdict was inconsistent and could not be reconciled.  *Id.* at 286–87.

14        A new trial is necessary because the verdict is inconsistent and cannot be reconciled.  By

15   ruling for Squeo on the Force Claims, the jury concluded that Squeo fired the beanbags to stop an

16   assault.  That conclusion necessitated rendering a verdict for Squeo on the First Amendment claim.

17   Jorge Antonio was not engaged in a constitutionally protected activity by threatening to assault

18   Snyder.  Jorge Antonio's alleged constitutionally protected activity was not the but-for cause of the

19   beanbags.  The jury should have returned a defense verdict based on the *Mt. Healthy* instruction

20   because regardless of whether Jorge Antonio was engaged in a constitutionally protected activity

21   (he was not), Squeo would still have fired the beanbags to stop the assault.  These irreconcilable

22   inconsistencies in the verdict necessitate a new trial on the First Amendment claim.

23   **E.    This Court's Rulings on the Dispersal Order Necessitate a New Trial**.

24        Respectfully, this Court wrongly prohibited the jury from hearing Riback's testimony,

25   wrongly concluded that no facts existed allowing Metro to enforce the dispersal order around the

26

27   [200]  Day-10-Tr. 5:9–11.

28   [201]  *Ward v. City of San Jose*, 967 F.2d 280, 286 (9th Cir. 1991); *see also Alves v. Cnty. of Riverside*, 135 F.4th 1161, 1168 (9th Cir. 2025).

1    courthouse, and wrongly prohibited Squeo from relying on the dispersal order for his defense.  Each

2    error is "sufficiently prejudicial to warrant a new trial."[202]  And the cumulative effect of those prej-

3    udicial errors, along with the others addressed in this Motion, necessitates a new trial.[203]  "In some

4    cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant re-

5    versal, the cumulative effect of multiple errors may still prejudice a defendant."[204]

6        Squeo is entitled to a new trial because the jury should have heard Riback's testimony.  Un-

7    der Ninth Circuit precedent, the prejudicial exclusion of admissible testimony necessitates a new

8    trial.[205]  Respectfully, this Court committed prejudicial error by denying Riback the opportunity to

9    testify before the jury.

10        Plaintiffs never moved in limine before trial to limit Riback's testimony.  And during open-

11    ings, this Court allowed Squeo to tell the jury—without objection from Plaintiffs—that, "[Y]ou'll

12    hear from an officer that will come in, Lieutenant Riback, and he will testify about the dispersal

13    order being given.  And the dispersal order will be given over the radios of the officers who are to

14    repeat the dispersal order and provide that."[206]  But several days later, this Court prohibited Riback

15    from testifying to those same topics before the jury.[207]

16        Squeo sought to call Riback to testify before the jury about many facts and issues relevant

17

18    _____

    [202]  *Sidibe v. Sutter Health*, 103 F.4th 675, 706 (9th Cir. 2024) (granting a new trial based on the
19    erroneous exclusion of evidence and erroneous jury instructions).

20    [203]  *See, e.g.*, *Jerden v. Amstutz*, 430 F.3d 1231, 1241 (9th Cir. 2005) (cumulative error in a civil
    trial may suffice to warrant a new trial even if each error standing alone may not be prejudicial);
    *see also Jazzabi v. Allstate Ins. Co*., 278 F.3d 979, 982 (9th Cir. 2002) (concluding "that cumu-
21    lative error renders th[e] verdict unreliable"); *Gonzales v. Police Dep't, City of San Jose, Cal.*,
    901 F.2d 758, 762 (9th Cir. 1990).

22    [204]  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Gordon Mailloux En-
23    ters., Inc. v. Firemen's Ins. Co. of Newark, N. J.*, 366 F.2d 740, 742 (9th Cir. 1966) (reversing a
    jury verdict and concluding that "although the errors requiring reversal, if considered separately,
24    were perhaps harmless, their cumulative effect was prejudicial").

    [205]  *See, e.g., Sidibe*, 103 F.4th at 694–695; *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d
25    1227, 1238 (9th Cir. 2017); *Reed v. Lieurance*, 863 F.3d 1196, 1208 (9th Cir. 2017).

    [206]  Day-2-Tr. 70:14–18.
26
    [207]  Squeo's Offer of Proof, Dkt. 234, Oct. 27, 2025; Day-4-Tr. 160:5–164:9 at 162:3–14 (proffer-
27    ing, as Squeo's counsel represented to the jury during opening statements without objection,
    that Riback would testify "that he was the lieutenant that gave the dispersal order," and "officers
28    that are in that Downtown area are on that specific [radio] frequency, that they would then hear
    that specific frequency and that order on their frequency"); Day-5-Tr. 257:14–260:20;

1   to the Estate's First Amendment claim, as outlined in this Motion's "factual background" section.

