**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

JEANNE LLERA, *et al.*

Plaintiff,

v.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT, *et al.*

Defendants.

Case No. 2:20-cv-01589

**ORDER ON POST TRIAL MOTIONS**

Before the Court are eleven post-trial motions filed by the parties, including Defendants' Renewed Motions for Judgment as a Matter of Law (ECF Nos. 276, 282), Motions for New Trial (ECF Nos. 277, 280), a Motion to Amend Judgment (ECF No. 281) and related motions, as well as Plaintiffs' Motion for Attorneys' Fees (ECF No. 285). For the reasons discussed below, Defendants' Motions for Judgment as a Matter of Law and Motions for a New Trial are both **DENIED**. The remaining motions are addressed herein.

## I. PRELIMINARY MATTERS

The Court begins by resolving several preliminary matters. First, the Court acknowledges that Defendant John Squeo prepared an omnibus motion, combining his Renewed Motion for Judgment as a Matter of Law and his Motion for a New Trial and Remittitur. Likewise, Defendant Ryan Fryman combined his Motion for New Trial and Motion to Amend the Judgment. The Court will address each motion in turn. Second, and relatedly, Defendant Squeo moved for leave to file excess pages as to the omnibus motion, ECF No. 275, as well as for his reply in support of that motion, ECF No. 299. Defendant Fryman also moved for leave to file excess pages as to his combined Motion for a New Trial and Motion to Amend the Judgment. ECF No. 279. No party opposed any of these three motions. Good cause appearing, all three Motions for Leave to File

Excess Pages are granted *nunc pro tunc*; the Court has considered the parties' briefs in full in reaching the rulings below.

## II. RELEVANT FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Jeanne Llera and Jorge L. Gomez, parents of Decedent Jorge A. Gomez ("Decedent"), commenced this action on August 29, 2020, filing their complaint raising both federal civil rights violations and state tort claims. ECF No. 2. Specifically, Plaintiffs alleged that on June 1, 2020, Decedent was fatally shot and killed by law enforcement officers, after he attended Black Lives Matter protests in downtown Las Vegas. Id. Plaintiffs made the following federal claims: violation of free speech and right to peaceful protest; unlawful search and seizure—excessive force; unreasonable search and seizure—denial of medical care; violation of substantive due process; municipal liability for unconstitutional practice or policy; municipal liability for failure to train; and municipal liability for ratification of misconduct. Id. Plaintiffs' complaint also raised two state law causes of action for battery and negligence, for which Plaintiffs sought wrongful death and survival damages. Id.

The Court ruled on numerous pre- and mid-trial motions from both parties. The Court granted in part and denied in part both the Motion for Summary Judgment from Defendant Squeo as well as the Motion for Summary Judgment from Defendants Dan Emerton, Vernon Ferguson, Ryan Fryman, Andrew Locher, and Las Vegas Metropolitan Police Department ("LVMPD"). ECF No. 120. The Court also denied motions for Judgment as a Matter of Law from both parties, ECF No. 241, and ruled on several motions *in limine*, ECF Nos. 176, 190, 211. Defendants jointly submitted proposed jury instructions, ECF No. 164, as did Plaintiffs, ECF No. 170. The case proceeded to trial on eleven claims: (1) a First Amendment retaliation claim against Defendant Squeo; (2) a Fourth Amendment excessive force claim against Defendant Squeo; (3) a Fourth Amendment excessive force claim against Defendant Fryman; (4) a Fourth Amendment excessive force claim against Defendant Emerton; (5) a Fourth Amendment excessive force claim against Defendant Ferguson; (6) a Fourth Amendment excessive force claim against Defendant Locher; (7) a Nevada law battery claim against Defendant Squeo; (8) a Nevada law battery claim against Defendant Fryman; (9) a Nevada law battery claim against Defendant Emerton; (10) a Nevada law

battery claim against Defendant Ferguson; and (11) a Nevada law battery claim against Defendant Locher.

Trial and deliberations lasted from October 20, 2025, to November 3, 2025. The jury returned a split verdict, ultimately finding: (1) Defendant Squeo was liable on the First Amendment claim, awarding $1,500,000 in compensatory damages to the Estate, but not liable on the Fourth Amendment or battery claims; (2) Defendant Fryman was liable on the Fourth Amendment excessive-force claim, awarding $2,500,000 in compensatory damages to the Estate, and was liable on the Nevada battery claim, awarding $1,250,000 each to Plaintiffs Llera and Gomez; and (3) Defendants Emerton, Ferguson, and Locher were not liable on any claims. ECF No. 261. Judgment was entered November 18, 2025. ECF No. 266.

On December 16, 2025, Defendants filed the following motions: Defendant Squeo's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial and Remittitur (ECF Nos. 276, 277); Defendant Fryman's Renewed Motion for Judgment as a Matter of Law (ECF No. 282), and Motion for a New Trial and Motion to Amend Judgment (ECF Nos. 280, 281). Plaintiffs opposed these motions on January 16, 2026, ECF Nos. 288, 290, 292, and Defendants replied in support of their motions on February 23, 2026, ECF Nos. 300, 301, 302, 303. On December 23, 2025, Defendants Squeo and Fryman also jointly moved to stay execution of the judgment, ECF No. 283, which Plaintiffs opposed on January 6, 2026, ECF No. 284. Defendants replied in support of this motion on January 13, 2026. ECF No. 287. Additionally, Plaintiffs moved for statutory attorneys' fees on January 6, 2026, ECF No. 285, which Defendants jointly opposed on February 3, 2026, ECF No. 295. Plaintiffs submitted a reply on February 24, 2026, ECF No. 304, and, on May 11, 2026, Plaintiffs' attorneys submitted four declarations in support of the motion, ECF Nos. 305, 306, 307, 308. Defendants submitted a supplemental opposition in response to the declarations on May 26, 2026. ECF No. 309. Finally, Plaintiffs submitted a Bill of Costs on January 6, 2026, ECF No. 286, which Defendants jointly objected to, ECF No. 296.

Having considered the foregoing filings, the Court's Order follows.

## III. LEGAL STANDARDS

### A. First Amendment Retaliation

To have prevailed on a First Amendment retaliation claim against a government official, Plaintiffs needed to prove three elements: (1) that Decedent was engaged in constitutionally protected activity, (2) that Defendant's conduct would "chill a person of ordinary firmness from future First Amendment activity," and (3) that their evidence proves that the Defendant's "desire to chill" Decedent's constitutionally protected conduct was a "but-for cause" of the officer's conduct. See Nieves v. Bartlett, 587 U.S. 391, 397 (2019); Index Newspapers LLC v. United States Marshals Serv., 977 F.3d 817, 827 (9th Cir. 2020). As to the first element, the Decedent's expressive conduct—where he intended to convey a particularized message and there was a significant likelihood his message would be understood by those who viewed it—would be constitutionally protected activity. See Spence v. Washington, 418 U.S. 405, 410–11 (1974); Roulette v. City of Seattle, 97 F.3d 300, 305 (9th Cir. 1996).

**B. Fourth Amendment Excessive Force**

Under the Fourth Amendment, whether an officer used impermissibly excessive force when effecting an arrest, investigatory stop, or other kind of seizure, is analyzed under an objective-reasonableness standard. See Graham v. Connor, 490 U.S. 386, 395 (1989). Under this inquiry, the officer's actions must have been objectively reasonable considering the facts and circumstances he confronted in the moment, without regard to his underlying motivations. This totality of the circumstances test requires attention to the severity of the risk posed to the safety of the officers, and whether the suspect was actively resisting or attempting to evade arrest. See id. at 396. The test also acknowledges that officers can be forced to make split-second decisions under tense and rapidly evolving circumstances. Id. at 396–97. The U.S. Supreme Court has affirmed that the inquiry "has no time limit" and requires looking to the entire encounter leading up to the use of force, not just the isolated moment in time that the force was used. Barnes v. Felix, 145 S. Ct. 1353, 1358 (2025).

**C. Motion for a New Trial or Remittitur**

It is the jury's province as factfinder to weigh evidence, determine credibility, and generate inferences from the evidence before them. United States v. Preston, 873 F.3d 829, 836 (9th Cir. 2017); United States v. Bonds, 784 F.3d 582, 603 (9th Cir. 2015) (en banc). Accordingly, a jury's

verdict may only be set aside in instances of serious error; the trial court may grant a new trial only where "'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" Roy v. Volkswagen of Am., Inc., 896 F.2d 1174, 1176 (9th Cir. 1990) (quoting Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir. 1976)). Indeed, while it is a district court's duty to "weigh the evidence as [it] saw it," and to set aside the verdict if it is contrary to the "clear weight of evidence," a court must not grant a new trial simply when it could have reached a different verdict. See Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). In general, a court should grant a new trial only when the judge "is left with the definite and firm conviction that a mistake has been committed." Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir. 1987) (quoting 11 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2806, at 49 (1973)).

If the judge determines such a mistake has been made, Federal Rule of Civil Procedure 59(a) allows a district court to "grant a [party's motion for a] new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(A). "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'" Murphy v. City of Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) (quoting Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980)).

Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted . . . . [courts] are thus bound by those grounds that have been historically recognized." Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003). Such historical grounds include claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving[.]" Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940); see also Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 510 n.15 (9th Cir. 2000). "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." Murphy, 914 F.2d at 187.

When a district court determines whether an award of damages is excessive, that court must

view evidence concerning damages in the "light most favorable to the prevailing party." Fenner v. Dependable Trucking Co., Inc., 716 F.2d 598, 603 (9th Cir. 1983). Typically, a court will only disturb a "jury's finding of the amount of damages if the amount is grossly excessive or monstrous." Zhang, 339 at 1040 (quoting Lambert v. Ackerley, 180 F.3d 997, 1011 (9th Cir. 1999) (citation modified)). If a court does determine the damages were grossly excessive, it has two options: "[i]t may grant the defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur." Fenner, 716 F.2d at 603. The proper amount of a remittitur is ordinarily the maximum amount sustainable by the evidence. See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1366 (9th Cir. 1986).

**D. Renewed Motion for Judgment as a Matter of Law**

A renewed motion for judgment as a matter of law is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. Castro v. Cnty. of L.A., 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting Pavao, 307 F.3d at 918) (quotations omitted). A jury's verdict must be upheld under Federal Rule of Civil Procedure 50(b) if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. See id. That is to say, the verdict will be upheld under Rule 50(b) absent a circumstance where "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006). As a result, Rule 50(b) imposes a very high, demanding standard that strictly limits the Court's role: the Court may not make credibility determinations or weigh the evidence, nor "substitute its view of the evidence for that of the jury," but instead, must view the evidence in the light most favorable to the nonmovant. Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)); see also Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 512 & n.6 (9th Cir. 2004); Josephs, 443 F.3d at 1062. This standard is markedly higher than the standard governing a motion for a new trial, so a party who has not met the standard for a new trial necessarily cannot meet the judgment as a matter of law standard either. See Lobato v. Las Vegas Metro. Police Dep't, 2026

WL 891887, at *3 (D. Nev. Mar. 31, 2026); see also Dees v. Cnty. of San Diego, 960 F.3d 1145, 1155 (9th Cir. 2020). A party may only raise in a Rule 50(b) motion arguments it already raised in its pre-verdict Rule 50(a) motion and may not raise new ones. Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d 1075, 1082 (9th Cir. 2009).