2   For example, Riback would have testified about "what was going on with the crowd" and why the

3   order "would apply here at the Federal Courthouse," but this Court said, "No.  You know, he can't

4   do that."[208]  Ultimately, this Court allowed Riback to testify only without the jury present.[209]

5           Shortly after Riback testified in a closed session, this Court ruled that no facts existed on

6   the night in question allowing Metro to enforce the dispersal order around the courthouse.[210]  It

7   based that ruling mostly on videos from around the courthouse.[211]  Following that ruling, this Court

8   prohibited Squeo from relying on the dispersal order to defend against the First Amendment

9   claim.[212]  Based on that ruling, this Court inserted language into the jury instruction on the First

10  Amendment claim—language absent from the pre-opening instruction on the claim[213]—stating,

11  "Defendant Squeo is not relying upon the dispersal order as a permissible motivating factor in firing

12  beanbag rounds at Jorge Antonio for the First Amendment.  He likewise is not relying upon the

13  dispersal order regarding his use of force for the Force Claims against him."[214]

14

---

15  [208] Day-6-Tr. 15:6–19:7; *see also id.* 17:9–12 ("[W]e've cited case law in our trial brief that shows
16  that it is an issue of fact that goes to the jury, as is identified by the plaintiffs in the joint pretrial
    order."); *Id.* 228:17–242:17.

17  [209] Day-7-Tr. 5:4–7 ("What I am going to do as relates to Officer Riback, I will take his testimony
    outside the presence of the jury, so you need to make sure that he's here later on this after-
18  noon."); *see also id.* 169:7–202:17 (wherein Riback testified without the jury present).

    [210] Day-7-Tr. 210:14–16 ("I don't think that the dispersal order was lawful as applied to him and
19  I'll go through that in my order, but I don't think it was.").

20  [211] Day-7-Tr. 183:15–17 ("Because on the video that I've seen, there's no one -- there are no pro-
    testers, anyone, in front of the courthouse at that time."); *see also id.* 189:14–16 ("[B]ecause
21  the video that I have seen, there's almost no one there around the time this incident occurs.");
    *Id.* 196:13–15 ("Because I'm just saying that because in terms of some of the video I've seen -
22  - I'm trying to understand the timing -- I haven't seen anything like this.").

23  [212] *See, e.g.,* Day-7-Tr. 219:3–6 ("He cannot rely upon a mistake of law, and if he's applying an
    unlawful order, he doesn't get the benefit of that, Mr. McNutt, right. That's not something he
24  gets a benefit from."); *see also id.* 220:1–4 ("And I am concerned that you're going to say that
    he was simply following the orders or the dispersal order itself and that would, therefore, justify
25  an unlawful arrest. And I think ***that would be an improper argument***.") (emphasis added); *Id.*
    222:20–24 ("[I]t sounds like what you want to argue, which you started to say here, is that your
26  client exercised restraint because he was authorized to arrest him the entire time and he didn't,
    right. ***And I am going to tell you right now, I'm not going to allow that argument***.") (emphasis
    added).

27  [213] Day-2-Tr. 22:6–23:10.

28  [214] Day-8-Tr. 37:19–23; *see also id.* 5:22–24 (overruling Squeo's request for a modification of the

The jury should have heard Riback's testimony. During openings, this Court allowed Squeo to tell the jury—without objection from Plaintiffs—that Riback would testify that Metro gave a dispersal order, broadcast that fact over the radio, and trained its officers to enforce dispersal orders in their areas of assignment immediately upon hearing about such orders on their radio channels.[215]

Plaintiffs waived all objections to Riback's testimony before the jury on those topics by not raising those objections before or during the openings. Even more, by allowing Squeo to make that representation to the jury and then prohibiting him from fulfilling it by calling Riback, this Court confused the jury, prejudiced Squeo's defense, and harmed his credibility before the jury.

Riback's testimony would have been relevant and instrumental to Squeo's defense. Take the first prong for the Estate's First Amendment claim, requiring the Estate to prove that Jorge Antonio was engaged in constitutionally protected activity. Riback would have testified that Jorge Antonio violated the dispersal order by heading south on Las Vegas Blvd. rather than going east.[216]

Had it heard that relevant testimony, the jury would have concluded that Jorge Antonio was neither protesting nor engaged in any other constitutionally protected activity because he was violating the dispersal order. This Court effectively removed an "element [from] the plaintiff's burden of proof"[217] because had the jury heard Riback's testimony, the Estate would have had to prove that Jorge Antonio's conduct was somehow constitutionally protected despite violating the dispersal order. A new trial is necessary because "there is no way to know whether the jury would" have returned the same verdict had this Court "allowed [Squeo] to present [his] chief defense."[218]

Respectfully, this Court wrongly concluded that no facts could allow Metro to enforce the dispersal order around the courthouse. This Court's resolution of factual questions reserved for the jury warrants a new trial.[219] The jury should have decided whether facts allowed Metro to enforce

---

instruction); Day-7-Tr. 256:13–15 ("And so you have certainly preserved your argument that you think it's a valid order that they could rely upon.").