### E. Motion to Alter or Amend the Judgment

Rule 59(e) allows for motions to "alter or amend a judgment." FED. R. CIV. P. 59(e). Amending the judgment is appropriate "if the district court: (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." Cir. City Stores, Inc. v. Mantor, 417 F.3d 1060, 1064 (9th Cir. 2005) (citing Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993)). Indeed, a Rule 59(e) motion is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." Wood v. Ryan, 759 F.3d 1117, 1121 (9th Cir. 2014) (citing Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000)).

### F. Motion for Bill of Costs and Attorneys' Fees

Rule 54(d)(1) creates a strong presumption in favor of awarding costs to the prevailing party. See FED. R. CIV. P. 54(d)(1); Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572, 591 (9th Cir. 2000) (*en banc*). The losing party must overcome that presumption and demonstrate why costs should not be awarded; while a district court "needs no affirmative reason" to award costs, it "must specify reasons" if it does deny costs to the prevailing party. Id. at 593.

Under 42 U.S.C. § 1988(b), a court may award reasonable attorneys' fees to the prevailing party in a § 1983 claim. For purposes of attorneys' fees, a plaintiff may be considered the "prevailing party" if they succeed on "any significant issue in litigation which achieves some of the benefit parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Reasonableness is measured using the lodestar method. First, the trial court calculates attorneys' fees by multiplying the number of hours reasonably spent by counsel by a reasonable hourly rate. Morales v. City of San Rafael, 96 F.3d 359, 363 (9th Cir. 1996). This

determination is made by examining the prevailing market rates in the relevant community charged for similar services by "lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The "relevant community" for these purposes is the district in which the lawsuit proceeds. Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997); Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992).

"Importantly, the fee applicant has the burden of producing 'satisfactory evidence' that the rates he requests meet these standards." Gonzalez v. City of Maywood, 729 F.3d 1196, 1206 (9th Cir. 2013). Once the fee applicant has met its burden, the opposing party "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." Gates, 987 F.2d at 1397.

The resulting figure may then be adjusted based on the factors set forth in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69–70 (9th Cir. 1975). These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Id. However, in spite of these factors, there is a strong presumption that the lodestar figure itself is reasonable, rebuttable only in "rare" and "exceptional" circumstances. See City of Burlington v. Dague, 505 U.S. 557, 562 (1992); Edmo v. Corizon, Inc., 97 F.4th 1165, 1168 (9th Cir. 2024).

**G. Motion to Stay Execution of Judgment**

A party wanting to avoid immediate enforcement of a money judgment has two options under Rule 62(b): (1) post security and receive a stay as of right, or (2) ask to be excused from posting security at all. Rule 62(f) demands a separate analysis: whether state law would give the same relief to the party regardless of how the Rule 62(b) question comes out. NLRB v. Westphal,

859 F.2d 818, 819 (9th Cir. 1988).

***i. Rule 62(b)***

Under Rule 62(b), a party may obtain a stay of execution of a money judgment if the party provides a bond or other security. The stay then takes effect when the court approves the bond. See FED. R. CIV. P. 62(b); In re Combined Metals Reduction Co., 557 F.2d 179, 193 (9th Cir. 1977). No further showing is required because the security itself is what earns the party the stay—the purpose of requiring security is to protect the judgment holder against the risk of a future uncollectible judgment as well as to compensate for the delay. Westphal, 859 at 819.

A stay with no security at all is reserved for unusual circumstances. Several courts have noted that Rule 62 disfavors unsecured bonds. See, e.g., Int'l Wood Processors v. Power Dry, Inc., 102 F.R.D. 212, 214 (D.S.C. 1984) ("Rule 62, taken in its entirety, indicates a policy against any unsecured stay of execution after the expiration of the time for filing a motion for a new trial."); Cohen v. Hansen, No. 212CV1401JCMPAL, 2016 WL 1411349, at *1 (D. Nev. Apr. 8, 2016); In re Apollo Grp. Inc., No. CV04-2147-PHX-JATLIT, 2008 WL 410625, at *1 (D. Ariz. Feb. 13, 2008). Indeed, while true that whether to grant a partially secured or unsecured stay remains "within the discretion of the Court," Crowe v. Berryhill, No. 2:17-CV-02897-RFB-CWH, 2024 WL 409714, at *4 (D. Nev. Jan. 19, 2024), "a district court's authority to issue a stay is generally conditioned upon approval of a bond," United States v. Maris, No. 2:10-CV-1337-RCJ-RJJ, 2012 WL 1664209, at *1 (D. Nev. May 11, 2012) (citing Vacation Village, Inc. v. Clark Cnty., 497 F.3d 902, 913–14 (9th Cir. 2007)). But courts in this Circuit have not settled on a single test for deciding when such an unusual circumstance exists. Two approaches appear to be in use.

First, district courts in this Circuit regularly apply five factors set out in Dillon v. City of Chicago, 866 F.2d 902, 904–05 (7th Cir. 1988): (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure. Id.

(quotations and citations omitted).

Under the second approach, the court begins with a broader threshold question—whether the Court should even issue a stay in the first place—before it turns to whether to waive the supersedeas bond. One recent decision in this District applied the four-factor test for stays of injunctive relief to answer this first question: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Applications in Internet Time, LLC v. Salesforce, Inc., 2024 WL 5088486, at *1–3 (D. Nev. June 24, 2024) (citing Nken v. Holder, 556 U.S. 418, 425–26 (2009)); accord Leiva-Perez v. Holder, 640 F.3d 962, 964 (9th Cir. 2011) (applying the same test within this Circuit). The burden of establishing each of these factors is borne by "[t]he proponent of a stay[.]" Id. (citing Clinton v. Jones, 520 U.S. 681, 708 (1997)). But other courts have called the four-factor test "irrelevant" to a money-judgment stay and applied only Dillon. See Sarver v. Hurt Locker LLC, 2012 WL 12892147, at *2 (C.D. Cal. Feb. 2, 2012).

Whichever test applies affects only whether a party can be excused from posting security. Neither disturbs the automatic, as-of-right stay which remains available to any party willing to post an adequate bond.

***ii. Rule 62(f)***

Under Rule 62(f), "[i]f a judgment is a lien on the judgment debtor's property under the law of the state where the court is located, the debtor is entitled to the same stay of execution that a state court would give." FED. R. CIV. P. 62(f). In other words, the rule entitles a judgment debtor to the same stay that state law would entitle them. See Hurley v. Atl. City Police Dep't, 944 F. Supp. 371, 372 (D.N.J. 1996). Rule 62(f) and Rule 62(b) serve different functions and are not mutually exclusive. Getting a stay through Rule 62(b) remains available option regardless of whether Rule 62(f) applies. See Vacation Village, Inc. v. Clark Cnty., 497 F.3d 902, 913–14 (9th Cir. 2007) (holding that the same bond-based stay mechanism, then numbered Rule 62(d) and now Rule 62(b), displaced a conflicting state-law requirement).

## IV. DISCUSSION

**A. Defendant Squeo's Motions for a New Trial and Remittitur and Renewed Motion for Judgment as a Matter of Law**

Defendant Squeo's motion presents three alternative forms of relief in a single filing: a new trial under Rule 59, renewed judgment as a matter of law under Rule 50(b), and, failing either, remittitur of the $1,500,000 award for violation of Decedent's First Amendment rights. ECF No. 276. The Court addresses each in turn.

**i. *Motion for a New Trial***

As previously stated, a trial court may grant a new trial only where "'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" Roy, 896 F.2d at 1176 (quoting Hanson, 541 F.2d at 1359). A new trial should only be granted when the court "is left with the definite and firm conviction that a mistake has been committed." Landes, 833 F.2d at 1372 (quoting 11 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2806, at 49 (1973)). Federal Rule of Civil Procedure 59 vests the trial court with a level of discretion if that standard is met: if the court is so firmly convinced that a mistake has been committed, it may grant a motion for new trial on any historically recognized ground. FED. R. CIV. P. 59(a)(1)(A); Murphy, 914 F.2d at 186; Zhang, 339 F.3d at 1035.

Defendant Squeo argues that he is entitled to a new trial on the following bases: (1) he is entitled to qualified immunity; (2) no evidence supports the verdicts; (3) the Court's answers to jury questions were prejudicially misleading; (4) the verdicts were inconsistent and irreconcilable; (5) the Court ruled incorrectly on the dispersal order; (6) the verdict was grossly excessive; (7) rejecting a special verdict form/interrogatories was a prejudicial abuse of discretion; (8) the Court's exclusion of admissible evidence was a prejudicial abuse of discretion. ECF No. 276. Defendant's argument for a new trial and remittitur fails on each of these grounds.

1. Qualified Immunity

Qualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time. Cuevas v. City of Tulare, 107 F.4th 894, 898 (9th Cir. 2024).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 577 U.S. 7, 11–12 (2015) (internal quotation marks, citations, and alterations omitted).

"The 'clearly established' inquiry is a question of law that only a judge can decide." Morales v. Fry, 873 F.3d 817, 821 (9th Cir. 2017). "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; see also Ziglar v. Abbasi, 582 U.S. 120, 151 (2017) ("Whether qualified immunity can be invoked turns on the 'objective legal reasonableness' of the official's acts."). "In the Ninth Circuit, we begin [the clearly established] inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." Moore v. Garnand, 83 F.4th 743, 750 (9th Cir. 2023).

Defendant Squeo argues that his actions did not violate clearly established law. To support this, Defendant Squeo argues that the jury's finding of non-liability on the excessive force claim is inconsistent with the jury's finding of liability on the First Amendment claim. Essentially, Defendant Squeo argues that, if force is reasonable under the Fourth Amendment, it must also be clearly established *not* to violate the First Amendment. ECF No. 276 at 3, 16. He cites cases from other circuits to argue that the law in this area is unsettled. Id. at 19. For example, he quotes a Fifth Circuit decision that "leave[s] the question for another day" whether the rule from Graham v. Connor, 490 U.S. 386 (1989)—that all excessive force claims be governed by the Fourth Amendment—bars a First Amendment retaliation claim arising under the same use of force. Id. at 22 (citing Batyukova v. Doege, 994 F.3d 717, 722 (5th Cir. 2021)). But the qualified immunity issue here is narrower: whether a reasonable officer in this Defendant's position would have understood that he may not use his authority—any authority—to retaliate against someone for protected speech was clearly established.

As explained in this Court's order denying Defendant Squeo's motions for summary judgment and initial judgment as a matter of law, which is fully incorporated by reference herein,

the Court finds that the verdict on the excessive force claim does not foreclose a verdict on the First Amendment claim. See ECF No. 120 at 12, 14 (citing Capp v. Cnty. of San Diego, 940 F.3d 1046, 1059 (9th Cir. 2019); see also Nieves v. Bartlett, 587 U.S. 391 (2019); ECF No. 268 at 234. The Court adds the following reasoning.