[215] Day-2-Tr. 70:14–18.

[216] Day-7-Tr.-(Riback) 177:15–179:18; 180:14–183:3; 186:7–188:12; 194:17–195:2.

[217] *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1245 (9th Cir. 2021).

[218] *BladeRoom*, 20 F.4th at 1244–45.

[219] *See*, *e.g.*, *United States v. Gaudin*, 515 U.S. 506, 508 (1995) (reversing a fraud conviction because the judge decided the issue of materiality).

1   the dispersal around the courthouse, i.e., whether two or more persons assembled near the court-

2   house and engaged in unlawfulness, civil unrest, or disrupted the peace.

3          As for this Court's conclusion that videos do not show "two or more persons assemble[d]

4   [around the courthouse] for the purpose of disturbing the public peace, or committing any unlawful

5   act,"[220] the jury should have watched the videos to evaluate the crowd size and behavior and, in this

6   Court's words, "ma[d]e that determination themselves."[221]

7          Making findings on the crowd size and behavior was for the jury.  Factual disputes existed

8   in *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996) regarding whether officers reasonably believed

9   demonstrators planned to act unlawfully, the crowd size and behavior, whether dispersal orders

10  were obeyed, whether noncompliant individuals were organized groups or people trying to leave,

11  whether officials preemptively banned all demonstrations, whether assemblies were unlawful and

12  arrests justified, and whether protesters posed a clear danger or had ignored prior dispersal orders.

13         Likewise, in *Reed v. Lieurance*, 863 F.3d 1196, 1211–12 (9th Cir. 2017), the district court

14  engaged in improper factfinding by resolving factual questions about "content neutrality, narrow

15  tailoring to a significant government interest, and the existence of alternatives" relevant to a First

16  Amendment claim.  *Menotti v. City of Seattle*, 409 F.3d 1113, 1118, 1148–50 (9th Cir. 2005) found

17  factual questions regarding the constitutionality of an order restricting access to downtown Seattle.

18  In *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008), "a material issue of fact

19  existed as to whether law enforcement sought to 'end the protest, rather than just to clear the pro-

20  testors from the streets.'"  Factual questions existed in *Quraishi v. St. Charles Cnty., Missouri*, 986

21  F.3d 831, 838 (8th Cir. 2021) regarding "whether the reporters' location was an unlawful assembly"

22  and if the reporters were "engaged in unlawful activity when Anderson fired on them."  In *Grady

23  v. Cratsenburg*, 769 F. Supp. 3d 609 (E.D. Mich. 2025), it was for the jury to decide if a dispersal

24

25

26

---

[220]  Nev. Rev. Stat. § 203.020.

27  [221]  Day-6-Tr. 191:6–9 (addressing videos); *see also* Calendar Call Tr., Dkt. 195, July 2, 2024, at
        22:11-13 ("These videos do go quickly, and I think the experts can point out to them where they
28      can look when they go back to deliberate ***to decide for themselves***.") (emphasis added).

order was a reasonable time, place, or manner restriction.[222]

Not only did this Court invade the province of the jury by making factual findings, but respectfully, it reached the wrong conclusion. It erred in concluding that no facts existed under Nev. Rev. Stat. § 203.020[223] allowing Metro to enforce the dispersal order around the courthouse. Both Nev. Rev. Stat. § 203.020 and clearly established federal law allow Metro to command two or more persons who are disturbing the peace or committing an unlawful act to disperse and to arrest individuals who disobey that command. Those conditions have been met on this record.

Assemblies that "are violent or pose a clear and present danger of imminent violence or [violate] some other law"[224] can be dispersed. "Whether a particular situation presents a clear and present danger of imminent lawlessness must be evaluated under an objective standard, rather than based on the subjective apprehensions of the officers."[225] Once the police give a dispersal order to a chaotic and violent mass assembly, like the one described by Riback, the law does not require officers to assess the lawfulness of each passing protester on an individual basis. "In the context of a massive demonstration with tens of thousands of participants, once a pattern of chaotic violence ha[s] been established, it [is] unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions."[226]

Only one reasonable conclusion can be reached from the record: "there were sufficient objectively reasonable grounds to establish the requisite 'clear and present danger' of an 'immediate threat to public safety, peace, or order.'"[227] The record establishes that (1) two or more persons

---

[222] *Grady*, 769 F. Supp. 3d at 655 ("[E]ven if **_a jury found that the order was a reasonable time, place, or manner restriction_**, they would still need to find that the arrests were motivated by Plaintiffs' speech in order for Plaintiffs to prevail on their retaliation claim.") (emphasis added).

[223] Nev. Rev. Stat. § 203.020 ("If two or more persons assemble for the purpose of disturbing the public peace, or committing any unlawful act, and do not disperse, on being desired or commanded so to do by a judge, justice of the peace, sheriff, coroner, constable or other public officer, the persons so offending are guilty of a misdemeanor.").