The Fourth Amendment and First Amendment claims are different and separate inquiries for the jury. Notably, the standard jury instructions in this Circuit for each claim contain multiple distinct factors. To collapse the rights into one instruction would be to suggest that the rights being protected are coterminous, which they clearly are not. For example, and significantly here, the Fourth Amendment instruction includes language that requires jurors to consider, *inter alia*, the extent to which a plaintiff's conduct affects the amount of force used and the amount of time the officer had to decide the type and extent of force used. The First Amendment instruction does not. Additionally, the Court cannot know what facts the jury found as to each claim to reach its respective verdicts. The jury may have found the same facts established a First Amendment violation, but not a Fourth Amendment violation. The jury could also have found that the actions taken by the officers, including Squeo, individually or collectively established a First Amendment violation, but not a Fourth Amendment violation. Alternatively, the jury could have found different facts were relevant to each violation. For example, the jury may have found that shooting the beanbags was not excessive force under the Fourth Amendment and separately found that shooting the beanbags would chill a person of ordinary firmness from continuing to engage in protected activity. The jury was presented with a range of possibilities as to Defendant Squeo's conduct. Defendant's argument presupposes knowledge of the facts decided by the jury and how the jury applied the law to those facts. Defendant and the Court cannot know either.

Moreover, as a matter of law, an excessive force claim does not resolve or negate the possibility of a First Amendment claim on related facts. For example, an objectively reasonable use of force, given the threat an officer perceived in the moment, can still be sufficient to deter an ordinary person from exercising their First Amendment rights. See Sanderlin v. Dwyer, 116 F.4th 905, 911 (9th Cir. 2024). In Sanderlin, the Ninth Circuit found that an officer's use of force against a protestor who had not immediately complied with a command, violated a "clearly established

right that police officers may not use their authority to retaliate against individuals for protected speech," identifying that the right had been clearly established by May 30, 2020. Id. (citing Ford v. City of Yakima, 706 F.3d 1188, 1195 (9th Cir. 2013)). Indeed, Sanderlin also demonstrates that Defendant's related argument, that the Fourth Amendment is the only framework that can govern such a case as this, is incorrect. The Ninth Circuit continues to analyze claims about retaliatory force independently, without reference to Fourth Amendment principles. Id. at 910–11; accord Cheairs v. City of Seattle, 145 F.4th 1233, 1243–47 (9th Cir. 2025) (affirming that this framework remains intact today even though).

Defendant also argues that he is entitled to qualified immunity because Decedent's conduct was not constitutionally protected. The Defendant notes that this Court also raised a similar concern when it heard Defendant's argument during his Rule 50(a) motion at trial. ECF No. 276 at 24. The Court did ask then whether a reasonable jury could infer that witnesses would have perceived a message from Decedent's manner of walking. Plaintiffs' counsel responded to the Court that such an inference could be drawn from the full context, including his presence at a protest against police violence, his stopping in front of the courthouse for ten to fifteen seconds after officers told him to keep moving, and his subsequent slow and deliberate walk away from the officers. ECF No. 268 at 226–29. On that basis, the Court allowed the claim to proceed to the jury. The issue is therefore one of sufficiency of the evidence, which the Court addresses below.

Plaintiffs separately argue that Defendant forfeited his qualified immunity claim altogether because he argued it based on a version of the facts that assumes the jury resolved all disputed issues in his favor, rather than correctly construing the record in the light most favorable to the Plaintiffs as Rule 50 instructs. ECF No. 292 at 19. The Ninth Circuit did accept a similar forfeiture theory in George v. Morris, 736 F.3d 829, 837 (9th Cir. 2013). The Court thus finds that this is a separate basis upon which to reject Defendant's argument.

2. Sufficiency of the Evidence

Defendant next argues that no evidence supports the verdict against him. He makes three arguments: (1) that under Mt. Healthy (as was correctly described in the jury instructions), Defendant would have taken his same actions even in the absence of any motive to retaliate; (2)

that no evidence supports the First Amendment's first prong, and (3) that no evidence supports the First Amendment's third prong. ECF No. 276 at 27–31.

Under Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), regardless of whether Decedent's actions were constitutionally protected, if Defendant could show that he would have taken the same actions even absent the protected conduct, then there is no First Amendment violation. Id. Using this rule, Defendant argues that the jury's verdict for the excessive force claim establishes, as a matter of law, that he would have fired the beanbags at Decedent regardless of any retaliatory motive. ECF No. 276 at 27–28. But whether force is *excessive* and whether it is *retaliatory* are different questions. A jury could reasonably and compatibly find that (1) with regard to the Fourth Amendment, the force used was reasonable under an objective standard, and that (2) with regard to the First Amendment, Decedent's protected activity was subjectively a substantial or motivating factor in Defendant's decision to fire. To further emphasize, the Fourth Amendment analysis under Graham is objective and specifically does not inquire into motive, and the opposite is true for the First Amendment analysis. Thus, the jury had sufficient basis under Mt. Healthy to find that Decedent's protected activity was the motivating factor in Defendant's decision.

Defendant also argues that, because Plaintiffs' First Amended Complaint states that Decedent was approaching the courthouse "not to protest" but to "go to his vehicle so he could leave the area," they conceded that he was not engaged in protected activity. ECF No. 276 at 4, 28. Defendant argues that walking to one's car is not protected, and that this admission forecloses any First Amendment violation under the first prong. Id. The Court is not persuaded by this argument. Plaintiffs also allege in the First Amended Complaint that Decedent was attending and participating in a protest more broadly that evening, and a single paragraph describing his immediate destination at one moment is not a binding admission that he had disengaged entirely from protected activity. See generally ECF No. 21. While Defendant attempts to treat Decedent's behavior as one of two binary options—either he was walking to leave or he was still protesting, but not both—that choice is a false one. The jury was entitled to find that Decedent's presence and engagement in the protest that evening was ongoing, even as he began to make his way towards

his car. Indeed, the jury must decide the facts based upon the evidence as presented to them at trial, not what was alleged in the First Amended Complaint. The Court rejects Defendant's argument.

Finally, Defendant contends that there is no evidence showing Decedent's protected activity was a "but-for cause" of Defendant's conduct in the first place—the third prong of the First Amendment claim. See ECF No. 276 at 29–31 (citing Cheairs, 145 F.4th at 1243–47; Hill v. City of Fountain Valley, 70 F.4th 507, 519 (9th Cir. 2023)). For the same reasons Defendant's Mt. Healthy argument fails, so too does this argument. The jury heard the full context of the encounter and reasonably inferred that Defendant would not have approached, confronted, and escalated the situation with Decedent, but for Decedent's protest activity. Further, Cheairs can be distinguished specifically on this point: in that case, uncontradicted video evidence eliminated any inference of retaliatory motive as a matter of law. Here the jury was presented with a combination of testimonial and video evidence that suggested various versions of the conduct by the officers on the steps, including Defendant Squeo. The various forms of evidence permitted a finding consistent with the verdict, defeating Defendant's sufficiency argument.

3. The Court's Answers to Jury Questions

The Ninth Circuit reviews a district court's responses to jury notes to assess whether they "correctly state[] the law" and "eliminate[] confusion." United States v. Castillo-Mendez, 868 F.3d 830, 835 (9th Cir. 2017). Where the jury's question does not reveal that the jurors were affirmatively misreading the law, and where the original instructions correctly stated the law and generally addressed the question already, a court acts within its discretion to simply point the jury back to those instructions. Crowley v. Epicept Corp., 883 F.3d 739, 751 (9th Cir. 2018); Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003). But even if there was an error, it is not reversible if "more probably than not" there would have been no change in the verdict. Clem v. Lomeli, 566 F.3d 1177, 1182 (9th Cir. 2009).

In this case, the jury's Day 8 note asked whether an act of noncompliance is itself expressive conduct. ECF No. 270 at 162. The Court told the jury that noncompliance "can be" expressive if it meets the instructions' definition of expressive conduct. The Court did not direct a verdict or tell the jury that noncompliance necessarily satisfies the first prong. Id. at 163. To add,

Plaintiffs' First Amendment claim was not premised solely on the singular act of noncompliance, but on the broader context of the protest activity, and the Court's answer correctly directed the jury back to the particularized-message test in its original instructions. But even if the Court had responded simply "no" to the jury's question, Defendant has not demonstrated that a negative answer would more probably than not have changed the verdict. The jury did not send any further notes on this question, demonstrating that the Court's answer did not confuse the jury in a way that prejudiced Defendant.

The Day 10 note from the jury asked whether repeated noncompliance is itself "arrestable." ECF No. 274 at 4. Defendant argues the jury's use of the word "arrestable" shows the jury imported an unpled arrest theory into the First Amendment analysis. ECF No. 276 at 35. The Court did acknowledge at the time that the jury should not consider an arrest theory for the First Amendment claim, ECF No. 274 at 10, but declined to give Defendant's proposed instruction because the scope of the question was ambiguous. The Court also stated to the parties outside of the presence of the jury, "I don't know that [the note is] about the First Amendment claim. And saying that might suggest that they think about it in that context, and that may not be what it's about, right." Id. at 7. In other words, instructing them thus could suggest something to them that they had not even considered. That concern was well founded, and the original instructions' adverse-action element never mentioned arrest, while the Fourth Amendment instruction expressly did reference a "lawful arrest." ECF No. 270 at 39.

4. Alleged Inconsistency of the Verdict

A court should uphold a verdict if it can be reconciled under any reasonable theory consistent with the evidence. Ward v. City of San Jose, 967 F.2d 280, 286 (9th Cir. 1991). That is true here. Defendant argues that the jury's verdict on the Excessive Force Claim necessarily forecloses any First Amendment violation as a matter of law. ECF No. 276 at 4. He argues that the verdict on the use of excessive force established factually that the Decedent was threatening and therefore his activity was no longer protected under the First Amendment. Id. at 18.

As previously discussed in Part IV.A.i.1, the Fourth Amendment and the First Amendment ask different questions and have different standards when analyzing the application of each. The

two claims require consideration of various factors and elements in determining liability, the most important of which do not overlap. For example, the Fourth Amendment claim focuses on the objective reasonableness of the officer's action, while the First Amendment claim focuses on the subjective motivation for the officer's action—that is, *why* the officer acted as he did, and specifically whether the plaintiff's protected activity was a substantial or motivating factor for the officer's reaction. Index Newspapers, 977 F.3d at 827. These are categorically different inquiries as to focus and scope. Thus, even if the jury found that the force was objectively reasonable, they could still have found that this particular officer was motivated to retaliate against Decedent for his protected activity.

In any case, Defendant waived any argument that the two claims required merged jury findings. The Ninth Circuit strictly holds that to raise an argument in a post-verdict motion, that argument must have been raised in a pre-verdict motion. Zhang, 339 F.3d at 1028–29 ("The failure to raise [an] issue prior to the return of the verdict results in a complete waiver, precluding our consideration of the merits of the issue."). Because the judgment here was entered according to a general verdict form, arguments about inconsistent verdicts should have been made pre-verdict. Cf. Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1369 (9th Cir. 1987) (holding that a party does not need to raise inconsistent answers pre-verdict to raise them later if the judgment was entered in accordance with a special verdict form). In any case, as the Ninth Circuit instructs, "[W]e have a duty 'to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence.' Emphasizing this duty to reconcile the jury's responses when possible, the Supreme Court has held: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'" Guy v. City of San Diego, 608 F.3d 582, 586 (9th Cir. 2010) (internal citations and quotations omitted).