[224] *Puente*, 123 F.4th at 1062 (quoting *Collins*, 110 F.3d at 1371) (internal quotes omitted)); *see also Duran v. City of Douglas*, Ariz., 904 F.2d 1372, 1377 n.4 (9th Cir. 1990) ("The First Amendment does not prevent enforcement of disorderly conduct statutes so long as they are not vague or applied to curb protected speech.").

[225] *Puente*, 123 F.4th at 1062.

[226] *Menotti*, 409 F.3d at 1134.

[227] *Puente*, 123 F.4th at 1062.

41

1    assembled near the courthouse, and (2) protesters engaged in unlawful acts, civil unrest, and dis-

2    rupted the peace—the only two elements needed for a lawful dispersal order.

3         As for the "two or more persons" element, protesters Rayce Rayos and Daniel Gugel ap-

4    proached the courthouse with Jorge Antonio.[228]  Rayos supposedly stood close enough to overhear

5    commands given to Jorge Antonio to "find another way."[229]  Even more, the D Hotel video (Trial

6    Ex. 619) shows a large crowd of protesters fleeing from Las Vegas Blvd. and Bridger Avenue mo-

7    ments after the fatal rounds.[230]  Riback testified that protesters were congregated "en masse"[231] at

8    that specific intersection.  This evidence satisfies the first element for a lawful dispersal order.

9         As for the unlawfulness, civil unrest, or disturbing the peace element, Riback saw protesters

10   throwing objects in front of or near the courthouse.[232]  While stationed at that particular intersection,

11   officers were targeted by fireworks fired from around the front of the courthouse.[233]  This record

12   establishes that (1) two or more persons gathered near the courthouse, and (2) they engaged in

13   violence and lawlessness.  Metro did not restore law and order until several hours after Jorge Anto-

14   nio's death.[234]  Respectfully, on this record, this Court wrongly concluded as a matter of law that

15   no facts allowed Metro to enforce the dispersal order around the courthouse.

16        Respectfully, besides wrongly prohibiting Riback from testifying before the jury, making

17   factual findings reserved for the jury, and reaching the incorrect factual conclusion, this Court also

18   wrongly prohibited Squeo from relying on the dispersal order in support of his defense of the First

19   Amendment claim and wrongly inserted that ruling into the jury instructions.  *Velazquez v. City of

20   Long Beach*, 793 F.3d 1010, 1013, 1026–27, (9th Cir. 2015) reversed a jury verdict on an excessive

21   force claim because the district court's ruling on the unlawful arrest claim improperly influenced

22

---

23   [228]  Day-5-Tr.-(Gugel) 81:20–22 ("Q. Okay. At some point do you begin walking towards the court-
     house? A. Yes.").

24   [229]  Day-5-Tr.-(Rayos) 50:15–51:20 ("Q. Okay. And you heard an officer respond to Mr. Antonio
     by saying, 'Find another way'? A. To that effect, yes.").

25   [230]  Day-3-Tr. 124:18–125:18 (admitting Trial Ex. 619); Ex. K (Trial Ex. 619, D Hotel Video,
     LVMPD 005632) at 0:01:50–0:02:14.

26   [231]  Day-7-Tr.-(Riback) 183:21–184:2.

27   [232]  Day-7-Tr.-(Riback) 197:19–24; *Id.* 200:13–23.

     [233]  Day-7-Tr.-(Riback) 198:1–19.

28   [234]  Day-7-Tr.-(Riback) 191:21–192:1; Day-3-Tr.-(Ferguson) 62:16–18.

42

the jury and removed key factual issues from the jury's consideration.  So too here.

Finally, even if no facts had existed allowing Metro to enforce the dispersal order around the courthouse (that is not true), the law still entitled Squeo to rely on the dispersal order to defend himself against the First Amendment claim, even if he was mistaken in believing the dispersal order could be enforced around the courthouse.  Respectfully, this Court wrongly ruled that Squeo "cannot rely upon a mistake of law, and if he's applying an unlawful order, he doesn't get the benefit of that ...."[235]  Evidence that an officer acted based his understanding of his official duties, even if he was mistaken, is admissible to rebut the retaliatory motive prong for a First Amendment claim.

Dismissing a First Amendment claim, *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) said that "[i]f the response was driven not by 'animus' but by the defendant's understanding—***however mistaken***—of his official duties, then it was not 'retaliatory.'"  (emphasis added).  The *Mitchell* officers shot the plaintiff with beanbags and arrested him "only after [he] stood in their way and ignored a countdown warning ...."  *Id.*  Emphasizing again that retaliatory animus cannot be the driving force behind an officer's actions if the officer acts based on his understanding, however mistaken, of his official duties, *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 341 (8th Cir. 2023) likewise said that "even if the officers 'unreasonably believed' that the group was refusing to comply with their earlier directions to disperse, their official orders—not retaliatory animus—caused them to use the tear gas.'"