Here, Defendant did not raise the possibility of inconsistent verdicts in his pre-verdict motion for judgment as a matter of law. He also did not request a jury instruction providing that a finding of objectively reasonable force on the Fourth Amendment claim would necessarily preclude a First Amendment verdict. And he did not object when the two claims were separately submitted on that basis before the case went to the jury. Indeed, while Defendant did request

special interrogatories before the case was submitted, it was for entirely different questions, not on the theory raised for the first time in these post-trial motions, that this combination of verdicts was not legally possible. Had Defendant believed then, as he argues now, that a finding of excessive force under the Fourth Amendment was a legal prerequisite to the First Amendment claim, the time to say so was before the case was submitted, not now, after the verdict was returned unfavorable to him. The strategic choice to litigate the claims as independent inquiries, and to let the jury reach independent verdicts on each, is not a persuasive reason for the Court to now overturn a jury verdict on the legal theory that the claims were never independent to begin with.

5. The Court's Dispersal Order Ruling

Defendant next argues that the Court should not have excluded Lieutenant Riback's testimony. ECF No. 276 at 36–39. Riback was the LVMPD downtown area commander that night and gave the dispersal order. Defendant sought to have him testify to the conditions justifying that order, but the Court heard his testimony only outside the jury's presence. Id. Defendant argues that the Court's exclusion of Lieutenant Riback's testimony, and its ruling that the dispersal order was not lawfully applicable to Decedent's conduct and location, deprived Defendant of a central defense and warrants a new trial. Id. Defendant's argument is without merit.

The dispersal order was never a viable defense to the First Amendment retaliation claim, and this Court has already held as much. At summary judgment, considering the dispersal order, the Court held that the "dispersal order issued at Las Vegas Boulevard and Fremont Street did not terminate Decedent's First Amendment right to express himself," including his right to "verbal criticism and challenge directed at police officers." ECF No. 120 at 9 (quoting City of Houston v. Hill, 482 U.S. 451, 461 (1987)). That holding remains sound now. While a dispersal order operates, at most, as a restriction on time, place, and manner of expressive activity, it cannot function as a blanket suspension of the First Amendment rights of every individual anywhere near its vicinity. See Get Outdoors II, LLC v. City of San Diego, Cal., 506 F.3d 886, 893 (9th Cir. 2007) (citing Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808 (1984)) ("[T]he regulations must not be 'substantially broader than necessary to protect the city's interests.'"). The trial did not establish that the dispersal order legally applied to the Defecedent, a

lone individual standing near the courthouse, obstructing no one, and far from any crowd needing to disperse at that moment. Even if the order was lawful for dispersing the crowd near Bridger Avenue, such an order would not become a lawful time-place-manner restriction as applied to someone else in a different location. It must be lawful as applied to the person in question's actual conduct and circumstances. See Menotti v. City of Seattle, 409 F.3d 1113, 1143 (9th Cir. 2005). Thus, the dispersal order would not have authorized Defendant to arrest Decedent, and it supplies no independent defense to the First Amendment retaliation claim, even if Defendant had been permitted to rely on it.

Defendant himself concedes that the dispersal order would not have justified shooting beanbags at Decedent. He testified "absolutely," when asked whether it would have been "inappropriate for [him] to fire [his] beanbag shotgun at [decedent]" even given the dispersal order, ECF No. 227 at 76–77, and his own counsel agreed on the record at trial that the dispersal order could not justify the deployment of beanbags. See ECF No. 268 at 218.

Moreover, even if Defendant did subjectively and reasonably believe he was enforcing a valid dispersal order, that belief cannot immunize him from a jury factual finding that his conduct was nevertheless substantially motivated by Decedent's constitutionally protected activities. The jury was entitled to weigh alongside everything else in the record his credibility in conveying what his beliefs had been and what motivated him. Defendant was permitted to argue that he acted pursuant to his understanding of his official duties. Indeed, Defendant testified before the jury that he believed he was enforcing the dispersal order, and the jury weighed that evidence and did not find it credible compared to the evidence that he was motivated to retaliate against Decedent. See ECF No. 268 at 218; ECF No. 227.

6. Alleged Grossly Excessive Verdict

For the same reasons addressed, *infra*, Part IV.A.ii., the Court rejects Defendant's grossly excessive verdict claim.

7. Rejection of Special Verdict Form and Interrogatories

Whether to submit special interrogatories to the jury is within the trial court's discretion. Acosta v. City & Cnty. of San Francisco, 83 F.3d 1143, 1149 (9th Cir. 1996); FED. R. CIV. P. 49(b).

An interrogatory that covers ground that the instructions already address but framed in a way that pushes the jury toward one side's version of events, is properly rejected as argumentative and unnecessary. United States v. Sarno, 73 F.3d 1470, 1485 (9th Cir. 1995); see also Sloman v. Tadlock, 21 F.3d 1462, 1468 (9th Cir. 1994) ("Special jury verdicts would unnecessarily complicate easy cases, and might be unworkable in complicated ones.").

That discretion was not abused here. Defendant proposed a single question for the jury: whether he deployed the beanbags because he believed Decedent was reaching for a bat. The Court reasonably found that question not dispositive of the First Amendment claim on its own, and that Defendant's broader proposal left out the other factual issues the claim actually turns on. Frank Briscoe Co. v. Clark Cnty., 857 F.2d 606, 614–15 (9th Cir. 1988). The jury instructions already captured the relevant issues, particularly the Mt. Healthy instruction, which asked substantively the same question Defendant's proposed interrogatory would have asked. ECF No. 270 at 23. Defendant was able to argue his theory of the case—that he fired the beanbags because he believed Decedent was reaching for a bat—to the jury under the instructions as given. Any error in declining the interrogatory was, on this record, harmless.

8. The Court's Exclusion of Prejudicial Evidence

Defendant also challenges the exclusion of evidence that as Decedent antagonized LVMPD officers on Fremont Street minutes before the shooting, as well Decedent's text messages and social media posts, and the illegal weapons found on his person. See Plaintiffs' Motion *in limine* No. 1, ECF No. 141, granted at ECF No. 176. The Court excluded this evidence because none of it was known to Defendant at the time and therefore could not have been relevant to what Defendant perceived. In his reply, Defendant argues that because the First Amendment instruction required that Decedent have "intended to convey a message," ECF No. 270 at 36, Defendant needed the excluded evidence to show that Decedent's actual intent was to confront officers, not to lawfully protest.

Defendant's argument misplaces the frame of reference for the First Amendment inquiry. That inquiry focuses on the alleged expressive conduct *observed by the defendant* and whether *that defendant believed or perceived* Decedent to be intending expressive conduct. Nieves, 587

U.S. at 397; Index Newspapers, 977 F.3d at 827. Decedent's true or actual intent is irrelevant. If the Court were to accept the Defendant's approach to this claim, a plaintiff's entire personal history of expressive conduct and behavior would be relevant to a First Amendment claim. This plainly misstates the law. The conduct that Defendant sought to admit was not known to or observed by Defendant and was therefore not relevant to the jury's inquiry.

Furthermore, Defendant has not demonstrated that the exclusion more probably than not affected the jury's verdict. The First Amendment inquiry and thus the verdict also rested on the jury's assessment of Defendant's motivations in engaging Decedent, not on Decedent's subjective purpose in attending the protest. The Court finds that the evidence is not clearly against the jury's verdict, but rather, the jury's verdict was supported by substantial evidence and should be upheld. Furthermore, the Court finds that there were no legal errors made at trial independently or cumulatively that were prejudicial to Defendant such that a new trial is warranted. To the extent Defendant has raised arguments not explicitly addressed in this Order, the Court finds the reasoning in Plaintiffs' briefing in opposition persuasive and hereby incorporates that reasoning by reference. For these reasons, Defendant Squeo's Motion for a New Trial is denied.

***ii. Remittitur***

Alternatively, Defendant asks the Court to remit the $1,500,000 First Amendment award. ECF No. 276 at 44. He relies primarily on Bell v. Williams, 108 F.4th 809 (9th Cir. 2024), to argue that comparable awards are capped at $150,000. ECF No. 276 at 45. While the court in that case discussed a cap for pain and suffering, the court also emphasized that each case must be decided on its own facts. Bell, 108 F.4th at 835. The Bell court explicitly stated: "We emphasize that the evidence presented at trial should be given foremost priority in assessing the reasonableness of a damages award. If the evidence is sufficient to support even a high award, there is no need to compare cases." Id. at 832. And importantly, in Bell, there was little evidence to justify the original amount in damages awarded by the jury, and what pain and suffering that plaintiff did endure, "did not leave lasting physical or emotional damage." Id. at 834. The same is not true here.

In that case, Bell was a pretrial detainee who sued, among others, the city of San Francisco under the Fourteenth Amendment for excessive force, and under the Americans with Disabilities

Act and Rehabilitation Act for denying him a wheelchair or prosthetic. The jury found the city liable and awarded $504,000 in compensatory damages against the city alone, without apportioning the award among the claims. The Ninth Circuit remanded the case with a choice for a new trial or remittitur because the plaintiff had some abrasions and bruising, but no lasting pain, no long-term psychological effects, and no need for medical treatment. Id. at 833–34. The only evidence of any pain was from Bell's own testimony from which the Ninth Circuit concluded, "At most, he had to endure pain for a few days while his minor physical injuries healed." Id. at 834.

In comparison, the trial record here supplies ample evidentiary support for the award given. Dr. Omalu testified that the beanbag rounds left a golf-ball-sized wound and wounds all over Decedent's body. One such wound was so bad it was initially mistaken for a real gunshot wound. And such beanbags are fired at high velocity and designed to inflict maximal pain. ECF No. 272 at 184–85, 193–95, 199–202, 205–06. The jury also heard evidence about the fearful expression on Decedent's face when he tried to flee, and the possibility that Decedent believed he was already being struck by live ammunition, rather than beanbags at that point. Id. at 34, 69, 71–72, 107, 138. Emotional and psychological pain and suffering of this kind may be inferred from the circumstances even without Decedent there to testify and is compensable even independently of physical injury. Tortu, 556 F.3d at 1086–87; see also Bell, 108 F.4th at 832 (citing Tortu for the same proposition). Unlike in Bell, where the panel could find no evidence beyond the plaintiff's own brief testimony to justify the damages, Bell, 108 F.4th at 834, the record here includes expert medical testimony, witness testimony, and video footage of the events to support the suffering the Decedent experienced, and his damage was obviously much more permanent than anything Mr. Bell experienced.

The jury was also not acting out of passion or prejudice. The jury's $4 million combined survival-damages award against Defendants Squeo and Fryman together was less than 27 percent of the $15 million Plaintiffs' counsel suggested in closing. ECF No. 270 at 92. It also split the verdict, finding liable only two officers out of five and under different theories, indicating there was no specific animus towards these two Defendants. ECF No. 261.