Ninth Circuit precedent likewise allows officers to rely on good faith mistakes in support of their defense of § 1983 claims.  *Hill*, 70 F.4th at 519 affirmed summary judgment on a First Amendment claim because "no evidence suggests that [the officers] would not have arrested [the plaintiff] absent [the plaintiff's] statements.  The record suggests the officers arrested [the plaintiff] because they believed, ***though mistakenly***, that he was hiding a suspect in a potential kidnapping case."  (emphasis added).  *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013) found an ordinance limiting speech at city council meetings unconstitutional but still granted qualified immunity to officers who enforced the unconstitutional ordinance.  The officers could assume the ordinance was

---

[235]  Day-7-Tr. 219:3–6.

valid when enacted and were not expected to recognize complex constitutional issues.[236]

In summation, because this Court wrongly prohibited Riback from testifying before the jury, ruled that no facts existed allowing Metro to enforce the dispersal order around the courthouse, and prevented Squeo from relying on the dispersal order, Squeo "was not entitled to an opportunity to meet the [Estate's] case under the correct interpretation,"[237] necessitating a new trial.

## F.    The Grossly Excessive Verdict Necessitates Remittitur or a New Trial.

No evidence on this record could allow the jury to award $1.5 million for the First Amendment claim.  The Ninth Circuit "review[s] for abuse of discretion the district court's decision to deny remittitur and a new trial.  The jury's verdict must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.  In this deferential review, [the Ninth Circuit] give[s] the trial court the benefit of every doubt and [will] reverse only where a damages award exceeds its reasonable bounds."[238]

The Ninth Circuit has reversed an award of excessive damages in a § 1983 case based on considerations that apply equally here.  In *Bell*, 108 F.4th at 815, a pretrial detainee "whose right leg is amputated above the knee" received a jury award of $504,000 after a jailer denied him "a wheelchair or other mobility device" while moving him between cells and "required [him] to hop on his one leg until it gave out."  Finding the award grossly excessive and not supported by the record, the Ninth Circuit remanded for "the district court to give [the plaintiff] the option between a remittitur or a new trial.  While the district court has discretion to set the exact remittitur amount,

---

[236] *Acosta*, 718 F.3d at 823–24; *see also Gates v. Khokhar*, 884 F.3d 1290, 1302 (11th Cir. 2018) (quoting *Ashcroft*, 563 U.S. at 131) (noting "an officer who has arrested someone without probable cause might still be entitled to immunity" because the clearly established prong "does not ask whether there was probable cause in actuality" but instead "asks whether the preexisting law was so clear that, given the specific facts facing a particular officer, one must say that 'every reasonable official would have understood that what he is doing violates' the Constitutional right at issue").

[237] *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 531 (1958) (ordering a new trial based on the district court's erroneous ruling regarding the legal definition of a statutory employer, preventing the respondent from pursuing a viable affirmative defense).

[238] *Bell v. Williams*, 108 F.4th 809, 830–31 (9th Cir. 2024) (internal citations and quotes omitted); *see also Snyder v. Freight, Const., Gen. Drivers, Warehousemen & Helpers, Loc. No. 287*, 175 F.3d 680, 689 (9th Cir. 1999); *K.J.P. v. Cnty. of San Diego*, 621 F. Supp. 3d 1097, 1156–57 (S.D. Cal. 2022) (concluding an $80 million award of noneconomic wrongful death damages in a § 1983 case was grossly excessive and necessitated "a new trial on wrongful death damages").

1  we find it difficult to conceive that [the plaintiff's] emotional distress and pain and suffering could

2  be valued reasonably anywhere above $150,000." *Id.* at 835.

3  The *Bell* plaintiff "rated his pain as 9.5 out of 10, and he testified that he felt degraded during

4  the experience.  But all told, the transport between cells lasted less than two minutes." *Id.* at 833.

5  "At most, he had to endure pain for a few days while his minor physical injuries healed." *Id.* at

6  833.  Stating that "[l]ocating the upper limit" of a damages award "is a question of law," *Bell* settled

7  on the $150,000 figure by surveying cases limiting awards based on similar facts.  *Id.* at 831–832.

8  The jury's $1.5 million award is grossly excessive and monstrous, not supported by the

9  record, based on speculation and guesswork, and "contrary to the clear weight of the evidence,"[239]

10  requiring remittitur or a new trial.  The award here is even more erroneous than the one in *Bell*.

11  True, several beanbags struck Jorge Antonio, causing some bruises and pain.[240]  But the

12  importance of this point cannot be overstated: the Estate cannot recover any damages for bruises or

13  pain caused by the beanbags because firing the beanbags was objectively reasonable as a matter of

14  law and justified in preventing Jorge Antonio from assaulting Snyder, as the jury concluded.  The

15  same would be true for any emotional or psychological pain or trauma caused by the beanbags,

16  setting aside the fact that the record lacks evidence of any such pain or trauma.