Nor is the award so large as to be monstrous or fall outside the range a reasonable jury

could find appropriate under the circumstances. $1,500,000 is a substantial award, but it is not disproportionate to the jury's finding that a law enforcement officer used his authority to retaliate against Decedent for exercising his First Amendment rights at a public protest concerning matters of significant public concern—precisely the context in which First Amendment protections carry the greatest weight. The Court will not substitute its own damages assessment for the jury's, and instead affords it the substantial deference to which it is entitled. See Harper v. City of Los Angeles, 533 F.3d 1010, 1028 (9th Cir. 2008) (noting that a jury's damages finding is entitled to "substantial deference," and the reviewing court gives the verdict "the benefit of every doubt"); Bell, 108 F.4th at 831 (quoting Harper). No showing that the award is grossly excessive has been made here. Defendant Squeo's request for remittitur is denied.

***iii. Renewed Motion for Judgment as a Matter of Law***

The Court again highlights the comparative standards of motions under Rule 50 and Rule 59. A Rule 50 Renewed Motion for Judgment as a Matter of Law imposes a higher standard than a Rule 59 Motion for a New Trial. A renewed motion for judgment as a matter of law is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits a single reasonable conclusion that is contrary to the jury's verdict. Castro, 833 F.3d at 1066. Thus, because Defendant raised arguments in his Rule 59 Motion that are identical to those raised in his Rule 50 Motion, these arguments necessarily fail for the reasons set forth in Section IV(A)(i). The Court incorporates by reference its reasoning in Section IV(A)(i) here and finds that, because the verdict was not against the weight of the evidence on any of these grounds, Defendant necessarily fails to prove he is entitled to Rule 50 relief when considering the evidence construed in the light most favorable to the Plaintiffs.

**B. Defendant Fryman's Motions for a New Trial, Remittitur, and Judgment as a Matter of Law**

Defendant Fryman moves for a new trial or alternatively to alter or amend the judgment under Rule 59, and he separately renews his motion for judgment as a matter of law under Rule 50(b). ECF Nos. 280, 281, 282. The Court addresses each in turn.

***i. Motion for a New Trial***

Defendant Fryman argues that he is entitled to a new trial on the following bases: (1) the clear weight of the evidence shows that his use of lethal force was reasonable; and (2) there were cumulative errors at trial that made it fundamentally unfair, specifically denying his request for a special interrogatory or verdict form, excluding admissible evidence, and erroneously instructing the jury on the Fourth Amendment. ECF No. 280. Defendant's argument for a new trial and remittitur fails on each of these grounds.

1. The Clear Weight of the Evidence

Defendant argues that the clear weight of the evidence established that Decedent raised his rifle "as if to fire," making the verdict against him individually unsustainable. ECF No. 280 at 12. Defendant points to his own testimony and corroborating testimony from other officers Dennett and Lee that the rifle came up, arguing that the jury's finding of non-liability for the other Shooting Officers necessarily means that the jury found the rifle was indeed raised, which should eliminate any basis for liability against him. Id. The Court has carefully weighed the evidence and concludes that the clear weight does not mandate a verdict in Defendant's favor individually.

The Court first notes, as it has previously in this Order, that the Defendant and the Court cannot know the factual findings of the jury as to the various theories of liability and respective defendants in this case. The jury was presented with video evidence, officer testimony, eyewitness testimony, photographic evidence and expert testimony over the course of several days. Defendant's attempt to compress all of this evidence into an unassailable version of the facts is completely undercut by the vast amount of evidence, some of which was conflicting and much of which required individualized credibility and relevance determinations by the jury. Thus, the first fundamental flaw in Defendant Fryman's argument is his assertion that his version of the facts is the only one the jury could have or should have accepted.

The jury returned a carefully individualized split verdict which, contrary to Defendant's assertion, shows that it assessed each officer separately rather than as an undifferentiated group. The jury had before it evidence that was specific to this Defendant from which it could find facts unique to him. For example, Defendant Fryman observed Decedent for only "about a quarter of a second" before firing, the shortest interval of any Shooting Officer. He also admitted on cross-

examination that he could not see Decedent's rifle through his gunsight while firing and did not know where the rifle was pointed during his shots. Defendant fired seven shots—the most of any officer. Defendant gave rambling and conflicting answers as to the facts of the shooting, which provided the jurors with a wealth of possible facts from which to choose. And his substantial testimonial difficulties, which required the Court to intervene repeatedly through sidebars and ultimately to restrict him to "yes/no" answers, were observed directly by the jury. Indeed, Defendant's own counsel had to acknowledge that the Court needed to intervene to curtail the rambling testimony of the Defendant. A jury is entitled to assess a witness's credibility and weigh that evidence as it sees fit.

At trial, Plaintiffs presented evidence—like shots to Decedent's back—that also raised the issue of whether Defendant knowingly and intentionally continued to fire at Decedent even as he fell to the ground and posed no threat. The jury was presented with forensic, expert and testimonial evidence that suggested Defendant Fryman had time to assess the level of the threat Decedent posed, before Defendant fired several shots that could have struck the Decedent in the back or the head as he was almost on the ground.

Defendant cites several cases to claim it was reasonable for him to keep shooting, because officers need not justify every shot fired within a single volley. He frames the entire slew of shots as justified, due to the threat he perceived at the outset and that the later shots do not need any additional or separate scrutiny. Defendant states, "It makes no difference whether Sergeant Fryman fired four shots or seven; his use of lethal force was reasonable because he fired a single volley and ceased firing after the initial volley and clearly incapacitated Jorge Antonio." ECF No. 280 at 15–16 (discussing ECF No. 265 at 171–72, 257). He argues that the U.S. Supreme Court "soundly rejected" in Plumhoff v. Rickard, 572 U.S. 765 (2014), the argument that Plaintiffs make sure, that "even if the initial force was reasonable, the number of shots fired went too far," ECF No. 280 at 15, because officers "are taught to keep shooting until the threat is over." Plumhoff, 572 U.S. at 775. However, in its more recent decision, Barnes v. Felix, 145 S. Ct. 1353, 1354 (2025), the Supreme Court unanimously rejected an artificially narrow, time-limited review of an officer's use of force. Instead, the Court re-emphasized the need to assess the situation under a totality-of-the-

circumstances approach, considering everything leading up to and throughout the encounter. Id. at 1354.

Further, Plaintiffs argue that Zion v. County of Orange, 874 F.3d 1072 (9th Cir. 2017), and Estate of Hernandez v. City of Los Angeles, 139 F.4th 790 (9th Cir. 2025) (en banc), cert. denied, 146 S. Ct. 2746 (2026), clearly establish that Defendant was prohibited from shooting a suspect going down or down on the ground, because of a continuous duty to reassess threat level. Defendant's counterargument attempts to distinguish these cases because the decedents in those cases were holding knives, indicating different threat dynamics than the ones Defendant faced here. ECF No. 302 at 8. But the Ninth Circuit, did not, in either Zion nor Estate of Hernandez, limit the rule categorically to "edged weapons." While true that the threat levels may have been perceived differently, the test is as the Supreme Court instructed by Barnes: how "a reasonable officer would have understood and responded" to the situation under the totality of the circumstances with "no time limit." 145 S. Ct. at 1354.

More fundamentally, Defendant's own cited authorities provide the standard that defeats his claim. In Plumhoff, the Supreme Court said it "would be a different case" if officers "initiated a second round of shots after an initial round had clearly incapacitated" the suspect. 572 U.S. at 777. And here, Plaintiffs supplied enough evidence from which a jury could find this "different case": that some of Defendant's rounds were fired after Decedent had already been incapacitated by the initial exchange, not as part of one uninterrupted burst. The jury also heard testimony from Fryman himself suggesting that he had time to assess the situation during his volley of shots. Defendant's characterization of a clean single volley, ending only once he understood that Decedent had actually been incapacitated, assumes the truth of various disputed facts the jury was entitled to resolve against him. The clear weight of the evidence does not compel his account over the finding of the jury.

2. Cumulative Errors

Defendant argues that the cumulative errors from the Court—specifically, denying his request for special interrogatories, excluding admissible evidence about the Decedent's intentions while protesting, and providing an erroneous Fourth Amendment instruction to the jury—entitle

him to a new trial. ECF No. 280 at 16.

Defendant states that he sought a special interrogatory to support his qualified immunity and Rule 50 arguments because, without explicit factual findings from the jury, he can only rely on implicit determinations for these motions. Id. at 17. However, the Court engaged in extensive analysis of the request over multiple trial days, ECF No. 265 at 6–8; ECF No. 268 at 243; ECF No. 270 at 21, and it stated concerns about the specific questions requested by Defendant. On the record, the Court explained that a single question asking only whether Decedent raised the rifle would not capture the full reasonableness inquiry, since "he could have raised it and dropped it immediately . . . [t]hat wouldn't authorize them to continue shooting if he was no longer a threat," and separately, that "the question about the rifle being raised doesn't address the issue of him being potentially shot when he's falling to the ground or on the ground and the rifle not pointing at them." ECF No. 268 at 243. In other words, the single question by itself could not address the various factual scenarios that the jury needed to resolve to reach its verdict. The presentation of the one question would have suggested to the jury that various other facts surrounding the raising or not of the rifle were not relevant to its inquiry. This would have been and is contrary to the law and the instruction that the Court gave. And in finding this Defendant liable and not the other Shooting Officers, the jury clearly reached different factual conclusions for the various officers involved.

Fryman also challenges the exclusion of evidence that Decedent antagonized LVMPD officers on Fremont Street minutes before the shooting, as well as his text messages and social media posts, and the illegal weapons found on his person. See Plaintiffs' Motion *in Limine* No. 1 (ECF No. 141, granted at ECF No. 176); ECF No. 280 at 21. The Court excluded this evidence because none of this information was known to the Shooting Officers at the time and was therefore not relevant to what they perceived and would only be used as improper character evidence. ECF No. 195 at 14. Defendant argues that Plaintiffs opened the door to this evidence by repeatedly eliciting, over his objection, that Decedent was lawfully exercising his right to bear arms and was simply fearful and walking to his car. ECF No. 280 at 22. Defendant contends that this was evidence itself of Decedent's intentions and motivations that, according to Defendant, were equally unknown to the officers and equally barred by the same ruling. The Court does not accept

that characterization for the same reasons it rejected that argument during trial. ECF No 267 at 19–23. It appears to the Court that Plaintiffs sought to describe what Decedent was actually doing during the encounter, which would feed into the separate First Amendment claim's protected activity element, and was not offered as Defendant's excluded evidence was, as character and propensity evidence about unrelated prior conduct from a different time and place. Moreover, the jury heard evidence from the Decedent's father as to his intentions, including Decedent's intent to take a rifle and bulletproof vest to the protest.

And even accepting Defendant's understanding of Boyd v. City & Cnty. of San Francisco, 576 F.3d 938 (9th Cir. 2009), as recognizing that motive-and-intent evidence can be relevant in an excessive-force case for a purpose other than the officer's own perception, Defendant has not demonstrated the exclusion more probably than not affected the verdict. The central question for the jury on the excessive-force claim against Defendant was what he individually perceived, not Decedent's activities on Fremont Street twenty to forty minutes before their interaction began or messages Defendant would not have seen. Defendant's own detailed testimony about his perceptions was fully before the jury, and thus even if there was an error, it could not have been prejudicial.