17  Besides the beanbags being lawful and justified, only twelve seconds passed between the

18  beanbags and when Emerton or Locher lawfully and justifiably killed Jorge Antonio in self-defense

19  with an unsurvivable rifle shot.[241]  Thus, the purported First Amendment violation and the supposed

20  pain, bruising, or trauma from the beanbags lasted just twelve seconds.

21  *Bell* found the $504,000 award grossly excessive and unsupported by the record when the

22

23  [239] *Bandary v. Delta Air Lines, Inc.*, 623 F. Supp. 3d 1071, 1077 (C.D. Cal. 2022) (granting a new

24  trial following a $2.5 million award for bodily injuries caused by handcuffs).

25  [240] Day-6-Tr.-(Vilke) 92:12–14 (wherein Defendants' medical expert Dr. Gary Vilke testified that
   beanbags "can cause pain. We know that they cause bruises and contusions."); Day-5-Tr.-
   (Omalu) 184:16–185:24 (wherein Plaintiffs' medical expert Dr. Bennet Omalu described an

26  injury from a beanbag). Neither Dr. Omalu nor Dr. Vilke knows the exact number of beanbags
   that struck Jorge Antonio other than that several beanbags struck him in the lower abdomen and

27  legs. Day-5-Tr.-(Omalu) 212:22–213:5; Day-6-Tr.-(Vilke) 88:19–22.

28  [241] Day-2-Tr.-(Squeo) 126:8–22; *see also id.* 129:12–13; Day-4-Tr. (Emerton) 143:1–3; Day-4-Tr.-
   (Fryman) 257:12–16.

1    ordeal "lasted less than two minutes," and the plaintiff "had to endure pain for a few days while his

2    minor physical injuries healed." *Id.* at 833. The $1.5 million award here is even more unsupported

3    by the record, considering that Squeo justifiably fired the beanbags to protect Snyder, and Jorge

4    Antonio was lawfully and justifiably killed by an unsurvivable rifle shot to the head just twelve

5    seconds later. Hence, this Court should either remit the verdict to $150,000, per the maximum

6    recovery allowed in *Bell*, or grant Squeo a new trial on the First Amendment claim.

7    **G.    The Rejection of Squeo's Proposed Special Verdict Form and Special Interrogatories**
     **Was a Prejudicial Abuse of Discretion Requiring a New Trial**.

8

9            On the fourth day of trial on October 23, 2025, this Court instructed the parties "to start

10   thinking about" giving special interrogatories to the jury, noting that for "the First Amendment, ...

11   it would potentially be the issue of the bat" for a special interrogatory.[242] For that reason, Squeo

12   filed a proposed special verdict form and special interrogatories on October 28, 2025, proposing

13   asking the jury, among other things, "Did John Squeo deploy the beanbags because he saw Mr.

14   Antonio reach for what he believed was a bat?"[243] But the next day, this Court decided not to

15   request a special verdict or give special interrogatories, concluding "that the issues that the special

16   interrogatories raise are also captured in the instructions as well."[244]

17           "The decision whether to submit a general verdict accompanied by special interrogatories

18   is committed to the discretion of the trial court."[245] Respectfully, the decision not to request a

19   special verdict or to give special interrogatories was an abuse of discretion that prejudiced Squeo

20   and necessitates a new trial. This Court said that "the First Amendment claim is actually one of the

21   more complicated claims" in this case.[246] Squeo's proposed special verdict form and special inter-

22   rogatories would have helped the jury navigate and understand that complicated claim.

23

24   ---

     [242] Day-4-Tr. 7:17–10:1.

25   [243] Squeo Proposed Special Verdict Form, Dkt. 239, Oct. 28, 2025, at 1:23–25; *see also id.* 6:10–
          12 ("Did John Squeo reasonably believe that Mr. Antonio was reaching for a bat before he
26        deployed the beanbags?").

     [244] Day-8-Tr. 23:1–8; *see also id.* 21:1–5.

27   [245] *Frank Briscoe Co. v. Clark Cnty.*, 857 F.2d 606, 614 (9th Cir. 1988); *see also Hung Lam v. City*
          *of San Jose*, 869 F.3d 1077, 1086 (9th Cir. 2017).
28   [246] Day-7-Tr. 215:23–25.

1    The jury misunderstood that the First Amendment claim was limited to the beanbags and

2  did not include an arrest, as apparent from its question asking, "Is not listening to a police officer's

3  command three times against the law or ***arrestable***?"[247]  The questions proposed in Squeo's special

4  verdict form and special interrogatories would have prevented that confusion.[248]

5    Had it been asked to return a special verdict and been given the special interrogatories, the

6  jury would have returned a defense verdict for Squeo on the First Amendment claim because it

7  would have understood that the claim was limited to the beanbags and did not include an arrest.  In

8  fact, the special verdict form would have given the jury no option but to return a defense verdict

9  after answering "no" to the question, "Did John Squeo deploy the beanbags to retaliate against Mr.

10  Antonio for protesting?"[249]  Thus, a new trial is necessary on the First Amendment claim.

11  **H.    The Prejudicial Exclusion of Admissible Evidence Requires a New Trial**.