Defendant also challenges the language "pointing a weapon at an officer or civilian as if one is going to fire the weapon" from the Court's Jury Instruction No. 7. ECF No. 280 at 26. This argument was waived. At the charging conference, defense counsel initially proposed changing this language to "in a threatening manner." ECF No. 270 at 7. When the Court asked what that change was meant to capture, counsel explained his concern was a mistake-of-fact situation—that the jury should be allowed to find that an officer could have reasonably perceived a threat even if the weapon was actually aimed at no one. But when the Court asked counsel if adding a separate mistake-of-fact instruction would resolve Defendant's concern, counsel confirmed that it would, telling the Court, "If you added that, then I'm fine." ECF No. 270 at 9. Rule 51 requires a party to object to a jury instruction on the record before the instructions and arguments are delivered, and an objection not timely raised is waived. FED. R. CIV. P. 51(c); Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1109 (9th Cir. 2001). The Court agreed to an instruction he

requested in exchange for his withdrawal of his objection to the language, so Defendant cannot now challenge that same language after an adverse verdict. That alone disposes of this argument, but the Court also rejects it on the merits.

The Court's instruction did not improperly inject a subjective intent element into the objective-reasonableness analysis. Read in context, "as if one is going to fire the weapon" describes observable, threatening conduct visible to a reasonable officer, in contrast to merely holding a weapon not pointed at anyone. The instruction also expressly told the jury that the officers' subjective intent or motive "is not" relevant to reasonableness. Caballero v. City of Concord, 956 F.2d 204 (9th Cir. 1992), which ordered a new trial based on a district court incorrectly instructing the jury about an intent element, is distinguishable because it involved an instruction requiring proof of the officer's own subjective intent, not a description of the suspect's visible conduct. Defendant further relies on Estate of Strickland v. Nevada County, 69 F.4th 614, 620 (9th Cir. 2023), for the proposition that officers may never be asked to assess a suspect's apparent intent. But that argument fares no better. An instruction from the court about whether a weapon was raised as if to fire is merely a descriptive way to ask the jury to consider how apparent the threat would be to a reasonable officer in the moment. It is not a demand for a retrospective inquiry into whether the suspect actually intended to raise the weapon as if to fire. Indeed, this argument undercuts Defendant's own arguments elsewhere in his motion, where he argues Decedent's evident fear and other circumstantial evidence of his state of mind should have been admitted as relevant to the reasonableness of the officers' perceptions, an argument that itself depends on a suspect's apparent intent being a legitimate part of the objective inquiry.

The split verdict itself directly addresses Defendant's prejudice argument. The identical instruction applied to all four Shooting Officers, three of whom received verdicts in their favor. The instruction accurately directed the jury to assess how objectively threatening Decedent's conduct was individually from the position of each defendant. The verdict against Defendant reflects an individualized assessment of his particular circumstances. No individual error warrants a new trial. Evaluated cumulatively, the alleged errors do not establish fundamental unfairness.

Defendant's Motion for New Trial is denied. To the extent Defendant has raised arguments

not explicitly addressed above, the Court finds Plaintiffs' briefing persuasive and incorporates it by reference.

***ii. Motion to Alter or Amend the Judgment***

1. Nevada Battery Claim

Fryman asks the Court to reduce the battery award against him to conform to Nevada's statutory cap on damages recoverable against a political subdivision or its employees acting within the scope of employment. ECF No. 280 at 27 (citing Nev. Rev. Stat. § 41.035; Cnty. of Clark ex rel. Univ. Med. Ctr. v. Upchurch, 114 Nev. 749, 754, 961 P.2d 754, 758 (1998)). Plaintiffs did not address this request in their opposition and have therefore conceded that a cap applies. The Court agrees that application of the cap is not discretionary. NRS 41.035(1) provides that a qualifying tort award "may not exceed" the statutory limit, and a judgment that exceeds it must be amended to conform. Upchurch, 114 Nev. at 754.

The Court does not simply adopt the cap currently codified in NRS 41.035, because the cap has been increased twice since Decedent's death and each increase, by its own terms, applies only prospectively. The cap was $100,000 per claimant before July 1, 2020. Effective July 1, 2020, it was raised to $150,000 per claimant, but the enacting legislation expressly limited that increase to "a cause of action that accrues on or after July 1, 2020, but before July 1, 2022." S.B. 245, 80th Leg. §§ 1-3 (Nev. 2019) (Legislative Counsel's Digest). Effective July 1, 2022, the cap was raised again to $200,000 per claimant, the figure presently in force, but is likewise applicable only to causes of action accruing on or after that date. Id. § 1.5. "A cause of action accrues when the right to sue arises." Id. (citing Clark v. Robison, 113 Nev. 949, 951 (Nev. 1997)); accord Petersen v. Bruen, 106 Nev. 271, 274, 792 P.2d 18, 20 (Nev. 1990). For a battery claim like this one, the cause of action accrues when the "injured party discovers or reasonably should have discovered facts supporting a cause of action." North v. CoreCivic, Inc., 561 P.3d 50 (Nev. App. 2024).

Defendants killed Decedent on June 1, 2020, one month before the first of these two increases took effect. His cause of action would have accrued from the date of the injury. Because the Nevada battery claims arising out of Decedent's death accrued before July 1, 2020, neither the $150,000 figure nor the $200,000 figure now codified applies. The $100,000-per-claimant cap in

effect at the time the cause of action accrued controls. See S.B. 245 § 2 (Nev. 2019).

The Court grants this portion of Defendant's motion. The judgment on the Nevada battery claim is amended to award $100,000 to Plaintiff Jeanne Llera and $100,000 to Plaintiff Jorge L. Gomez, for a total of $200,000, replacing the jury's original award of $1,250,000 to each. The remainder of the judgment is unaffected by this reduction.

2. Fourth Amendment Remittitur

Defendant also asks that the Court remit the $2,500,000 awarded to the Estate for the Fourth Amendment violation. He supports his argument on three bases: (1) no evidence establishes that any of his seven rounds struck Decedent at all; (2) even if they did, it is undisputed that he did not fire the fatal shot since both parties' medical experts appeared to agree that the fatal wound was to Decedent's head, a wound that was caused by a rifle round, while Defendant fired a handgun; and (3) the total window of pain and suffering before Decedent died was brief. ECF No. 280 at 28. On that basis, Defendant argues that under Bell, 108 F.4th at 809, the award against him should have been capped at $150,000. Id. at 29.

The Court is still not persuaded that the cap here should be $150,000 for the same reasons as it was not persuaded when Defendant Squeo made the argument. The $150,000 figure in Bell was tied to a plaintiff who suffered abrasions and bruising from a two-minute cell transfer, required no medical treatment, and had fully recovered with no lasting pain by the time his trial took place. Id. at 833–34. Despite how Defendant presents the facts—that "it cannot be disputed that the plaintiff did not suffer any lasting injuries because he quickly lost his life," ECF No. 280 at 29—there was plenty of evidence at trial to dispute that characterization. Plaintiffs' expert testified that the shot to Decedent's back—where his back was exposed to the shooters—was independently fatal, separate from the head wound. ECF No. 272 at 214. Plaintiffs' expert also testified that Decedent remained alive for some period after sustaining his wounds and did not lose consciousness instantly. Id. at 203. The jury needed only a reasonable evidentiary basis on which to assess the severity and consequences of the violation it found, and this record supplies one. Bell itself cautions against treating any single figure as a fixed ceiling across cases: "Whether due to inflation or changing attitudes toward certain types of official misconduct, a damages award based

on emotional distress can be substantial if a plaintiff presents sufficient evidence to support it." Bell, 108 F.4th at 832. Deferring, as it must, to the jury's assessment of the evidence and the severity of the violation it found, the Court cannot conclude that $2,500,000 is so grossly excessive, or so clearly unsupported by the evidence, as to shock the conscience. Defendant's request for remittitur of the Fourth Amendment award is denied.

***iii. Renewed Motion for Judgment as a Matter of Law***

Because Fryman has not met the lower Rule 59 standard, he cannot meet the heightened Rule 50(b) standard, and the Court incorporates its reasoning above by reference. The Court now also addresses his independent arguments.

Defendant's primary argument for judgment as a matter of law is that the verdicts in favor of Defendants Emerton, Ferguson, and Locher necessarily established that Decedent raised his rifle "as if to fire," and that on this established fact—given that Defendant Fryman fired simultaneously with the others in one continuous volley—no reasonable jury could find his shots individually unreasonable. ECF No. 282 at 18.

The Defendant's argument initially fails because it assumes that the jury decided the facts in the same way as to each officer defendant. This was not required for the jury's split verdict. The jury heard testimony that the officers were in different positions to observe the Decedent. The officers themselves provided varying and at times conflicting testimony about what they observed as to the Decedent's actions, including when they did or did not see him raise a gun in their direction. They were in different positions when they fired their weapons, and they therefore observed the Decedent from different angles. Moreover, the jury could simply have chosen to disbelieve the testimony of Defendant Fryman that he ever saw a weapon raised in his direction, and further disbelieve him when he said that he felt threatened. As noted, Defendant Fryman gave demonstrably rambling and conflicting testimony; the jury could have discredited his entire testimony leading to an entirely different factual finding as to Defendant Fryman. Defendant cannot impute findings as to one defendant to others. This is precisely why there is an instruction directing jurors not to do this.

Defendant cites Wilkinson v. Torres, 610 F.3d 546, 552–53 (9th Cir. 2010), for the related

proposition that it makes no difference how many rounds an officer fires within a justified volley. In Estate of Hernandez, the Ninth Circuit specifically instructs that reading Wilkinson in that way is incorrect:

> Defendants characterize Wilkinson v. Torres, 610 F.3d 546 (9th Cir. 2010), as standing for the principle that "officers cannot reasonably be expected to immediately perceive a change in a suspect's threatening behavior when firing in rapid succession." To the contrary, Wilkinson did not authorize officers to "shoot mindlessly" until the suspect was dead, but rather recognized that officers may need "to reevaluate whether a deadly threat has been eliminated after each shot" if circumstances permit. Id. at 552. The officer in Wilkinson complied with this requirement "by ceasing fire after he perceived that ... the threat had been eliminated." Id. The issue was factual—the parties disputed whether the officer reasonably could have perceived that the threat had ended earlier, and we held that the officer's stated perception of an ongoing threat was "uncontradicted by any evidence in the record. Est. of Hernandez,139 F.4th at 801 (9th Cir. 2025).

Unlike the officer in Wilkinson, Defendant's perception that Decedent remained a threat through his seventh shot is contradicted by record evidence, including the forensic and expert testimony discussed above. As in Estate of Hernandez, the issue here is factual: whether circumstances permitted reassessment. The Court cannot grant Defendant's motion for judgment as a matter of law under this reasoning because it would require resolving factual disputes in Defendant's favor.

Plaintiffs also argue that Defendant's mixed-general-verdict theory is independently waived because he did not object to the potential for inconsistent verdicts, or seek a special interrogatory tailored to that theory, before the case was submitted to the jury. In his reply, Defendant disputes this characterization and frames his argument as an application of law to facts the jury necessarily found rather than an inconsistency challenge. ECF No. 302 at 3. He points to his oral Rule 50(a) motion, made at trial on October 28, 2025, and preceded by a supplemental trial brief, ECF No. 235, as having preserved the single-continuous-volley argument on the merits. Id. The Court need not resolve this preservation dispute because Defendant's motion fails on the merits for the reasons above, regardless of whether the argument was properly preserved.