12    The Ninth Circuit reviews evidentiary rulings "for abuse of discretion.  We will reverse if

13  an erroneous ruling more probably than not affected the jury's verdict."[250]  "In a civil case, an

14  evidentiary error is prejudicial if it 'more probably than not tainted the verdict.'"[251]  Under Ninth

15  Circuit precedent, the prejudicial exclusion of admissible evidence warrants a new trial.[252]

16    When deciding whether to grant a new trial based on an evidentiary ruling, the Ninth Circuit

17  "must determine whether the excluded evidence was relevant, whether its probative value was sub-

18  stantially outweighed by Rule 403 considerations, and, if exclusion was an abuse of discretion,

19

20

---

21  [247]  Day-10-Tr. 4:23–24 (emphasis added); *see also id.* 4:14–15:5.

22  [248]  *See, e.g.*, Dkt. 239 at page 2 ("Was Mr. Antonio protesting when John Squeo deployed the bean-
      bags?"); *see also id.* ("Did John Squeo deploy the beanbags to retaliate against Mr. Antonio for
      protesting?").

23  [249]  Dkt. 239 at page 2.

24  [250]  *Blind-Doan v. Sanders*, 291 F.3d 1079, 1082 (9th Cir. 2002) (internal citation omitted) (revers-
      ing a § 1983 verdict based on the erroneous exclusion of evidence).

25  [251]  *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1079 (9th Cir. 2019) (quoting *Wilkerson*, 772
26    F.3d at 838 (reversing a § 1983 verdict based on the erroneous exclusion of testimony regarding
      the decedent's past behavior).

27  [252]  *See, e.g.*, *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 526 (9th Cir. 1986) ("We remand
      for a new trial on account of the exclusion of expert testimony."); *see also Sidibe*, 103 F.4th at
28    706 (reversing and remanding for a new trial because the district court erred "in excluding
      highly relevant pre-2006 evidence"); *Blind-Doan*, 291 F.3d 1079; *Crawford*, 944 F.3d 1079.

whether that abuse more probably than not affected the verdict."[253]  Respectfully, under that standard, Squeo is entitled to a new trial based on this Court's prejudicial exclusion of admissible evidence related to Jorge Antonio's behavior, weapons, social media posts, and cell-phone content.

On May 31, 2024, Plaintiffs moved in limine (MIL No. 1) to exclude, among other things, Jorge Antonio's actions at a skirmish line, an illegally concealed handgun, his rifle's illegal short barrel, and Jorge Antonio's text messages, social media comments and posts, and cell phone notes.[254]  Shortly before his death, Jorge Antonio wrote numerous messages and posts advocating for violent confrontations with the police.[255]  A man of his word, he prepared to violently confront the police on June 1, 2020, by wearing a bulletproof vest and carrying three firearms, including an illegally concealed handgun and a rifle with an illegal short barrel.[256]  The illegal short barrel provided a tactical advantage for a fight by making the rifle lighter and more maneuverable.

That night, Jorge Antonio antagonized, harassed, and threatened officers as they rendered emergency aid to an incapacitated woman in downtown Las Vegas.[257]  He then moved to the front of a large and violent crowd on Las Vegas Blvd. and Fremont St. during the dispersal order.[258]

Defying the order, he approached a police skirmish line, crouched in a "cowboy" shooting stance, and put his hand on or near his handgun, all to provoke the police to shoot toward protesters behind him.[259]  There is no debate that he engaged in that provocative conduct: photographs and videos captured his actions, and nonparties described their observations in depositions.[260]  When they opposed MIL No. 1, Defendants filed extensive supporting evidence into the record, including, without limitation, videos, photographs, and the deposition transcripts of eyewitnesses.[261]

---

[253] *Shad*, 799 F.2d at 529.
[254] MIL No. 1 at 2:1–24, Dkt. 141, May 31, 2024.
[255] *See* Defs.' Joint MIL No. 1 Opp'n at 5:15–6:6, Dkt. 149, June 14, 2024.
[256] MIL No. 1 Opp'n 6:7–7:12.
[257] MIL No. 1 Opp'n 7:13–8:3.
[258] MIL No. 1 Opp'n 8:4–9:1.
[259] MIL No. 1 Opp'n 9:2–11:2.
[260] MIL No. 1 Opp'n 9:2–11:2.
[261] *See* docket entries no. 150–153.

Although facts unknown to officers "are irrelevant to the reasonableness analysis"[262] for a Fourth Amendment claim, the Ninth Circuit and its sister circuits nevertheless admit information unknown to the officers in excessive force cases when such evidence is offered for a purpose other than establishing someone's character or the reasonableness of the force.[263]  *See, e.g., Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938 (9th Cir. 2009); *see also Burton v. City of Zion*, 901 F.3d 772 (7th Cir. 2018); *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795 (11th Cir. 2017); *Doornbos v. City of Chicago*, 868 F.3d 572 (7th Cir. 2017).