Defendant separately argues that his motion for judgment as a matter of law should be granted because he is entitled to qualified immunity. He argues that no law clearly established, at the time of the shooting, that an officer firing within a single continuous volley alongside

colleagues who were themselves found to have acted reasonably could still be individually liable for shots fired as the threat was ending. Id. at 7. The Court denied qualified immunity pre-trial, and it affirms that reasoning again now.

This Court already held that "it has been clearly established in this Circuit for over twenty years that law enforcement officers may not kill an armed suspect that 'does not pose an immediate threat to their safety or to the safety of others,'" and denied qualified immunity because the disputed facts material to that question had to be resolved by a jury. ECF No. 120 at 19 (quoting Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997)). The jury has now resolved those facts, individually as to each Shooting Officer. Defendant now tries to narrow the rule to be about a continuous multi-officer volley of gunshots. Even so, by June 2020, the Ninth Circuit had already held in Zion v. County of Orange, 874 F.3d 1072 (9th Cir. 2017), that an officer violates the Fourth Amendment when he continues to shoot a suspect on the ground and who appears incapacitated, without reassessing whether the threat that suspect posed persists. Id. at 1076. Defendant argues that the shots in Zion were distinct from his because his were in a single volley compared with that case's "multiple distinct volleys with measurable gaps for officers to reassess." ECF No. 282 at 8. But Defendant mischaracterizes the description. The Ninth Circuit described the two volleys as coming "in rapid succession, without time for reflection." 874 F.3d at 1077. The Ninth Circuit found that there was a triable issue on the second volley because the suspect had fallen and stopped posing a threat, and "a reasonable officer would reassess the situation rather than continue shooting" regardless of how little time there was to think it all over. Id. at 1075. The duty to reassess as emphasized in Zion, and enforced by precedent later, is not only triggered by a gap in time but by a change in the objective circumstances that a reasonable officer would perceive even in a fast encounter. The jury's individualized verdict against Defendant reflects an officer-specific factual dispute about what each officer perceived. Those are disputes that the jury has already resolved against this Defendant on a sufficient evidentiary record, and are not questions of law this Court may revisit on a Rule 50(b) motion. Thus, Defendant's Renewed Motion for Judgment as a Matter of Law is denied.

**C. Defendants' Joint Objection to Plaintiffs' Bill of Costs**

Plaintiffs submitted a Bill of Costs on January 6, 2026, requesting $18,674.72. ECF No. 286. Defendants jointly objected on February 3, 2026, on three items: (1) $500.00 for Plaintiffs' counsel's verified petition to practice (*pro hac vice* admission); (2) $2,553.75 in transcript costs; and (3) $615.91 in postage costs. Defendants ask the Court to reduce the Bill of Costs by $3,669.66 in total. ECF No. 296. Plaintiffs did not file a response to the objection.

Under Federal Rule of Civil Procedure 54(d)(1), a prevailing party may recover costs other than attorneys' fees unless a federal statute, the rules, or a court order provides otherwise. 28 U.S.C. § 1920 lists the categories of costs that a federal judge may tax. All three categories that Defendants identify fall outside of those categories. First, the $500.00 in pro hac vice admission fees is not recoverable. Section 1920(1)'s reference to "[f]ees of the clerk" does not encompass fees for temporary admission to practice. Kalitta Air LLC v. Cent. Tex. Airborne Sys., Inc., 741 F.3d 955, 957–58 (9th Cir. 2013). LR 54-11(f) expressly lists pro hac vice admission fees among costs not ordinarily allowed. Second, the $2,553.75 in transcript costs is not recoverable. LR 54-3 permits taxing the cost of pretrial, trial, and post-trial transcripts only where the transcript was requested by the Court or prepared under a court-approved stipulation, and expressly excludes copies obtained for an attorney's or party's own use absent a prior court order. Nothing in the record shows these transcripts were court-requested or stipulated. See Green v. Daniels, No. 2:21-cv-00681-RFB-MDC, 2024 WL 4346346, at *2 (D. Nev. Sept. 29, 2024). Third, the $615.91 in postage costs is not recoverable. Postage is not among the categories listed in Section 1920 and is properly treated as general office overhead. LR 54-11(j) expressly excludes "[f]ees for general office overhead." See Nihart v. Nat'l Park Serv., No. 2:12-cv-00291-APG-GWF, 2015 WL 13674184, at *1 (D. Nev. Apr. 28, 2015).

Defendants' Joint Objection to Plaintiffs' Bill of Costs is sustained. The Bill of Costs is reduced by $3,669.66, from $18,674.72 to $15,005.06, and the Clerk of Court is directed to tax costs against Defendants in the latter amount.

**D. Plaintiffs' Motion for Statutory Attorneys' Fees**

42 U.S.C. § 1988(b) authorizes an attorneys' fees award to a party who prevails on a claim brought pursuant to 42 U.S.C. § 1983. For purposes of attorneys' fees, a plaintiff may be

considered the "prevailing party" if they succeed on "any significant issue in litigation which achieves some of the benefit they sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). A plaintiff who loses on his or her only federal claim and recovers solely on a pendent state-law claim is not a "prevailing party" under Section 1988 as to that plaintiff's own time. Mateyko v. Felix, 924 F.2d 824, 828 (9th Cir. 1990). The forum-rate rule presumptively governs, unless Plaintiffs show that no willing and able local counsel was available. Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 979 (9th Cir. 2008); Barjon, 132 F.3d at 501–02.

Plaintiffs request $2,909,230 in attorneys' fees under 42 U.S.C. § 1988. ECF No. 285 at 22. That number includes $1,454,615 lodestar (based on requested rates of $1,400/hour for Mr. Galipo, $950/hour for Mr. Valenzuela and Mr. Gonzalez, and $200/hour for paralegal Leslie De Leon, applied to 1,267.15 total hours) doubled by a 2.0 multiplier. Defendants respond that no more than $549,952 is warranted, based on Nevada forum rates of $700/$475/$475/$100, a set of specific hour reductions (excluding time spent exclusively on behalf of the non-prevailing Parent-Plaintiffs, reducing block-billed and duplicative entries, and reducing time attributable to the Shooting Officers found not liable and to Mr. Gonzalez's limited trial role), a further 10 percent reduction for limited success, and no multiplier.

Jeanne Llera and Jorge L. Gomez, in their individual capacities as Decedent's parents, did not prevail on any federal claim. Their Fourteenth Amendment claim was dismissed in its entirety at summary judgment, so their only trial success was the state battery claim. Time billed exclusively for tasks attributable to the Parent-Plaintiffs in their individual capacities—including any time spent responding to written discovery served only on them, preparing for and defending their individual depositions, litigating the sanctions motion and related evidentiary hearing directed at them individually, and the portions of trial time attributable solely to their own testimony—cannot be compensated under Section 1988. Of course, this exclusion does not extend to time spent on behalf of the Estate, which is unquestionably a prevailing party under Section 1988, given the favorable verdicts obtained on its behalf under the First and Fourth Amendments.

Further, the relevant market is the District of Nevada, not Southern California, unless Plaintiffs could show that no willing and able local counsel was available. Camacho, 523 F.3d at

979; Barjon, 132 F.3d at 501–02. Such a showing was not made here where Plaintiffs' own choice of co-counsel, Mr. Gonzalez, is a Las Vegas attorney with thirteen years of civil rights trial experience and who was, by his own declaration, retained because of his capabilities in litigating a case like this one. Defendants also submit an unrebutted list of Nevada attorneys who regularly litigate Section 1983 excessive-force cases in this District.

With that said, the Court is not required to ignore Mr. Galipo's well-documented, specialized experience in officer-involved shooting litigation, nor the complexity of a case like this which combines First Amendment retaliation and Fourth Amendment excessive-force claims that arose out of a fatal, multi-officer shooting following a protest against police brutality. The Court's review of recent decisions in the District of Nevada confirms the general range: hourly rates of $550 to $750 have recently been found reasonable for attorneys with thirty-eight or more years of experience, and $500 to $641 for attorneys with seventeen to thirty-eight years. See, e.g., WSOU Invs., LLC v. Salesforce, Inc., 2024 WL 307617, at 4*4 (D. Nev. Jan. 26, 2024). Mr. Galipo's requested rate exceeds that general range, but the Court finds that he should be treated differently than a generalist litigator of comparable seniority because he is recognized as a prominent trial lawyer with a specialty in these kinds of cases. That experience was clearly demonstrated to the Court in this case to his clients' benefit. That same specialty resulted in an $850/hour rate for elite local trial counsel in Mayorga v. Ronaldo, 656 F. Supp. 3d 1218, 1232 (D. Nev. 2023), but that rate is now more than two years old, which Plaintiffs' counsel points out in their reply. ECF No. 304. Indeed, courts in this District have recognized that a previously awarded rate may be adjusted upward to reflect the passage of time and intervening inflation. Humphries v. Button, No. 2:21-cv-01412-ART-EJY, 2025 WL 872613, at *2 (D. Nev. Mar. 20, 2025). Applying that adjustment to the benchmark from Mayorga supports a rate of $1,050/hour for counsel of comparable specialization and standing as Mr. Galipo.

The factors from Kerr, 526 at 69–70, corroborate this conclusion. This case required substantial time and work over years of litigation that culminated in a ten-day jury trial. It presented difficult questions about how the First Amendment retaliation and Fourth Amendment excessive-force doctrines interact. The case was also taken on a contingency basis, further justifying a higher

rate than a comparable hourly engagement, and it produced a substantial result for Plaintiffs on two independent constitutional claims. Those factors together support the rates set below.

Weighing the comparable Nevada rate awards cited by both sides against the out-of-district rates Plaintiffs seek, the Court sets the following rates: $1,050/hour for Mr. Galipo; $600/hour for Mr. Valenzuela and Mr. Gonzalez, both experienced civil-rights trial counsel who actively examined witnesses and argued motions at trial; and $125/hour for Ms. De Leon.

Defendants also seek specific, itemized reductions to the hours claimed and the underlying billing records support them. The raw hours billed, before any reduction, were: Mr. Galipo, 632.3 hours; Mr. Valenzuela, 425.3 hours; and Mr. Gonzalez, 164.6 hours. ECF No. 285 at 22. Defendants document instances where Mr. Galipo and Mr. Valenzuela both billed substantial time preparing for the same deposition, motion, or hearing on the same day. ECF No. 295, Ex. E. For example, both separately billed deposition-preparation time for the depositions for Defendants on identical dates, as well as other comparable instances involving Mr. Gonzalez. Defendants separately document entries, mostly by Mr. Valenzuela, that block-bill multiple distinct tasks together without allocating time among them. But these two categories flagged by Defendants overlap substantially.