This Court granted MIL No. 1 and declined to follow *Boyd*, calling it "a completely anomalous decision as far as I'm concerned as relates to what's permitted in."[264]  *But see Barnes v. Felix*, 605 U.S. 73, 80 (2025) (quoting *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427–28 (2017)) (assessing "the reasonableness of police force requires analyzing the 'totality of the circumstances,'" which, here, would include Jorge Antonio's behavior and weapons).  This Court also did not address Squeo's argument that the limit on unknown information applies only to Fourth Amendment claims and not to First Amendment or battery claims.[265]  Nor did it address Squeo's request for an instruction limiting the evidence to the latter claims.[266]

Excluding this admissible evidence prejudiced Squeo and necessitates a new trial.  The excluded evidence was highly relevant under Fed. R. Evid. 401 and not inadmissible under Fed. R. Evid. 403.  If it had heard about Jorge Antonio's comments advocating violence against the police, his conduct threatening other officers in downtown Las Vegas just a few blocks away earlier that night, his illegal short-barrel rifle, and his illegally concealed handgun, the jury would have found

---

[262] *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 n.6 (9th Cir. 2021).

[263] MIL No. 1 Opp'n 19:19–26:13.

[264] Calendar Call Tr. 14:14–15, Dkt. 195, July 2, 2024 (transcript filed on July 21, 2025); *see also* Minute Order, July 15, 2025, Dkt. 176 ("Defendants' Joint Motion [135] to Admit Evidence is DENIED without prejudice and Plaintiffs Motion [141] in Limine No. 1 is GRANTED. Neither party may offer evidence regarding Decedents intentions, motive, or prior acts.").

[265] MIL No. 1 Opp'n 4:20–22 ("Further, Plaintiffs fail to inform this Court the generalized legal proposition on which they rely is limited to excessive force claims. Plaintiffs neither argue nor show that the proposition applies to their First Amendment or state law claims."); *see also id.* 18:1–18 (showing the evidence is relevant and admissible for these claims).

[266] MIL No. 1 Opp'n 25:16–26:13.

1    for Squeo on the First Amendment claim.  The jury would have recognized from the excluded evi-

2    dence that Jorge Antonio was not engaged in constitutionally protected activity but was looking to

3    provoke a violent confrontation with the police, something he succeeded in doing.

4         Even more, the jury would have understood from the excluded evidence that Jorge Antonio

5    was not lawfully protesting because he was carrying and hiding illegal weapons.  His "not normal

6    walking or behavior,"[267] to use this Court's words, was not protected expressive conduct but was

7    pursued to conceal the rifle on his right side to keep the police from spotting the illegal short barrel.

8         Multiple times at trial, Plaintiffs opened the door to the excluded evidence by (1) telling the

9    jury during openings that Jorge Antonio lawfully carried his rifle and was permitted to have the

10    rifle (which was false because of the illegal short barrel and the illegally concealed handgun);[268]

11    and (2) soliciting testimony that Jorge Antonio appeared fearful, inconsistent with the videos, pho-

12    tos, and observations of his brazen conduct around Las Vegas Blvd. and Fremont St.[269]

13         In summation, respectfully, this Court committed prejudicial and reversible error by grant-

14    ing MIL No. 1, excluding the above evidence, and not allowing Squeo to introduce the excluded

15    evidence after Plaintiffs repeatedly opened the door, requiring a new trial.

16                          **V.  CONCLUSION.**

17         This Court should enter JMOL for Squeo or, in the alternative, grant him a new trial.  As for

18    the grossly excessive damages award, this Court should remit the damages or grant a new trial.

19              Dated December 16, 2025.

20              MCNUTT LAW FIRM, P.C.

21              */s/ Dan McNutt*
              Daniel R. McNutt, Esq., Bar No. 7815

22              Matthew C. Wolf, Esq., Bar No. 10801
              Mark D. Hesiak, Esq., Bar No. 12397

23              11441 Allerton Park Drive, Suite # 100
              Las Vegas, Nevada 89135

24              *Counsel for Defendant Detective John Squeo*

25

26    [267]  Day-7-Tr. 227:2–10.

27    [268]  Day-2-Tr. 46:2–4 ("Now, he did have visible on him slung over his right shoulder a rifle pointed
       down to the ground, and the evidence will be he was permitted to have that and it was lawful.");
       *see also id.* 59:12–68:9 (conducting a sidebar on that comment).

28    [269]  Day-5-Tr. 34:21–25; Day-6-Tr. 19:21–23:17.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF SERVICE

On December 16, 2025, the undersigned served a true and correct copy of **Defendant Detective John Squeo's Motion for Renewed Judgment as a Matter of Law or Alternatively for a New Trial and Remittitur** via electronic mail through the United States District Court's CM/ECF system to all persons registered to receive electronic service.

*/s/ Lisa Heller*
An Employee of McNutt Law Firm, P.C.