There are two accepted methods for reducing a fee request. One is an hour-by-hour exclusion of specific entries, and the other is an across-the-board percentage cut where the billing records document a more pervasive pattern rather than a handful of isolated entries, <u>Gonzalez v. City of Maywood</u>, 729 F.3d 1196, 1203 (9th Cir. 2013); <u>Gates v. Deukmejian</u>, 987 F.2d 1392, 1399 (9th Cir. 1992). Defendants' proposed reductions also account for time billed exclusively on behalf of the Parent-Plaintiffs (discussed above), as well as time spent on discovery and trial testimony attributable specifically the officers found not liable (Emerton, Ferguson, and Locher), and a reduction to Mr. Gonzalez's trial-preparation and attendance hours to reflect his more limited role at trial. Plaintiffs' reply did not specifically rebut these itemized reductions, resting instead on a broader argument that any reduction for limited success is unwarranted. Having reviewed the underlying billing records and exhibits, the Court finds Defendants' proposed reductions reasonable and adopts them, yielding the following compensable hours: Mr. Galipo, 569.1 hours;

Mr. Valenzuela, 324.8 hours; Mr. Gonzalez, 113.5 hours; and Ms. De Leon, 44.95 hours.

Finally, the Court agrees with Plaintiffs that no reduction for degree of success is warranted and rejects Defendants' broader argument that the verdict reflects only "limited success." ECF No. 295 at 10. Plaintiffs obtained a substantial jury verdict establishing two independent constitutional violations and a state battery claim, in a thoroughly litigated case. The claims share a common core of facts, so the Court will not attempt to allocate hours claim-by-claim, but instead focuses on the significance of the overall relief obtained in relation to the hours reasonably expended. Hensley, 461 U.S. at 435; Webb v. Sloan, 330 F.3d 1158, 1169 (9th Cir. 2003). When a plaintiff obtains excellent results, their counsel is typically entitled to a fee that fully compensates and encompasses all hours reasonably expended. Even though Plaintiffs here did not prevail against every named defendant, Plaintiffs did obtain meaningful, substantial relief here. City of Riverside v. Rivera, 477 U.S. 561 (1986); Bouman v. Block, 940 F.2d 1211, 1237 (9th Cir. 1991). No further reduction to the lodestar is applied on this basis.

However, the Court denies Plaintiffs' request for a 2.0 multiplier. There is a strong presumption that the lodestar figure itself represents a reasonable fee, rebuttable only in rare and exceptional circumstances. Dague, 505 U.S.at 562; Edmo, 97 F.4th at 1168. This case, while significant, was not so rare or exceptional as to warrant doubling the lodestar, and the legal theories, while requiring proper legal skills to litigate successfully, were not novel. And courts evaluating comparable fee requests by this same lead counsel have consistently declined to apply a multiplier. See I.H. v. California, No. 2:19-CV-02343-DAD-AC, 2025 WL 1158975, at *3 (E.D. Cal. Apr. 21, 2025); Donastorg v. City of Ontario, No. EDCV18992JGBSPX, 2021 WL 6103545, at *7 (C.D. Cal. Sept. 23, 2021); Est. of Casillas v. City of Fresno, 2020 WL 869117, at *16 (E.D. Cal. Feb. 21, 2020).

Applying the rates and hours set out above:

Mr. Galipo: 569.1 hours × $1,050/hour = $597,555.00

Mr. Valenzuela: 324.8 hours × $600/hour = $194,880.00

Mr. Gonzalez: 113.5 hours × $600/hour = $68,100.00

Ms. De Leon: 44.95 hours × $125/hour = $5,618.75

TOTAL FEE AWARD: $866,153.75.

As such, the Court grants in part Plaintiffs' motion for attorneys' fees, in the amount of $866,153.75. This award is limited to the hours documented in the original motion, ECF No. 285, and does not include time spent preparing the reply in support of that motion or time spent opposing the post-trial motions resolved in this Order. Plaintiffs may submit a timely, itemized supplemental application for that additional time, calculated at the rates set forth above. The Court will not entertain a renewed request for a multiplier on that supplemental time absent a substantial change in circumstances.

**E. Defendants' Joint Motion to Stay Execution of the Judgment**

Finally, Defendants move to stay execution of the judgment. ECF No. 283. They argue first that Rule 62(f) entitles them to an unsecured stay as of right under Nevada law; second, that the traditional four-factor stay standard independently supports a stay; and third, in the alternative, that any supersedeas bond under Rule 62(b) should be capped at no more than 50% of the judgment as reduced by NRS 41.035. Plaintiffs opposed this motion. Plaintiffs did not respond to the four-factor argument, but it fails regardless. Its first and most important factor, a strong showing of likelihood of success on the merits, fails for the reasons already described throughout this Order, which denies nearly all of Defendants' arguments on the merits. See Applications in Internet Time, 2024 WL 5088486, at *1-3 (denying an unsecured stay based on failing the first factor alone). The Court proceeds to the two remaining, better-briefed grounds.

1. FED. R. CIV. P. Rule 62(f) and NEV. R. CIV. P. 62(e)

For FED. R. CIV. P. Rule 62(f) to apply, the judgment must be a lien on the judgment debtor's property under state law, and that state's law must also provide for a stay if the case were in state court. The parties appear to agree that the judgment is a lien under Nev. Rev. Stat. § 17.150(2), but they disagree about whether NEV. R. CIV. P. 62(e) which exempts "an officer or agency" of the State or a political subdivision from posting a bond, extends this exception to individual officers held personally liable for on-duty conduct, as opposed to ones sued in their official capacity.

The legal question here is a close one. NEV. R. CIV. P. 62(e) does not contain an "official

capacity" qualifier and Nevada's discretionary-immunity statute uses the same unqualified term "officers" for individual-capacity defendants. See Scafidi v. Las Vegas Metro. Police Dep't, 966 F.3d 960, 965 (9th Cir. 2020) (citing Nev. Rev. Stat. § 41.032).[1] But the Court must also consider the purpose of exempting government defendants from the bond requirement, that is, to spare the public a cost the government's own solvency makes unnecessary. And that purpose seems to extend less naturally to an officer held personally liable because his own conduct, not the government's, caused injury. At the end of the suit, Defendants Squeo and Fryman are the named judgment debtors, not a government entity (even if LVMPD will indemnify them under Nev. Rev. Stat. § 41.0349 because the jury did not award punitive damages). And reading Nev. R. Civ. P. 62(e) as applying to any officer sued for on-duty conduct would leave Rule 62(b)'s bond requirement superfluous for an entire class of Nevada government defendants, or, indeed, an entire class of government defendants in any state where the judgment would be a lien. The Court declines to extend the Rule in this manner, and the Court declines Defendants' request to certify it to the Nevada Supreme Court. Sending it to the Nevada Supreme Court would delay a discrete procedural dispute for relatively modest stakes since the Court can resolve the issue on Defendants' alternative grounds based on the Dillon factors below.

2. Rule 62(b) and the Dillon Factors

Fed. R. Civ. P. Rule 62(b) supplies an independent path to a stay regardless of how Nev. R. Civ. P. 62(e) is ultimately construed as it relates to Rule 62. A party may obtain a stay by posting a bond or other security, and an unsecured stay under that Rule is reserved for unusual circumstances assessed under the Dillon factors.

The first three factors—the complexity of collecting against the debtor, the time required to collect after appeal, and the degree of confidence that funds are available—favor Defendants. LVMPD is a government entity, established and stable, not a debtor whose assets would be

---

[1] In Scafidi, the Ninth Circuit also cites Davis v. City of Las Vegas, 478 F.3d 1048, 1060 (9th Cir. 2007), for the principle that "where an officer arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an arrest, but instead because of hostility toward a suspect or a particular class of suspects . . . or because of a willful or deliberate disregard for the rights of a particular citizen or citizens, the officer's actions are the result of bad faith and he is not immune from suit." Id. The Court does not need to reach a decision on these grounds given the simpler explanation above.

difficult to locate or collect against. The Court finds Defendants' showing of their ability to pay, including the declaration from LVMPD's Director of Risk Management Bernadine Welsh, is substantial. LVMPD has immediate access to more than $53 million and represents it will pay the judgment in full within thirty days of any final resolution. Although Plaintiffs questioned municipal budget timelines, they did not submit evidence contradicting LVMPD's representations about its funds, and, in any case, LVMPD is a distinct entity from the City more broadly.

In contrast, the fourth and fifth factors—whether it would be a waste of money to make Defendants' post a bond and whether a bond would endanger other creditors—weigh against Defendants' request for an unsecured stay. A strong ability to pay does not by itself mean requiring a bond would be a waste of money. Given the size of this judgment and Plaintiffs' legitimate interest in security against the ordinary risks of delay and changed circumstances over the course of any appeal, the Court is not persuaded that no security at all is warranted. The Court is persuaded, however, that a bond in the full amount as Plaintiffs requested is not warranted by the facts in the record. Defendants proposed a reasonable alternative: a bond capped at 50 percent of the judgment (reduced by Nev. Rev. Stat. § 41.035). The Court adopts this proposal.

Defendants' Joint Motion to Stay Execution of the Judgment is denied to the extent it seeks an unsecured stay. Any stay of execution pending resolution of further post-trial proceedings or appeal shall be conditioned on Defendants posting a supersedeas bond, approved by the Court, in the amount of $2,100,000 (50% of the $4,200,000 judgment as amended by this Order). The stay shall take effect upon the Court's approval of the bond. See FED. R. CIV. P. 62(b). The parties may stipulate to an alternative form of security or a modified amount, subject to the Court's approval.

## V. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant Squeo's Renewed Motion for Judgment as a Matter of Law (ECF No. 276, 277) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Squeo's Motion for a New Trial and Remittitur (ECF No. 277) is **DENIED** in its entirety, including as to remittitur.

**IT IS FURTHER ORDERED** that Defendant Fryman's Motion for a New Trial (ECF No. 280) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Fryman's Motion to Alter or Amend the Judgment (ECF No. 281) is **GRANTED IN PART** and **DENIED IN PART**. The judgment on Plaintiffs' Nevada battery claim is **AMENDED** to award $100,000 to Plaintiff Jeanne Llera and $100,000 to Plaintiff Jorge L. Gomez, for a total of $200,000, pursuant to NRS 41.035. Defendant Fryman's request for remittitur of the $2,500,000 Fourth Amendment award is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Fryman's Renewed Motion for Judgment as a Matter of Law (ECF No. 282) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Stay Execution of the Judgment (ECF No. 283) is **DENIED** to the extent it seeks an unsecured stay. Any stay of execution shall be conditioned on Defendants posting a supersedeas bond of $2,100,000.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Statutory Attorneys' Fees (ECF No. 285) is **GRANTED IN PART**. Plaintiffs are awarded $866,153.75 in attorneys' fees under 42 U.S.C. § 1988. Plaintiffs may file a timely supplemental application for fees incurred both in litigating the fee motion itself and in opposing the post-trial motions resolved here.

**IT IS FURTHER ORDERED** that Defendants' Joint Objection to the Plaintiffs' Bill of Costs (ECF No. 296) is **SUSTAINED**. Plaintiffs' Bill of Costs (ECF No. 286) is reduced by $3,669.66, from $18,674.72 to $15,005.06. The Clerk of Court is directed to tax costs against Defendants in that amount.

**IT IS FURTHER ORDERED** that the total judgment, as amended by this Order, is now $4,200,000, made up of $1,500,000 against Defendant Squeo on the First Amendment claim, $2,500,000 against Defendant Fryman on the Fourth Amendment claim, and $200,000 against Defendant Fryman on the Nevada battery claim, plus post-judgment interest as provided by law.

**DATED:** September 30, 2026.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**